# EXHIBIT B

to Big E's Statement of Undisputed Facts
in Support of Motion for Summary Judgment

***Excerpts from the Deposition of Steve Sproles***

1

1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MASSACHUSETTS

3

4    ------------------------------)
     GCC MOVING, LLC and GARY       )
5    COOK d/b/a GCC MOVING          )
          Plaintiff                 )
6                                   )    C.A. NO. 1:16-cv-11538
            vs.                     )
7                                   )
     ESTES EXPRESS LINES, CORP.     )
8    D/b/a, alias, BIG E.           )
     TRANSPORTATION; and BIG E      )
9    TRANSPORTATION, LLC d/b/a,     )
     alias ESTES EXPRESS LINES;     )
10   JOHN DOES 1-10, JANE DOES      )
     1-10 and XYZ CORPORATIONS      )
11   1-10                           )
          Defendants                )
12   ------------------------------)

13

14            DEPOSITION OF STEVE SPROLES, a Witness in
       the above-entitled case, taken on behalf of the
       Plaintiff, before Patricia Quirk, CSR, Notary
15     Public in and for the State of Rhode Island, at
       the offices of Brainsky Levinson, LLC, 1543 Fall
16     River Avenue, Suite 1, Seekonk, MA 02771, on
       August 16, 2017, scheduled at 10:00 a.m.

17

18
     PRESENT:
19
     FOR THE PLAINTIFF....BRAINSKY LEVINSON, LLC
20                   BY:  MATTHEW I. SHAW, ESQUIRE

21   FOR THE DEFENDANT....SCOPELITIS GARVIN LIGHT HANSON &
                          FEARY
22                   BY:  JAMES T. SPOLYAR, ESQUIRE

23

24

25

**Rhode Island Court Reporting**

**Steve Sproles**

1          (DEPOSITION COMMENCED AT 10:08 a.m.)

2                        STEVE SPROLES

3          The Deponent, having been satisfactorily

4      identified and duly sworn by the Notary Public,

5      deposes and testifies as follows:

6                  EXAMINATION BY MR. SHAW

7              IT IS HEREBY STIPULATED AND AGREED, by

8      and between counsel for the respective parties,

9      that the witness will read and sign the deposition

10     transcript under the pains and penalties of

11     perjury; that the reading and signing is deemed

12     waived if not accomplished within thirty (30) days

13     of transcript delivery; and that the sealing,

14     filing, and certification of deposition transcript

15     are waived.

16              It is further stipulated and agreed that

17     all objections, except objections to the form of

18     the question and motions to strike, will be

19     reserved until the time of trial or pre-trial

20     hearing.

21  Q.  Good morning, Mr. Sproles.  My name is Matthew

22     Shaw, we just met a moment ago.  I represent GCC

23     Moving and Gary Cook doing business as a GCC Moving

24     in a lawsuit that's been filed against Estes

25     Express Lines Corporation, Big E Transportation,

**Steve Sproles**

1             It's very common for people to try and

2       speak over one another in a normal conversation.

3       We try and limit that with the stenographer taking

4       down everything that we're saying.  So, with that

5       being said, any questions?

6       A.   No.

7  Q.   Okay.  Mr. Sproles, it's my understanding that you

8       served as vice president of operations at Big E

9       Transportation; is that correct?

10      A.   No, vice president of operations for Level 2

11      Logistics, which was a division of Estes Express

12      Lines.

13 Q.   What is -- excuse me, I'll start again.

14            Level 2 Logistics, what is its

15      relationship to Big E Transportation?

16              MR. SPOLYAR:  Object to the form of

17      the question, requiring legal conclusion, lacking

18      foundation.

19      A.   Level 2 Logistics oversees the operations of

20      Big E Transportation via a service contract between

21      Big E Transportation and Estes Express Lines.

22 Q.   Could you describe your responsibilities as vice

23      president with Level 2 Logistics?

24      A.   I'm responsible for all day-to-day operations

25      of the company, as well as, all working with

**Steve Sproles**

1      counsel on legal matters.  That's it.

2  Q.   Are you familiar with the relationship between Big

3       E and Estes?

4                  MR. SPOLYAR:  Object to the form of

5       the question as vague and lacking foundation.  Go

6       ahead.

7  A.    I just explained that Level 2 Logistics is a

8       division of Estes, so that is the relationship that

9       I explained.

10 Q.   What is Big E's relationship to Level 2 Logistics?

11 A.    Level 2 Logistics manages the operations of

12      Big E Transportation via a service contract between

13      the two corporations.

14 Q.   I'm trying to determine whether Level 2 is a

15      separate company, or if it's part of Big E, can you

16      answer that?

17                 MR. SPOLYAR:  Object to the form of

18      the question as vague and requiring a legal

19      conclusion.  Go ahead.

20 A.    Level 2 Logistics is a division of Estes

21      Express.

22 Q.   And it's part of Big E Transportation?

23 A.    Big E Transportation is a wholly-owned

24      subsidiary of Estes Express Line.

25 Q.   And you work for Level 2?

**Steve Sproles**

1        A.    Uh-huh.

2    Q.    And they didn't have any issues on the driving

3          record or safety issues; is that correct?

4                      MR. SPOLYAR:  Object to the form of

5          the question as mischaracterizing the witness'

6          testimony.  Go ahead.

7    Q.    Is that correct?

8                      MR. SPOLYAR:  Go ahead and answer.

9        A.    I think I feel more comfortable answering the

10         previous question again.

11   Q.    Okay, and that question has long passed.

12               I think -- all right, let me -- I'm going

13         to show you a document and ask if you recognize

14         this?  That might be easier.

15       A.    Yes, I recognize that.

16   Q.    What is that?

17       A.    It's a worksheet that our managers would use

18         when trying to see if a potential contractor is

19         qualified.

20   Q.    And when you say, "manager," would that have been

21         Mike Rail in 2012?

22       A.    Yes.

23   Q.    And I'm sorry, I don't have copies of this.

24               I looked over the application for

25         employment, what type of inquiry to a previous

40

1      employer was made?

2      A.   DOT requires that we do a previous employment

3      check for the last three years for anybody that's

4      operating under Big E's DOT.

5   Q.  Is that a Big E requirement?

6      A.   It's a DOT requirement.

7   Q.  Independent of Big E's requirement, that's solely a

8      federal requirement?

9      A.   That's correct.

10  Q.  Okay.  Another box checked here, is annual driver

11     certification of violations, and you testified

12     briefly to that, is that a federal requirement or

13     is that a Big E requirement?

14              MR. SPOLYAR:  Object to the form of

15     the question, requiring a legal conclusion.  Go

16     ahead.

17     A.   It's a federal requirement.

18  Q.  And if you know, can you briefly describe for me

19     what a driver's certification of violations is?

20     A.   It's a document, FMCSA document, where the

21     driver lists any -- he fills out the document and

22     lists any violations he has on his driving record

23     in the last 12 months and signs certifying it.

24  Q.  Is that crosschecked, do you know, by Big E with

25     any state or municipal authority?

**Steve Sproles**

41

1        A.    Big E also gets a copy of abstract or MVR;

2        motor vehicle records.

3    Q.  Together with this, with the certification?

4        A.    That's correct, a certification is required

5        annually.

6    Q.  Is a motor vehicle report from -- do you know, if a

7        motor vehicle report from a municipal or state

8        authority is required, if at all?

9        A.    That's what I was referring to is a motor

10       vehicle record, yes.

11   Q.  But is that a Big E requirement, or is that a

12       federal requirement?

13                   MR. SPOLYAR:  Objection:  legal

14       conclusion.  Go ahead.

15       A.    Federal requirement.

16   Q.  Could you -- the next line is a driver's road test

17       certificate or equivalent, can you describe for me

18       what that is?

19       A.    It's another federal requirement that you have

20       to maintain.  There has to be in the driver's file

21       certifying that he has been tested and that you

22       know he can operate the vehicle safely.

23   Q.  Do you know what type of test that usually entails?

24       Is it a number of hours performed, or is it a

25       skills test?

**Steve Sproles**

1      A.   It can be an actual ride along with the

2           driver, or we can just take the endorsement on his

3           license as proof that he can operate.

4  Q.   Now, this qualification file checklist has a number

5           of items on it, do you know if they all need to be

6           checked off for an agent to be qualified?

7      A.   May I see it?

8  Q.   Yes.

9                     MR. SPOLYAR:  I'm going to object to

10          the form of the question as a legal conclusion.

11          Take your time, go ahead, and read it.

12     A.   Could you ask the question again, please?

13                    (QUESTION READ BACK)

14     A.   This checklist is for a manager to be sure

15          he's collected all the things to be in the driver

16          qualification file, it's a federal document.  All

17          things on here are required by FMCSA to be in the

18          driver qualification file.  This is also after

19          we've come to an agreement on a contract.

20 Q.   Okay, that's post contract?

21     A.   That's correct.

22 Q.   Okay.  Thank you.  You wouldn't even get to this

23          until you've -- you and the agent have come to

24          terms on the contract?

25     A.   That's correct.

**Rhode Island Court Reporting**

Steve Sproles

43

1  Q.   Are you familiar with the hiring of an employee

2       driver by Big E?

3                   MR. SPOLYAR:  Object to the form of

4       the question as lacking in foundation.  Go ahead.

5       A.   Big E has never had employee drivers.

6  Q.   Do you know if Estes Express has employee drivers?

7       A.   Yes, they do.

8  Q.   We discussed this, but you don't know how many?

9       A.   It's a fluid number.

10 Q.   So going back to the attention of contractors.

11      Once an application is filled out, and the various

12      information is sought by Big E, what's next?

13      A.   Please repeat that, I'm sorry.

14 Q.   I'm trying to go through the steps of the process

15      of pertaining an agent, so if I've missed one,

16      you'll have to correct me.

17           But as I understand it, Big E makes it

18      known that they need services of an agent.  A

19      potential agent will make an inquiry, that will

20      prompt some sort of meeting, telephone call, or

21      otherwise, between a potential agent, Big E, a

22      manager or somebody over at Big E.  That meeting

23      will involve obtaining some information from a

24      potential agent.  Some of that information is

25      included in the driver qualification file

**Steve Sproles**

1   Q.   -- Exhibit 2.  I have an Attachment A as the

2        contractor payment rates.  I have Supplement 1 to

3        Attachment A, Supplement 2 to Attachment A.  I have

4        Attachment B, contractor election form; and I have

5        Attachment D, equipment list; and then I have a

6        statement of lease?

7   A.   Yes.

8   Q.   These are included as attachments to Exhibit 2.

9        Are these the types of attachments that are typical

10       to other contracts with other agents?

11  A.   Yes.

12  Q.   Are these types of -- are these attachments the

13       type that would be negotiated between Big E and a

14       potential agent?

15                  MR. SPOLYAR:  Objection.  Go ahead.

16  A.   Attachment A could be negotiated.

17  Q.   How about Attachment B?

18  A.   No.

19  Q.   But it looks like Attachment B could be filled out

20       in a variety of ways by different potential agents;

21       is that correct?

22  A.   It's an election form, yes.

23  Q.   Attachment D is an equipment list?

24  A.   Correct.

25  Q.   And I'm sure each potential agent comes with

48

1          MR. SPOLYAR:  Objection:  Vague.  Go
2      ahead.
3      A.   Yes.
4  Q.   Okay.  So once the parties -- once Big E and a
5      potential agent come to terms on the contract, what
6      happens next?  The contract is executed and the
7      parties are ready to -- ready to perform.  What
8      happens next?
9      A.   The contractor, again, is provided services as
10     needed.
11 Q.   Does the contractor bring to the agreement any
12     equipment, typically, or does that change on a
13     contractor-by-contractor basis?
14     A.   The contractor always brings his own
15     equipment.
16 Q.   Can you describe that equipment, like what it is?
17     A.   That would be the power unit, and tools
18     needed.
19 Q.   What do you mean by power unit?
20     A.   It can be a straight truck, it can be a
21     tractor.
22 Q.   Beside the power unit or the tools, what else does
23     a typical agent bring in terms of equipment?
24     A.   That's all.
25 Q.   That's all, okay.  Is there any training that's

**Steve Sproles**

49

1       involved?

2                   MR. SPOLYAR:   Object to the form of

3       the question, that's vague.   Go ahead.

4       A.    The contractor, his employees, are shown how

5       to do the paperwork, and for whatever customer it

6       is, and -- if you call that training.   Could I

7       clarify that a bit?

8    Q.   Yes.

9       A.    Different customers have different

10      requirements, so they are shared -- the customer

11      requirements for where they are providing the

12      services.

13   Q.   When you talk about customers, are you talking

14      about, like, a single individual?   Are you talking

15      about a business?   Can you clarify what you mean by

16      "customer"?

17      A.    It would be a business.

18   Q.   Okay.   I'm going to clarify because I'm not sure I

19      understand.

20                  If an agent is retained as a contractor

21      for a customer, is this a one-time job, or is it a

22      job that goes over a period of time or -- what's,

23      generally, the scope of a contract?

24                  MR. SPOLYAR:   Objection:   vague and

25      compound.   Go ahead.

**Rhode Island Court Reporting**

**Steve Sproles**

50

1     A.   Generally, it would be for a period of time;

2     contracts are one year with an extension.  There's

3     not any one-time fix.

4  Q.  Excuse me, you mentioned it in terms of providing

5     services for a customer.  I don't think Big E would

6     hire an agent for one person or one business to do

7     one job, that's not how it works, is it?

8     A.   It isn't, that's correct.

9  Q.  It's a contract to provide services for a period of

10    a year, you say?

11    A.   That's the initial term of the contract,

12    correct.

13  Q.  And could that -- would that be to provide whatever

14    services Big E needs during that duration?

15             MR. SPOLYAR:  Objection: vague.  Go

16    ahead.

17    A.   Big E would present the contractor with their

18    needs, and the contractor can decide whether or not

19    to accept their work.

20  Q.  Those needs, what are they typically?  Are they

21    typically small job needs?  Are the needs fairly

22    consistent?  What types of employment or work can a

23    contractor expect?

24             MR. SPOLYAR:  Objection: vague.  Go

25    ahead.

Steve Sproles

1   A. Usually it's final-mile deliveries to end

2  customers or deliveries to businesses, distribution

3  centers, things like that, or retail outlets.

4 Q. How consistent is the workload?  Is it an every day

5  type of workload, or is it sporadic?

6      MR. SPOLYAR:  Objection:  vague,

7  speculation.  Go ahead.

8   A. It's generally every day; five days a week,

9  sometimes six days a week.

10 Q. In terms of training, you testified that Big E

11  would review paperwork with the agent contractor

12  and the customers' needs?

13      MR. SPOLYAR:  Object to the form of

14  the question as mischaracterizing the witness'

15  testimony.

16   A. Customer requirements.

17 Q. What does that typically involve in terms of

18  paperwork and customer requirements?

19   A. It's typically a proof of delivery document

20  that the customer signs, the contractor notes any

21  services provided.

22 Q. Does Big E have any employment policies or an

23  employee handbook that agents are required to

24  adhere to?

25      MR. SPOLYAR:  Object to the form of

52

```
 1          the question as vague.
 2          A.   No, we don't have any employees.
 3   Q.   So Big E doesn't have any employees working for it?
 4          A.   That's correct.
 5   Q.   They are a fully -- full contractor agent
 6        operation?
 7          A.   That's correct.
 8   Q.   What's the hierarchy of Big E in terms of delivery
 9        drivers or agents up the chain?
10                    MR. SPOLYAR:  Objection:  vague.  Go
11        ahead.
12          A.   Big E is managed through a service contract
13        between Big E and Estes Express.
14   Q.   Do you know who manages the contract on the Big E
15        side?
16                    MR. SPOLYAR:  Objection:  vague.  Go
17        ahead.
18          A.   I'm responsible for the day-to-day operations,
19        managing day-to-day operations of Big E through a
20        service contract.
21   Q.   And what does that involve?
22          A.   It involves day-to-day operation nationwide.
23   Q.   That seems like it's a big task.  You work out of
24        Richmond, Virginia and Big E's up here, and you do
25        this nationwide.  Can you tell me what your
```

Steve Sproles

54

1       at Big E in Seekonk?

2       A.   Keith Davis oversees several local managers,

3       but there is no local manager in Seekonk.

4  Q.   How many local managers does he oversee?

5       A.   I don't know the exact number, but it's around

6       six.

7  Q.   And it's your testimony that there's no local

8       manager at Seekonk?

9       A.   That's correct.

10  Q.   Has there ever been a local manager at Seekonk?

11       A.   Nope.

12  Q.   So how is it that drivers get their assignments in

13       Seekonk?

14                   MR. SPOLYAR:  Object to the form of

15       the question as lacking foundation,

16       mischaracterizing testimony.  Go ahead.

17       A.   Drivers get their assignments from whoever

18       they work for.  In this case, it would have been

19       Gary Cook.

20  Q.   And how did Gary Cook get his assignments?

21                   MR. SPOLYAR:  Objection:

22       mischaracterizes testimony.  Go ahead.

23       A.   Michael Rail would have told Gary Cook where

24       we need trucks, and he would decide whether he

25       wanted to put trucks there or not.

**Steve Sproles**

```
 1   Q.   Michael Rail was -- at the time, 2012, 2015, was he
 2        an agent for Big E or was he an employee?
 3                      MR. SPOLYAR:  Objection:  legal
 4        conclusion.
 5        A.   He was an employee of Estes Express Lines.
 6   Q.   Does Estes Express Lines have any other employees
 7        that work at Big E?
 8        A.   I have other employees that manage Big E's
 9        operations, yes.
10   Q.   Where are those employees located, geographically?
11        A.   Some would be Dallas, Texas; St. Louis,
12        Missouri; Los Angeles, California; York, Pennsylvania;
13        North Bergen, New Jersey; Atlanta, Georgia.
14   Q.   Estes Express Lines doesn't have any employee
15        that's located out of the Big E in Seekonk?
16        A.   Say that again, please?
17   Q.   Does Estes Express have an employee that works out
18        of the Seekonk terminal?
19        A.   Everybody at the Seekonk terminal is an Estes
20        employee.
21   Q.   So over at Seekonk, you've got Estes Express --
22        A.   Right.
23   Q.   -- and Big E?
24                      MR. SPOLYAR:  Objection:  vague.  Go
25        ahead.
```

**Rhode Island Court Reporting**

**Steve Sproles**

1   Q.   Change, okay, okay.  In terms of vacation time,

2        sick time, do agents of -- agents or contractors of

3        Big E typically receive those types of benefits?

4                      MR. SPOLYAR:  Objection:  vague.  Go

5        ahead.

6        A.   They don't receive them from Big E.

7   Q.   If they were to receive them, how would they

8        receive them or from whom would they receive them?

9                      MR. SPOLYAR:  Objection:  lacks

10       foundation.  Go ahead.

11       A.   I wouldn't know.

12  Q.   Outside of the regulations that you -- that we

13       discussed in the checklist, and I'll show this to

14       you again to use as reference.  Aside from the

15       regulations that you pointed to in that checklist,

16       are there any other policies of Big E that

17       contractor, agents -- contractor, agent drivers

18       have to adhere to?

19                      MR. SPOLYAR:  Objection:  vague.  Go

20       ahead.

21       A.   If contractor is operating under Big E's DOT

22       authority, they have to adhere to drug and alcohol

23       policies.

24  Q.   Are those drug and alcohol policies established by

25       regulation or by Big E policy?

**Steve Sproles**

64

1      A.    They are a federal requirement.

2  Q.    In negotiating a contract or discussing a contract

3        with a particular agent, a contract driver in

4        discussing this checklist with a potential agent,

5        contractor, drivers, are those drivers provided

6        copies of DOT regulations, federal regulations?

7                    MR. SPOLYAR:  I'm going to object to

8        the form of the question as vague, and I think we

9        need to clarify something.  Can we go off the

10        record for a moment?

11                    (OFF THE RECORD)

12                (RECESS TAKEN AT 12:03 p.m.)

13                    MR. SHAW:  I want to mark as

14        Exhibit 5 a driver qualification file checklist we

15        referred to on and off.

16                    (SPROLES EXHIBIT 5 MARKED)

17  Q.    Let's clarify some of our conversation so we're on

18        the same page, and obviously, feel free to jump in.

19                    We've been talking about agent

20        contractors who are, I'm going to say, parties to

21        Big E Transportation independent contractor

22        operating agreement.  I've been using the term

23        agent and contractor as one in the same, and I've

24        been discussing those individuals in terms of

25        driving services provided for Big E.  So I just

1      want to clarify that, if you have anything further?

2                     MR. SPOLYAR:  No, if you want to ask

3      him a question to clarify his understanding of what

4      you are asking, I think that would be good.

5   Q.  I will.  Does Big E have an independent contractor

6      operating agreement with agents and contractors to

7      perform driving services; is that correct?

8   A.  Yes.

9   Q.  Do they maintain other similar independent

10      contractor operating agreements to provide other

11      types of services?

12   A.  No.  And to clarify, the agent, contractor

13      terms within our organization, they both sign an

14      operating agreement.

15                 An agent operates under his own operating

16      authority; therefore, Exhibit 5 isn't required by

17      us.  A contractor operates under Big E's authority;

18      therefore, all the FMCSA requirements apply.

19                 I don't know if that's the way other

20      people would define it, but our office defines it

21      that way to distinguish between the two

22      requirements.

23   Q.  I'll get to that and that's a good distinction, and

24      that's a distinction that we are going to get to

25      further on.

1              For example, and as it relates to this

2       case, GCC Moving is a party -- is a contractor

3       under this independent contractor operating

4       agreement, but GCC Moving also serves as an agent

5       and has drivers working for it; is that accurate?

6       A.   Not really.  A contractor can have -- just

7       drive himself, or a contractor can have multiple

8       drivers.  An agent can do the same thing.

9              The difference is, in our organization,

10      an agent is operating under their own DOT

11      authority, and a contractor is operating under Big

12      E's DOT authority.  We employ agents and

13      contractors for the same types of work, so --

14  Q.  And when you say, "operation under DOT authority,"

15      would an agent have its own -- I don't even know

16      how to describe it, their own DOT authorization?

17      A.   Yes, their own DOT authority.

18  Q.  Permits and they've met independent certain DOT

19      requirements?

20      A.   That's correct.

21  Q.  Apart from, say Big E, and a contractor would be

22      operating under Big E's DOT authorization and

23      licensure or permitting.  I don't know how to

24      describe it, but is that accurate?

25      A.   Yes.

**Steve Sproles**

1      of Estes Express?

2                      MR. SPOLYAR:  Objection:  vague,

3      lacking foundation.  Go ahead.

4      A.   No.

5  Q.   Why is that, do you know?

6                      MR. SPOLYAR:  Same objection.

7      A.   All the insurances are maintained by Estes

8      Express for employees.

9  Q.   And with respect to registration of vehicles and --

10     would Estes Express employees have to bear the cost

11     of that, or would that be borne by Estes Express?

12                     MR. SPOLYAR:  Objection:

13     foundation, calls for a legal conclusion.

14     A.   It would be borne by Estes Express.

15 Q.   And same with maintenance of the vehicle?

16                     MR. SPOLYAR:  Same objection.

17     A.   Estes Express pays for the maintenance of the

18     vehicle.

19 Q.   With respect to operating cost of vehicles for

20     contractor drivers, who maintains those costs?

21                     MR. SPOLYAR:  Objection to the form

22     of the question as vague on the term "contractor

23     driver."  Go ahead -- and also requires a legal

24     conclusion.

25     A.   The contractor is responsible for all the

Steve Sproles

1    costs to maintain his equipment.

2  Q.  I want to turn your attention to Section 7A of the

3      contract.  Section 7A provides, "The contractor

4      shall provide contractor and/or other competent

5      professional drivers who meet carrier's minimum

6      driver qualification standards and all requirements

7      of the DOT."

8            Is there an expectation on the part of

9      the contractor to provide additional drivers under

10     the contract?

11            MR. SPOLYAR:  Objection:  vague,

12     calls for speculation.  Go ahead.

13  A.   I'm hung up on the word "expectation," could

14     you rephrase?

15  Q.  Well, that's -- I was looking for an explanation of

16     that provision because it would imply that drivers

17     who are parties to this contract would go out and

18     recruit additional drivers to either work for them

19     or work for Big E.  So I was wondering if you could

20     explain that or explain how that works?

21            MR. SPOLYAR:  Objection to the form

22     of the question as mischaracterizing the exhibit,

23     calls for speculation.  Go ahead.

24            MR. SHAW:  That's why I'm asking you

25     to explain it.

Rhode Island Court Reporting

**Steve Sproles**

70

1      A.   The contractor determines who is going to

2      drive his vehicles, and if we have the need for

3      multiple vehicles, how many he would want to

4      provide, that's totally up to him.

5              If we had a need for five trucks and he

6      wanted to put two on, he could put two on and we

7      would get the other three somewhere else.

8              We would never recruit people on behalf

9      of Big E.  He would be recruiting people on his

10     behalf.

11  Q.  Okay, so at that point in time -- so, say, for

12     example, Big E has a need for five vehicles and a

13     driver signs this contract to come on as a

14     contractor and perform driving services, delivery

15     services, and he's got one truck, can he bring on

16     other drivers who each have their own truck to fill

17     the other four spots?  Does that make sense?

18                 MR. SPOLYAR:  Objection:  vague.  Go

19     ahead.

20  Q.  A.   If you're -- by bringing on -- if he wanted to

21     have them work and pay them, it's his decision if

22     they have their own truck or not.

23  Q.  That's the decision of the driver?

24     A.   Of the contractor.

25  Q.  Of the contractor, I'm sorry.  So, could you

**Steve Sproles**

```
 1        explain how that process works in terms of
 2        compensation and actually performing services for
 3        Big E?  So if, for instance, and we'll refer to
 4        this more specifically later on, but if Gary Cook
 5        executes the independent operator contracting --
 6        independent contractor operating agreement, and
 7        he's providing services for Big E, how is it that
 8        he can -- is it possible for him to bring or have
 9        other drivers work for him in providing services
10        for Big E, or is he providing those drivers to
11        perform services on his behalf for Big E?
12                    MR. SPOLYAR:  Objection:
13        foundation, calls for legal conclusion.
14        A.    That's a very unclear question.
15   Q.   I'm trying to figure out and maybe if you could
16        just explain, in a little bit more detail, how is
17        it that other drivers come to perform services
18        under this agreement and that work is performed?
19        A.    A contractor has a business, he can hire as
20        many drivers and buy as many trucks or rent as many
21        trucks as he wants to.  That has nothing to do with
22        Big E.
23              If Big E has a need and we have a
24        relationship with the contractor, and Big E has a
25        need for multiple trucks, he can provide them based
```

Steve Sproles

1       on the contract, he doesn't have to.

2   Q.  In this case, Gary Cook provided additional

3       drivers; is that correct?

4   A.    That's correct.

5   Q.  And those drivers were ultimately providing

6       services for Big E, correct?

7                   MR. SPOLYAR:  Objection to the form

8       of the question as requiring a legal conclusion and

9       vague.  Go ahead.

10  A.    I would say they were providing services for

11      Gary Cook, and Gary Cook was providing services for

12      Big E.

13  Q.  So in this situation, Gary Cook would have gotten

14      assignments or delivery instructions --

15      assignments, for lack of a better word, and then he

16      would have instructed drivers to do that work for

17      him?

18                  MR. SPOLYAR:  Objection:  vague on

19      assignments, but go ahead.

20  A.    I was going to say assignments are very vague.

21      He would know which locations.  He would be told

22      which locations needed a driver and a truck, and he

23      would decide who he would send to cover that work.

24  Q.  Is there any relationship between these other

25      drivers and Big E, or is the relationship primarily

1       between these other drivers, these secondary

2       drivers, for lack of a better term, and the

3       contractor who is a party to the agreement?

4       A.   Big E has no relationship with those drivers.

5   Q.  The contract just allows contractors to hire

6       drivers?

7       A.   That's correct.

8   Q.  And it allows contractors to hire drivers, for lack

9       of a better term, to perform services for it, the

10      contractor?

11      A.   Correct.

12  Q.  Ultimately, those services are for the benefit of

13      Big E though; is that correct?

14                  MR. SPOLYAR:  Objection:  vague,

15      legal conclusion, lacks foundation.  Go ahead.

16      A.   Are you speaking specifically of the GCC

17      relationship?

18  Q.  No, generally speaking?

19      A.   Yeah, correct.

20  Q.  In terms of contractors who drive and deliver, is

21      it a common practice to hire additional drivers?

22      Is it common in the industry?  Is it common for

23      Estes?

24                  MR. SPOLYAR:  Objection.  We're

25      asking on behalf of -- you are asking as to this

**Steve Sproles**

1        if that contractor was contracted to operate under

2        Big E authority, those drivers that would be

3        driving would also have Big E's authority on it.

4    Q.  Do those drivers, secondary drivers, bring to the

5        contractor, or Big E, their own equipment, or are

6        they using the contractor's equipment?

7                    MR. SPOLYAR:  Object to the form of

8        the question as lacking in foundation as to Big E.

9        Go ahead.

10   A.   It's between the contractor and his employees.

11   Q.  Okay.  So it could be that a contractor has

12       multiple trucks to use and he allows a secondary

13       driver to use the truck?

14   A.   Correct.

15   Q.  Or it could be that these drivers have trucks and

16       they want to work for the contractor?

17   A.   It's possible.

18   Q.  Okay.  I'm just trying to figure out various

19       scenarios.  Okay, all right.

20                    With respect to the secondary drivers, is

21       there any process by which Big E would vet them or

22       establish their minimum qualifications?

23   A.   The federal government establishes minimum

24       qualifications, and if they are operating under Big

25       E's operating authority, then Big E has to maintain

**Steve Sproles**

76

```
 1        the records, as in Exhibit 5, for those drivers.
 2   Q.   So even for secondary drivers, Big E has to make
 3        sure that they meet minimum federal guidelines?
 4        A.   If they are operating under Big E's authority,
 5        yes.
 6   Q.   Okay.  I want to turn to Section 8G of the
 7        contract.
 8        A.   8G.  Okay.
 9   Q.   And I want to take a look at 8G1 and review it, and
10        then I've got a couple of questions about that
11        section.
12        A.   Okay.
13   Q.   Is there a similar requirement for employee drivers
14        of Estes Express?
15                      MR. SPOLYAR:  Objection:  lacks
16        foundation.  Go ahead.
17        A.   I'm not sure of the policy of Estes Express.
18   Q.   Okay.  Section 8G1 would appear to require that
19        contractors maintain a mobile phone.  Is that an
20        accurate summary?
21                      MR. SPOLYAR:  Objection:  Calls for
22        a legal conclusion.  Go ahead.
23        A.   Yes.
24   Q.   What's the purpose of that policy?
25                      MR. SPOLYAR:  Objection:
```

77

1       foundation, speculation.  Go ahead.

2       A.   8G1 states purpose for safety and customer

3       service.

4  Q.   Is that required by any federal regulation, do you

5       know?

6                 MR. SPOLYAR:  Objection:  legal

7       conclusion.  Go ahead.

8       A.   Not that I'm aware of.

9  Q.   What I'm getting at is that a provision or a

10      requirement that Big E requires on its own,

11      notwithstanding any law or regulation?

12               MR. SPOLYAR:  Same objection:  Legal

13      conclusion.  Go ahead.

14      A.   Yes.

15  Q.   And that's for, you said safety and customer

16      service?

17      A.   Correct.

18  Q.   And what aspects of customer service?

19      A.   If there was an issue with customer delivery,

20      the driver can contact his dispatcher to relay any

21      issues that he's having as far as customer service

22      goes.

23          Also, it's good practice to and we

24      recommend that they call the customer before they

25      arrive and ask for any special instructions that

Steve Sproles

78

1          they may need.

2     Q.   And it's typically on a mobile phone that's

3          maintained by the contractor?

4     A.   Yes.

5     Q.   Big E doesn't provide any type of telephone service

6          or dispatch radio on its trucks?

7     A.    No.

8     Q.   Go down to 8G2.  8G2 describes an electronic

9          onboard recorder.  It also talks about compliance

10         with FMCSA.  Can you describe how the two relate?

11                    MR. SPOLYAR:  Objection:  vague.  Go

12         ahead.

13    A.    FMCSA requires hours of service documentation

14         on drivers and electronic onboard recorders.  It's

15         a relatively new technology that does that

16         electronically instead of the driver manually

17         filling out a paper log.

18    Q.   Does that track routes and miles?

19                    MR. SPOLYAR:  Objection:  vague.  Go

20         ahead.

21    A.    I wouldn't say routes, it tracks miles and

22         hours of service.

23    Q.   It refers to FMCSA?

24    A.    Uh-huh.

25    Q.   Do you know if Estes Express trucks have similar

```
 1          recorders?
 2          A.   Estes Express has electronic onboard recorders
 3          on all of the trucks.  In fact, as of December of
 4          this year, all motor carriers have to have it.
 5                   Local deliveries and box trucks this
 6          doesn't apply, they were never in Gary Cook's
 7          trucks.
 8     Q.   Okay.  So in what -- that's a distinction I want to
 9          make.  In what trucks or in what equipment are
10          these recorders required, and what equipment are
11          they not?
12                   MR. SPOLYAR:  Objection to the form
13          of the question.  It's requiring a legal
14          conclusion.  Go ahead.
15     A.   FMCSA exemptions from the rule, without saying
16          I'm 100 percent accurate, a driver that operates
17          within a hundred air-mile radius and starts and
18          stops at the same place every day is not required
19          to keep them up, they keep a timesheet.
20     Q.   Okay, fair enough.  Section 8H refers to uniforms?
21     A.   Uh-huh.
22     Q.   Now, what's the purpose of that policy for a
23          contractor?
24                   MR. SPOLYAR:  Object to the form of
25          the question as vague, lacking in foundation.  Go
```

Steve Sproles

80

1      ahead.

2      A.   So most of our customers have this requirement

3      for security reasons because we're delivering

4      inside people's homes.  So we want to make sure

5      that our customers -- we want to make sure for

6      security reasons that the customers are comfortable

7      with those people and are properly identified

8      before they let them in their homes.

9   Q.  Does Big E provide those uniforms or does the

10      contractor provide those uniforms?

11                 MR. SPOYLAR:  Objection as to vague.

12      A.   The contractor provides those uniforms, Big E

13      does have some contractor shirts which they can

14      purchase, if they want to, they can.

15  Q.  Again, this uniform provision, that's a policy of

16      Big E, that's absent of any federal regulation?

17      A.   Right.  That's correct.

18  Q.  Now, we did discuss early on about medical and

19      alcohol and drug testing.  We're back to Section

20      7B, which speaks to medical examinations.  Is that

21      a requirement to comply with federal regulation or

22      is that a requirement to -- is that a requirement

23      that's just a Big E policy?

24      A.   Federal regulation.

25  Q.  And are Estes Express employees subject to the same

1      medical examination?

2                     MR. SPOLYAR:  Objection:  legal

3      conclusion.  Go ahead.

4      A.   Anybody that drives a commercial motor vehicle

5      is, so, yes.

6  Q.  Same with the alcohol, drug, and alcohol testing,

7      it looks to be -- to fulfill a federal regulation;

8      is that correct?

9      A.   That's correct.

10 Q.  And would Estes Express drivers be subject to the

11     same requirement?

12                    MR. SPOYLAR:  Objection:

13     foundation, subject to legal conclusion.  Go ahead.

14     A.   Yes.

15 Q.  I want to jump forward to Section 15B.  If you

16     could just review 15B for me.  I have a couple of

17     questions.

18     A.   Okay.

19 Q.  Correct me if I'm wrong, but Section 15B looks to

20     speak to the identification of the contractor's

21     equipment, whether it's the truck, the power unit

22     you described, or other equipment; is that

23     accurate?

24     A.   Yes.

25 Q.  My questions are:  With respect to Big E, what type

**Steve Sproles**

82

```
 1          of identification is required, and how is it placed
 2          on the equipment?
 3                     MR. SPOLYAR:  Objection:  compound
 4          question, calls for a legal conclusion.  Go ahead.
 5          A.   The only identification that's required by
 6          Big E to be on the equipment is what's required by
 7          the Federal Motor Carrier Safety Administration.
 8          That is the name of the company, whose operating
 9          authority, and DOT number, that's applied with a
10          decal.
11     Q.   A decal?
12          A.   Yes.
13     Q.   So that's not a Big E requirement, that's an actual
14          requirement provided by federal regulation?
15                     MR. SPOLYAR:  Objection:  Calls for
16          a conclusion.
17          A.   That's correct.
18     Q.   Okay, now I want to talk about Gary Cook's
19          contractual relationship with Big E.  Turning your
20          attention to Exhibit 3.  Now that I have a basic
21          understanding of the contract, Exhibit 3 is a
22          contract between Big E and who?
23                     MR. SPOLYAR:  I object to the form
24          of the question as requiring a legal conclusion.
25          Go ahead.
```

1        required or provided by Big E during his contract

2        time?

3        A.   I don't know.

4   Q.   Do you know the manner in which Gary Cook's

5        equipment was branded or identified during the

6        contract time?

7                     MR. SPOLYAR:   Object to the form of

8        the question as vague.   Go ahead.

9        A.   Any equipment operating under any authority

10       would have been identified with the federal

11       required regulations.

12  Q.   Do you know if that happened?

13       A.   I don't know that for a fact.

14  Q.   Section 18 of the contract talks about alternative

15       uses of the equipment?

16       A.   Uh-huh.

17  Q.   In some -- I think this section provides that the

18       contractors can't use the equipment for another

19       carrier but for written permission from Big E; is

20       that correct?

21                     MR. SPOLYAR:   Object to the form of

22       the question as mischaracterizing the exhibit,

23       requiring a legal conclusion.   Go ahead.

24       A.   That's correct.

25  Q.   Do you know if Gary Cook ever sought to use the

Steve Sproles

```
 1         equipment for another carrier?
 2         A.   I don't know.
 3    Q.   Is that provision standard in the industry?
 4                    MR. SPOLYAR:  Objection:  vague,
 5         lacks foundation.  Go ahead.
 6         A.   Like it states, it's a Federal Motor Carrier
 7         Administration requirement.
 8    Q.   So it's fairly standard?
 9         A.   It's a federal requirement.
10    Q.   Do you know, is it -- do you know how common the
11         practice is for contractors to use equipment for
12         various carriers?
13                    MR. SPOLYAR:  Objection:  vague.  Go
14         ahead.
15         A.   It's very common.
16    Q.   Okay.
17         A.   Uh-huh.
18    Q.   Do you know if any of Big E -- any of Big E's
19         contractors used the equipment for other carriers?
20         A.   Any?
21    Q.   Yeah, any?
22         A.   Yeah, there's been Big E contractors that use
23         equipment.
24    Q.   Do you know who they used it for?
25         A.   No.
```

Rhode Island Court Reporting

92

1   Q.   Do you know the name of the contractors?

2        A.   No, not off the top of my head, no.

3   Q.   But it's occurred?

4        A.   Yes.

5   Q.   All right.  This contract was signed by -- it looks

6        to be on or about March 2012.  Do you know when the

7        contract terminated?

8        A.   I do not.

9   Q.   Do you know why it terminated?

10       A.   There was a decrease in the amount of business

11       and the number of trucks that was needed in the

12       area.

13  Q.   All right.  Regardless, it looks like a second

14       contract was entered in January of 2015 and

15       that's --

16       A.   Could I correct that?

17  Q.   Yes.

18       A.   These two exhibits are confusing.  The first

19       one was terminated because we signed the new one.

20  Q.   Okay, all right.  What was the purpose of moving to

21       an entirely new agreement?

22       A.   That's when GCC Moving started running their

23       own DOT authority.

24  Q.   And it looks like they now are referring to

25       Exhibit 2.  It looks like the equipment changed as

**Steve Sproles**

94

```
 1                    THE WITNESS:  Thank you.
 2   Q.   Do you have any knowledge as to the day-to-day
 3        driving and delivery operations of Big E and how
 4        those are performed?
 5                    MR. SPOLYAR:  Objection:  vague.  Go
 6        ahead.
 7        A.   Yes.
 8   Q.   Okay.  We've discussed it generally, but I wanted
 9        to get more into specifics.  And I want to walk
10        through it at an excruciatingly slow pace.
11              So with respect to GCC Moving, GCC Moving
12        is retained by Big E as a contractor to provide
13        delivery services.  What happens next?
14        A.   Well, we would have communicated with GCC
15        Moving, which terminals needed the service, needed
16        trucks, and he would dispatch his trucks.
17   Q.   And if he didn't have any secondary drivers working
18        for him, would he report to that terminal himself?
19        A.   Yes.
20   Q.   What would he do then?
21        A.   He would communicate with the terminal to see
22        what deliveries they wanted him to do.
23   Q.   Let me backup.  Who would tell him what terminal to
24        go to?
25                    MR. SPOLYAR:  Object to the form of
```

**Steve Sproles**

95

1    the question, requires speculation.  Go ahead.

2    A.   At this point in time, it would have been

3    Michael Rail.

4  Q.  So Gary Cook has been retained, GCC Moving has been

5    retained as a contractor, he is instructed by, at

6    the time, 2012, to go to a specific terminal by

7    Michael Rail?

8              MR. SPOLYAR:  Mischaracterizes

9    testimony.  Go ahead.

10   A.   Yes.

11 Q.  Yes?

12   A.   Yes.

13 Q.  And once GCC Moving gets to the terminal, what

14   happens next?

15             MR. SPOLYAR:  Objection:

16   speculation.  Go ahead.

17   A.   The terminal would present him with a list of

18   deliveries they would like him to do.

19 Q.  Is there a specific individual at the terminal that

20   would do that?

21   A.   I don't know enough about terminal operations

22   to answer that.

23 Q.  Is it typically a body there or someone who would

24   do that?

25   A.   Typically the dispatch office would do that.

96

1   Q.   Is the dispatch office located at the terminal?

2        A.   Yes.

3   Q.   Okay, all right.  So they present -- what do they

4        present to him?

5        A.   A list of deliveries they would like for him

6        to execute.

7   Q.   And at that point in time, what happens, is the

8        truck loaded or?

9        A.   Well, he would either accept or refuse -- he

10       would accept the deliveries he wanted to take or

11       refuse any he didn't want to take, and they would

12       tell him which door to go to, put his truck in and

13       then he would load his own truck.

14  Q.   He would load his own truck, okay.  Is there any

15       specific -- strike that.

16            If he accepts to do the deliveries, is

17       there any particular order in which he has to load

18       his truck?

19       A.   No.  That's completely up to him how he loads

20       his truck.

21  Q.   And then is he given any paperwork?  Once the truck

22       is loaded, what happens next?

23       A.   He would have been given a delivery manifest

24       which lists all the deliveries loaded on his truck,

25       and then he would be given a delivery receipt,

Steve Sproles

1          proof of delivery made for each delivery.

2     Q.   Does he have any tracking system that he's carrying

3          to show what's been delivered, what hasn't been

4          delivered, signatures, that sort of thing?

5                    MR. SPOLYAR:  Object to the form of

6          the question as vague.  Go ahead.

7     A.    Not to my knowledge.

8     Q.   So he's given -- the truck is loaded up, he's given

9          a list, he's got documentation with him; and then

10         is there anything else he needs to do before he

11         starts making deliveries?

12    A.    No.

13    Q.   Then he goes about his way and does deliveries?

14    A.    That's correct.

15    Q.   If there are any issues that he has with respect to

16         the ability to make deliveries, is there someone he

17         contacts at the terminal?

18                   MR. SPOLYAR:  Objection:

19         Speculation.

20    A.    If he had an issue completing a delivery, he

21         would contact the dispatch office at the terminal.

22    Q.   And they would -- he would wait for further

23         instruction or?

24                   MR. SPOLYAR:  Objection:

25         mischaracterization and speculation.  Go ahead.

**Steve Sproles**

98

1      A.    Yeah.

2  Q.  Yeah, okay.  Once his -- strike that.

3              Are there -- what are the nature of the

4      deliveries that have to be made, and I'll explain a

5      little bit further?  Is it simply offloading

6      something from the truck?  Is it offloading and

7      setting up?  What type of work goes into making

8      deliveries?

9      A.    Generally, working in an environment with GCC,

10     it would be offloading, what's typically called

11     curbside delivery, put it in your driveway, a

12     pallet in a driveway.  Occasionally a customer

13     requests additional services to go inside the house

14     for debris removal.  Those are rare, but they do

15     happen.

16 Q.  Would GCC Moving be eligible for some type of

17     compensation?

18     A.    In Attachment A, it's outlined for those

19     services.  He gets compensated.

20 Q.  Are there also pickups to be made or not so much?

21     A.    Sometimes already tendered pickups, the

22     terminal will make a request that they do a pickup.

23     They can choose to do it or not do it.

24 Q.  The documentation that GCC Moving would be

25     providing in terms of making deliveries, I don't

1        have an example of one, what type of information

2        does it include?  I mean, I'm sure it has location

3        of delivery, maybe a point of contact, maybe what

4        the item is?  Is there anything else?

5    A.    Typically, deliveries have the address,

6        customer's name, or consignee's name, phone number,

7        any special instructions that have been purchased

8        should be on there.

9    Q.  Is that paperwork on -- is it on a Big E form?  Is

10       it on a GCC Moving form, or is it on an Estes

11       Express form?

12                    MR. SPOLYAR:  Object to form, lack

13       of foundation.  Go ahead.

14   A.    It's an Estes Express form.

15   Q.  It says neither GCC Moving nor Big E, just Estes

16       Express?

17   A.    That's correct.

18   Q.  Is there contact information on the form?  If a

19       customer were subpoenaed, a co-signee wanted to

20       contact the delivery, or delivery company?

21                    MR. SPOLYAR:  Objection:  vague.  Go

22       ahead.

23   A.    There's a customer service phone number on the

24       form.

25   Q.  Where is that customer service phone number go to?

Steve Sproles

100

 1        A.    I don't know.
 2   Q.   You call that phone number and you don't know who
 3        you get.  Is it an Estes Express phone number?
 4        A.    It is.
 5   Q.   Is there any other type of, other than the form,
 6        any other tracking device that's required for use
 7        in terms of making sure deliveries get to where
 8        they need to?
 9        A.    No.
10   Q.   And we are talking about a box truck, so there's no
11        onboard recorder, correct?
12        A.    That's correct.
13   Q.   Once all the deliveries are made and it's the end
14        of the day or whatever, what happens next?
15                    MR. SPOLYAR:  Objection:
16        speculation.  Go ahead.
17        A.    If everything has been delivered and there's
18        nothing left on the truck, he's done for the day.
19        If he has -- if something didn't deliver, he has to
20        take that back to the terminal.
21   Q.   If he's done for the day, is there any type of
22        paperwork that he has to drop off at the terminal?
23        A.    He can drop it off that day or the next
24        morning.
25   Q.   Is he dropping it off to dispatch, or is he

101

1     dropping it off to Mike Rail, or?

2     A.   He's dropping it off to, usually the dock

3     supervisor.

4  Q.  The dock supervisor at Big E, is that a contractor

5     or an employee?

6     A.   He's an Estes employee.

7  Q.  If he's done for the day, it's his equipment, he

8     can just take the truck home, and he's done until

9     he gets called again?

10    A.   That's correct, but, when he's assigned a

11    terminal they show up every day.

12 Q.  Okay, all right.  When GCC Moving had secondary

13    drivers, would GCC Moving then direct the secondary

14    drivers to go to the terminal and make the

15    deliveries and so forth?

16              MR. SPOLYAR:  Foundation:

17    speculation, go ahead.

18    A.   Yes.

19 Q.  Would the secondary drivers be receiving

20    assignments through GCC Moving, or would the

21    secondary drivers be receiving assignments in the

22    same manner GCC Moving was, where when they show

23    up, get the paperwork, get their trucks loaded and

24    then move on?

25              MR. SPOLYAR:  Vague, speculation.

Steve Sproles

1          Go ahead.

2     A.    The location for them to work, they get from

3          GCC Terminal.  Once they arrive at the terminal,

4          the terminal dispatch would share with them

5          whatever deliveries they are making.

6     Q.   They would, correct me if I'm wrong, they would get

7          told by GCC Moving, show up to the terminal and

8          then after that it's kind of the same interaction

9          between the secondary drivers and the terminal that

10         GCC Moving would otherwise have; is that fair?

11    A.    The specific work that the terminal would like

12         for them to do would be shown to that driver, the

13         same way as we talked about before.  However, GCC

14         Moving would tell the driver whether or not to -- I

15         mean, he controlled his driver.  You could tell

16         them if the driver didn't want to do the delivery,

17         he would have to call GCC trucking.

18    Q.   If GCC Moving wanted a day off, what would he do?

19         Would he inform dispatch, or would he just not show

20         up?  How would he exercise a day off?

21                   MR. SPOLYAR:  Object to the form of

22         the questioning as requiring speculation and to

23         clarify, it's vague.  The scenario you're

24         describing is one where Gary Cook was driving?

25                   MR. SHAW:  Where Gary Cook was

1      vehicles, and whether Big E paid for the branding

2      or whether branding was paid for by the Plaintiff

3      and/or recruited drivers."

4              After objection you answered, "Big E

5      states it does not require any branding of

6      vehicles."

7              My question to you is:  Is that contrary

8      to Section 15B of the agreement of the contract?

9                  MR. SPOLYAR:  Object to the form of

10     the question as vague.  As to the term "branding,"

11     it requires a legal conclusion with respect to the

12     contract.  Which contract exhibit are we talking

13     about?

14                 MR. SHAW:  Let's look at the 2015

15     agreement.

16                 MR. SPOLYAR:  That's No. 2.

17                 MR. SHAW:  Number 2.

18     A.   So, okay I got both documents, what's the

19     question again, please?

20  Q.  The interrogatory speaks to the nature and extent

21     of branding of vehicles.  It would appear that

22     Section 15B requires a similar type of branding,

23     albeit, cloaked in or specified as identification

24     of equipment.

25              My question is:  Your answer says, "Big E

1          states it does not require any branding of

2          vehicles."  Doesn't Section 15B of the contract

3          require branding?

4                          MR. SPOLYAR:  Same objection:  vague

5          as to branding, and legal conclusion as to

6          interpretation of the contract.  Go ahead.

7          A.   I would say, no, they don't.  Branding to me

8          means advertising, you know, or something like

9          that.   Identification is a federal requirement to

10         have the truck legally owned.  I don't think they

11         are the same.

12   Q.    That's the clarification I'm looking for.  It's

13         your testimony that branding is different than

14         identification as required under the contract?

15         A.   Yes.

16   Q.    Section 15, under the contract, does it require a

17         decal, an Estes logo decal be placed on the

18         equipment?

19         A.   No.

20   Q.    I thought it was your testimony earlier that an

21         Estes Express decal was placed on the vehicles?

22                          MR. SPOLYAR:  Object to the form of

23         the question.  Go ahead.

24         A.   No.

25   Q.    The type of identification required under 15B of

1          the contract includes what?

2          A.    The federal regulation requires the name of

3          the company, whose operating authority is being

4          used, as well as their federally issued DOT number.

5     Q.   Is that information typically stenciled on in some

6          manner, or how is it placed on the vehicle?

7          A.    Typically, it's a decal.

8     Q.   Okay, all right.  And the name of the operating

9          authority under this contract would be who?

10         A.    Big E Transportation.

11                    MR. SPOLYAR:  I want to go back and

12         make sure we're clear.  We are talking about

13         Exhibit 2 in the 2015 contract?

14                    MR. SHAW:  Yes.

15                    MR. SPOLYAR:  Oh.

16         A.    It's a good point, Exhibit 2, he was running

17         on his own authority.

18    Q.   Okay.

19         A.    So, when we signed the new contract in 2015,

20         that would have been GCC Moving on the truck and

21         their DOT number.

22    Q.   His DOT number, his authority?  In 2012, it would

23         have been?

24         A.    Big E Transportation.

25    Q.   Big E Transportation, okay.  In both situations,

**Steve Sproles**

110

1          that identification is done at the contractor's

2          expense; is that correct?

3          A.   Yes.

4                    MR. SPOLYAR:  Object to the form of

5          the question, requiring a legal conclusion.  Go

6          ahead.

7          A.   That's correct.

8     Q.   Okay.  So --

9          A.   As per Exhibit 3.

10    Q.   Exhibit 3 being the 2000 --

11         A.   If it's -- it's the contractor's expense

12         anyway.

13    Q.   That's what I was getting at is whether the

14         contractor is operating under its own authority or

15         Big E's authority.  The identification is done at

16         the contractor's expense?

17         A.   That's correct.

18    Q.   Just for point of clarification, Interrogatory

19         No. 16 on Page 11, carrying over to Page 12, the

20         interrogatory asks to "identify with specificity

21         whether Big E provided Plaintiff and/or recruited

22         drivers.  Big E, Estes, or other corporate

23         identification, uniforms, and/or unique employee

24         numbers from 2008 to the present."  Further asked

25         to "identify the nature of the identification

**Steve Sproles**

1      provided and the purposes for which it was

2      provided."

3              After a series of objections you state

4      that "Big E does not assign drivers employee

5      numbers, but contractors are provided unique

6      numbers in order to connect delivery manifests to

7      contract through customer requirements."

8              My question to you is:  What type of

9      identifiers do employees have versus any type of

10     similar identifier for contractors?

11              MR. SPOLYAR:  Object to the form of

12     the question as vague.  Go ahead.

13     A.   Employees have employee numbers issued by the

14     company.

15 Q.  Payroll or something?

16     A.   For payroll and things like that.  Contractors

17     are issued a number in the routing system to

18     identify who actually made the deliveries.  Without

19     that number we wouldn't know what contractor did

20     the work.

21 Q.  Every contractor has their own number?

22     A.   Uh-huh.

23 Q.  Going down to Interrogatory 18:  "Identify with

24     specificity any vetting, investigation, or

25     interviewing process or any procedure established

**Steve Sproles**

112

1       by Big E with respect to an employee hired by

2       Plaintiff and/or recruiting drivers from 2011 to

3       the present."

4              After a series of objections, Big E

5       states it "performs background checks with drivers

6       in accordance with the FMCSR."

7              We've already discussed the acronym.  My

8       question is:  What are the background checks

9       performed by Big E on drivers, and then I'll have a

10      follow-up question?

11  A.   If they are operating under Big E's operating

12      authority, we have to do the previous employment

13      background check to verify whether or not they've

14      ever had a positive drug or alcohol test.  That's a

15      federal requirement, and when they are under their

16      own authority, we don't do that.

17  Q.  Now, what type of background checks does Big E

18      perform for secondary drivers if the contract

19      driver is operating under Big E's authority, or

20      does that situation not occur?

21              MR. SPOLYAR:  Object to the form of

22      that question as vague.  Go ahead.

23  A.   Some customers require a criminal background

24      check before drivers can be there.  Based on that

25      customer's requirements, we would run that

Steve Sproles

1       background check.

2  Q.   That could be secondary drivers?

3    A.   That's correct.

4  Q.   In terms of background checks for secondary drivers

5       operating under a contractor's own authority, who

6       would perform the background check?

7    A.   If they operated under the contractor's own

8       authority, we don't do background checks.

9  Q.   Would that be up to the contractor?

10    A.   It's up to the contractor, that's correct.

11  Q.   Interrogatory No. 19, I'm not -- strike that.

12           It's not so much with the substance of

13       the response, but it does make reference to

14       settlement deductions.  Again, that's not a term

15       I'm familiar with, I was wondering if you could

16       explain that?

17    A.   Did you say 19?

18  Q.   Yes.  Next to -- there's a line in the answer that

19       says, "Plaintiffs paid for the costs of

20       registration of permit fees through settlement

21       deductions."

22           My question to you is:  Could you

23       describe what settlement deductions are and how

24       that relates to compensation and the like?

25    A.   There is a -- in the contract there is a table

Steve Sproles

1      listing all the items that the contractor can pay

2      for via a settlement deduction.

3   Q.   That's what Section 5, 4?

4        A.   Section 5.

5   Q.   Okay.

6        A.   That's what that refers to.

7   Q.   Okay.  And we've discussed this before, but, just

8      for clarity, and this is sought in Interrogatory

9      21, with respect to compensation of secondary

10     drivers, of contractors, is compensation -- in

11     terms of compensation, between the primary

12     contractor and the secondary driver, or does Big E

13     get involved in that?

14       A.   Big E has nothing to do with it.  It's between

15     the contractor and his drivers.

16  Q.   Okay.  Why is that?

17       A.   Because they are not Big E's employees, Big E

18     doesn't have a relationship with those drivers.

19  Q.   But they ultimately perform a service on behalf of

20     Big E?

21                 MR. SPOYLAR:  Object to the form of

22     the question as vague and lacking foundation.  Go

23     ahead.

24       A.   Big E contracts with the contractor to perform

25     a service.  He hires his own employees to fulfill

Rhode Island Court Reporting

Steve Sproles

115

1       that contract, it's up to him what he pays them.

2    Q.    Does -- is there any type of -- strike that.

3              With respect to secondary drivers, is

4       there any amount of vetting that Big E has in

5       hiring them?

6                   MR. SPOLYAR:  Objection:  Vague.  Go

7       ahead.

8    A.    Under Big E's operating -- if they are

9       operating a truck with Big E's operating authority

10      on it, we have to do -- Big E does what's required

11      by the Federal Motor Carrier Safety Inspection.

12   Q.    For the most part, the contractor can hire whomever

13      he or she wants as a secondary driver?

14   A.    That's correct.

15   Q.    I think you testified earlier, correct me if I'm

16      wrong, that there are no employee drivers in the

17      Seekonk terminal?

18   A.    No, I didn't.

19   Q.    You didn't, okay.  Okay.  Are there employee

20      drivers in the Seekonk terminal?

21                  MR. SPOLYAR:  Objection to the form

22      of the question, implying real conclusion and

23      vetting, vague.  Go ahead.

24   A.    Estes Express Lines has employees out in

25      Seekonk terminals.

**Steve Sproles**

```
 1          drivers to do time, things that take more time,
 2          residential-type deliveries, where they are on
 3          small roads and neighborhoods because Estes
 4          employee drivers drive tractor trailers.
 5     Q.   So it's a scope-of-work-type issue?
 6     A.   Uh-huh.
 7     Q.   So is it -- well, no, I don't want to -- I don't
 8          want to put words in your mouth, but, it sounds
 9          like Big E contract drivers may not own rigs and
10          trailers as their equipment, they own smaller
11          vehicles?
12                    MR. SPOLYAR:  Object to the form as
13          vague.  Go ahead.
14     A.   Contractors that work on the terminal accounts
15          typically own smaller vehicles.
16     Q.   Chris Seng, what type of vehicle does he own?
17     A.   Box truck.
18     Q.   What about Marco?
19     A.   Box truck.
20     Q.   The contract -- 2015 contract was eventually
21          terminated, the contract with GCC Moving; is that
22          correct?
23     A.   That's correct.
24     Q.   Do you know why it was terminated?
25     A.   The amount of freight available had dropped
```

Steve Sproles

1    off to the point where we didn't need as many

2    trucks or Estes hadn't requested some trucks.

3 Q.  Was GCC Moving provided notice, and if so, how

4    much?

5    A.   I don't know.

6 Q.  Who would know that?

7    A.   Keith Davis would know that.

8 Q.  Is Keith Davis the one who terminated the contract?

9    A.   I don't know, but most likely.

10 Q. At the time the contract was terminated, do you

11    know how many secondary drivers GCC Moving had

12    working for them?

13    A.   I don't know.

14 Q. Do you know what happened to those drivers when the

15    contract was terminated?

16              MR. SPOLYAR:  Objection:  lacks

17    foundation.  Go ahead.

18    A.   I don't know.

19              MR. SHAW:  All right.  Jim that's

20    all I have.

21              MR. SPOLYAR:  I have a couple of

22    questions.

23              EXAMINATION BY MR. SPOLYAR

24 Q. Steve, can you pull out Exhibits 2 and 3, please.

25    A.   Okay.

Rhode Island Court Reporting

1               C E R T I F I C A T E

2

3          I, PATRICIA QUIRK, a Notary Public in and

4     for the State of Rhode Island and the Commonwealth

5     of Massachusetts, do hereby certify that I am

6     expressly approved as a person qualified and

7     authorized to take depositions pursuant to rules of

8     Civil Procedure of this Court, especially but

9     without restriction thereto, under Rules 29 and

10    30(b)(4) of said Rules; that the witness was first

11    sworn by me; that the transcript contains a true

12    record of the proceedings.

13

14    Reading and signing of the transcript was not

15    requested by the deponent or any parties involved

16    upon completion of the deposition.

17

18    IN WITNESS WHEREOF, I have hereunto set my hand

19    this      day of_____, 2017

20

21

22    PATRICIA QUIRK, CSR
      NOTARY PUBLIC/CERTIFIED COURT REPORTER
23    MY COMMISSION EXPIRES 12/11/2017

24

25

## CORRECTION SHEET/ERRATA SHEET

Case Name:          GCC Moving, LLC and GARY COOK d/b/a GCC Moving v.
                    ESTES EXPRESS LINES, CORP. d/b/a, alias, BIG E
                    TRANS
Date of Deposition: August 16, 2017
Deponent:           Steve Sproles

    I, Steve Sproles, do hereby certify that I have read the foregoing statement
and that, to the best of my knowledge, said statement is true and accurate (with the
exception of the following changes listed below:

| Pg. No. | Line No. | CHANGE TESTIMONY TO READ AS FOLLOWS: |
|---------|----------|--------------------------------------|
| 12      | 12       | "find" should be "moves"             |
| 32      | 20       | "FMC" should be "FMCSA"              |
| 58      | 11       | "FMC" should be "FMCSA"              |
| 115     | 11       | "Inspection" should be "Administration" |

Dated: __10/30/17__                    _____
                                        Steve Sproles

4828-5976-8403, v. 1