# EXHIBIT J

to Big E's Statement of Undisputed Facts
in Support of Motion for Summary Judgment

### *Exhibit 7 to Gary Cook's Deposition*

### *2012 Independent Contractor Operating Agreement*

# BIG E TRANSPORTATION LLC

# INDEPENDENT CONTRACTOR OPERATING AGREEMENT

Revised 4/1/10

*THIS AGREEMENT CONTAINS INDEMNIFICATION PROVISIONS, WHICH ARE HIGHLIGHTED IN BOLDFACED UNDERLINED TYPE.*



EXHIBIT

PENGAD 800-631-6989

BIGE_00001

BIG E TRANSPORTATION LLC
INDEPENDENT CONTRACTOR OPERATING AGREEMENT

TABLE OF CONTENTS

Section                                                                                                           Page

1.   PROVISION OF SERVICES AND EQUIPMENT ........................................................................ 1
     1(a)    Equipment .................................................................................................................. 1
     1(b)    Extent of Use of Equipment ...................................................................................... 1
     1(c)    Equipment Receipts .................................................................................................. 1

2.   DURATION AND TERMINATION ............................................................................................. 1
     2(a)    Commencement ......................................................................................................... 1
     2(b)    Termination ................................................................................................................ 1
     2(c)    Survival of Liabilities and Entitlements ..................................................................... 1

3.   COMPENSATION ..................................................................................................................... 1
     3(a)    Amount of Compensation .......................................................................................... 2
     3(b)    Definitions Applicable to Percentage-of-Revenue Compensation ........................... 2
     3(c)    Changes in Compensation ........................................................................................ 2
     3(d)    Earnings Adjustments ............................................................................................... 3

4.   SETTLEMENT PERIOD AND DOCUMENT REVIEW ............................................................. 3
     4(a)    Payment Period ......................................................................................................... 3
     4(b)    Settlement Compensation ......................................................................................... 3
     4(c)    Settlement Statement ................................................................................................ 3
     4(d)    Documentation ........................................................................................................... 3
     4(e)    Removal of Indemnification ....................................................................................... 4

5.   DEDUCTIONS FROM COMPENSATION ................................................................................ 4
     5(a)    List of Deducations ................................................................................................... 4
     5(b)    Other Deductions ...................................................................................................... 6
     5(c)    Information Regarding Deductions ............................................................................ 7
     5(d)    Changes in Existing Deduction Items ....................................................................... 7

6.   INSURANCE ............................................................................................................................. 7
     6(a)    CARRIER's Insurance Obligations ........................................................................... 7
     6(b)    CONTRACTOR's Insurance Obligations .................................................................. 7
     6(c)    Requirements Applicable to All of Contractor's Insurance Coverages ..................... 8
     6(d)    Availability of Insurance Facilitated By Carrier ......................................................... 9
     6(e)    Changes in Cost or Other Details of Coverages ....................................................... 9

7.   COMPLIANCE WITH PERTINENT LAWS AND REGULATIONS BY CONTRACTOR ........... 9
     7(a)    Drivers ....................................................................................................................... 9
     7(b)    Medical Examinations .............................................................................................. 10
     7(c)    Drug and Alcohol Testing ........................................................................................ 10
     7(d)    Paperwork Requirements ........................................................................................ 10
     7(e)    Shipping Documents ................................................................................................ 10
     7(f)    Safe Operations ...................................................................................................... 10
     7(g)    Maintenance and Inspection ................................................................................... 10

8.   CONTRACTOR'S EXPENSES ............................................................................................... 11
     8(a)    Operating Expenses ................................................................................................ 11
     8(b)    Fines ........................................................................................................................ 11
     8(c)    Overweight and Oversized Shipments .................................................................... 11
     8(d)    Fuel Tax and Mileage Tax Reporting ...................................................................... 11
     8(e)    Fuel Purchases ....................................................................................................... 12
     8(f)    Base Plate and Permits ........................................................................................... 12
     8(g)    Communications Equipment .................................................................................... 13
     8(h)    Uniforms .................................................................................................................. 13

9.   USE OF CARRIER'S TRAILER .............................................................................................. 13

10.  ACCIDENTS AND DELAYS .................................................................................................... 14
     10(a)   Accidents ................................................................................................................. 14
     10(b)   Delays ...................................................................................................................... 14

BIGE_00002

11.    CARRIER'S COMPLETION OF CONTRACTOR'S PERFORMANCE..................................................... 14

12.    INDEMNIFICATION BY CONTRACTOR.......................................................................................... 14

13.    INDEMNIFICATION BY CARRIER ................................................................................................... 15

14.    CONTRACTOR'S OBLIGATIONS UPON TERMINATION .............................................................. 15

15.    CARRIER RESPONSIBILITIES ...................................................................................................... 16
       15(a)    Exclusive Possession and Responsibility ......................................................................... 16
       15(b)    Identification of Equipment .............................................................................................. 16

16.    ESCROW FUND .............................................................................................................................. 16
       16(a)    Principal ............................................................................................................................ 16
       16(b)    Specific Items to Which Escrow Fund May Be Applied .................................................... 16
       16(c)    Accountings ...................................................................................................................... 17
       16(d)    Interest .............................................................................................................................. 17
       16(e)    Final Settlement ............................................................................................................... 17
       16(f)    Return of Escrow Balance ................................................................................................ 17

17.    CONTRACTOR NOT EMPLOYEE OF CARRIER .......................................................................... 17
       17(a)    In General ......................................................................................................................... 17
       17(b)    CONTRACTOR's Responsibility for Insurance, Taxes, and Operating Expenses ........... 17
       17(c)    The Parties' Financial Obligations If Contractor Is Determined To Be An Employee ....... 18

18.    ALTERNATIVE USES OF EQUIPMENT .......................................................................................... 19
       18(a)    Exclusive-Use Requirement of Federal Leasing Regulations .......................................... 19
       18(b)    Subleases and Other Alternative Uses of Equipment ...................................................... 19

19.    CONTRACTOR NOT REQUIRED TO PURCHASE OR RENT PRODUCTS, ................................... 21
       EQUIPMENT, OR SERVICES FROM CARRIER

20.    NO PASSENGERS .......................................................................................................................... 21

21.    LOADING AND UNLOADING.......................................................................................................... 21

22.    CONFIDENTIALITY.......................................................................................................................... 21

23.    BENEFIT AND ASSIGNMENT ........................................................................................................ 21

24.    NOTICES.......................................................................................................................................... 22

25.    NON-WAIVER .................................................................................................................................. 22

26.    SEVERABILITY ................................................................................................................................ 22

27.    GOVERNING LAW AND CHOICE OF FORUM ............................................................................... 22

28.    COMPLETE AGREEMENT AND WAIVER....................................................................................... 22

29.    COPIES OF THIS AGREEMENT AND STATEMENT OF LEASE..................................................... 22

RECEIPT FOR POSSESSION OF CONTRACTED EQUIPMENT

ATTACHMENT A – CONTRACTOR Payment Rates

SUPPLEMENT 2 TO ATTACHMENT A – Additional Fuel-Related Compensation Program

ATTACHMENT B – CONTRACTOR Election Form

ATTACHMENT C – Sublease Form

ATTACHMENT D –Equipment List

STATEMENT OF LEASE

BIGE_00003

**BIG E TRANSPORTATION LLC**
**INDEPENDENT CONTRACTOR OPERATING AGREEMENT**

BIG E TRANSPORTATION LLC, an authorized for-hire interstate motor carrier registered with the Federal Motor Carrier Safety Administration ("FMCSA") of the U.S. Department of Transportation ("DOT"), USDOT No. 1762766 ("CARRIER"), and _Cox C. Cimoving Co_ ("CONTRACTOR"), in consideration of the covenants and agreements herein and pursuant to the federal leasing regulations, 49 C.F.R. Part 376, enter into this Independent Contractor Operating Agreement, including any Attachments and addendums ("Agreement"), effective at 12:01 a.m. Eastern Time on _march_, _10_, 20 _14_ ("Effective Date").

### 1.  PROVISION OF SERVICES AND EQUIPMENT.

1(a).  **Equipment.**  During this Agreement, CONTRACTOR shall provide CARRIER professional truck driving services, other incidental transportation related services and the use of the equipment set forth in Attachment D (the "Equipment"). CONTRACTOR represents and warrants that CONTRACTOR has title to or is the "owner" of the Equipment within the meaning of 49 C.F.R. § 376.2(d) and has full authority to contract the Equipment and services to CARRIER.

1(b).  **Extent of Use of Equipment.** CARRIER does not agree to make any minimum use of the Equipment, to use the Equipment at any particular time or location, or to furnish any specified number of loads or pounds of freight to CONTRACTOR or to guarantee any amount of revenue to CONTRACTOR. CONTRACTOR is free to accept or reject any specific shipment offered by CARRIER. CONTRACTOR is not prohibited from entering into separate agreements to provide other equipment and other professional truck drivers, not identified as Equipment above or in an attachment and drivers not used to service this Agreement, to other motor carriers. Nor is CONTRACTOR, consistent with Section 18 of this Agreement, prohibited from using the Equipment for the pick up, transportation, or delivery of property for more than one common carrier or any other person or entity.

1(c).  **Equipment Receipts.**  Upon taking possession of the Equipment from CONTRACTOR, CARRIER shall furnish to CONTRACTOR a receipt for Equipment, which shall constitute the receipt required by 49 C.F.R. § 376.11(b). When CARRIER surrenders possession of the Equipment to CONTRACTOR upon termination of this Agreement, CONTRACTOR shall furnish a similar receipt to CARRIER, identifying the Equipment and the date and time when possession thereof was returned to CONTRACTOR. The receipt required by this Section may be transmitted to the other party by hand, mail, overnight delivery, fax, or other means of communication. CARRIER shall maintain those records regarding the Equipment required by 49 C.F.R. § 376.11(d).

### 2.  DURATION AND TERMINATION.

2(a).  **Commencement.**  This Agreement shall begin at the time and the date set forth above, and end at 11:59 p.m. Eastern Time on the next succeeding March 31.

This Agreement shall be renewed automatically from year to year after that period, unless terminated sooner by either party.

2(b).  **Termination.**  Either party may terminate this Agreement at any time for any reason by giving twenty (20) days' written notice to that effect to the other party. In addition, in the event of a party's actual or threatened commitment of a felony or intentional tort; violation of, or failure to comply fully with, the requirements of any applicable federal, state, local, and foreign authorities, including but not limited to DOT, state, provincial, or local highway safety, vehicle inspection, vehicle maintenance, traffic, road, truck size-and-weight, hazardous materials transportation, cargo security, or other laws and regulations ("Applicable Law"); material breach of this Agreement, or the occurrence of an "accident," as that term is defined by FMCSA in 49 C.F.R. § 380.5, that, in CARRIER's reasonable judgment, was caused in whole or in part by CONTRACTOR's negligence, gross negligence, or willful misconduct, then the other party may elect to terminate the Agreement by giving immediate oral, followed by written, notice of termination to the offending party. The effective date and time of termination shall be as set forth in the written notice given by either party, or at the date and time the receipt for the Equipment is given by CONTRACTOR to CARRIER, or at the date and time when, as a practical matter, possession of the Equipment by CARRIER pursuant to 49 C.F.R. § 376.11(b)(2) ends, whichever of these three dates/times is earliest.

2(c).  **Survival of Liabilities and Entitlements.**  If, up to and including the date of termination, one or more events occur that give rise, before or after that date, to an entitlement or liability of CONTRACTOR or CARRIER under this Agreement, such entitlement or the obligations relating to such liability shall continue, notwithstanding the termination of this Agreement, until such liability or entitlement is satisfied in full. CONTRACTOR's obligations include, but are not limited to, completing performance in the event of termination of this Agreement.

### 3.  COMPENSATION.  As total compensation for everything furnished, provided, or done by CONTRACTOR in connection with this Agreement, including driver's services, CARRIER shall pay CONTRACTOR as follows. CONTRACTOR is entitled to remuneration only upon the full and proper performance of deliveries accomplished in

BIGE_00004

each trip undertaken by CONTRACTOR pursuant to this Agreement.

**3(a).** **Amount of Compensation.** CONTRACTOR shall receive the Base Compensation and Additional Compensation set forth in **Attachment A (CONTRACTOR Payment Rates)** to the Agreement.

**3(b).** **Definitions Applicable to Percentage-of-Revenue Compensation.**

**3(b)(1).** **Gross Revenue.** Gross Revenue shall mean all revenue – billed by CARRIER to shippers, consignees, brokers, logistics companies, freight forwarders, other carriers, or other customers (referred to together as "CARRIER's Customer" throughout this Agreement) in connection with shipments CONTRACTOR hauls under this Agreement – for linehaul transportation, hourly work, accessorial services, detention, and all other services, and all fuel surcharges, liability insurance surcharge, and other charges and surcharges.

**3(b)(2).** **Adjusted Gross Revenue.** Adjusted Gross Revenue ("AGR") shall mean Gross Revenue for a particular shipment, reduced by any and all:

**3(b)(2)(A).** Revenue billed by CARRIER for all "Additional Compensation" items, listed in Attachment A (CONTRACTOR Payment Rates) to the Agreement;

**3(b)(2)(B).** Any incentive, discount, fee, or commission CARRIER gives CARRIER's Customer with respect to the shipment;

**3(b)(2)(C).** Payment-processing fees consisting of the actual cost incurred by CARRIER for the shipment if CARRIER's customer or a third-party payor makes deductions from CARRIER's freight charges related to electronically-transmitted billing and payment account use;

**3(b)(2)(D).** Other amounts CARRIER paid to third parties, including but not limited to an affiliate of CARRIER, in relation to movement of the shipment if not covered by a charge separately-stated on CARRIER's invoice to CARRIER's Customer, including, but not limited to, fees or commissions (including commission recoveries), paid to brokers, freight forwarders, interline or augmenting carriers, warehouse or other storage providers, terminals, agents, or any other third party, expenses attributable to an accessorial service, escorts, overweight, overdimensional, or other permits special loading and/or unloading services, or special security measures paid to a third party, including but not limited to an affiliate of CARRIER, or to CONTRACTOR; and amounts paid to other contractors as a pro rata payment

for their participation in the movement of a shipment; and

**3(b)(2)(E).** Charges separately stated on CARRIER's invoice to CARRIER's Customer as fuel surcharges (or fuel or other cost adjustments or special fuel charges), insurance surcharges, charges for third-party contract services, charges for escorts, charges for overweight, overdimensional, or other permits, charges for special loading and/or unloading services, excess-value charges or high-value freight charges, or surcharges for special security measures furnished or paid for by CARRIER.

**3(c).** **Changes in Compensation.**

**3(c)(1).** **Temporary Change.** CARRIER and CONTRACTOR may make a temporary change in CONTRACTOR's settlement compensation to be paid for one or more services relating to a shipment or shipments under this Agreement by both parties' signing (either manually or, as indicated in Subsection (c)(2) below, electronically) an addendum, setting forth the change in advance of any hauling assignments to which the change will apply. CONTRACTOR shall be under no obligation to accept the change in settlement compensation by signing such an addendum, and CARRIER shall not terminate this Agreement for CONTRACTOR's failure to do so (except to the extent the procedure below for an "Ongoing Change" is followed), although, in such event, CARRIER are hereby authorized not to assign you loads covered by such change in the meantime. Such temporary change shall not be effective for more than twenty (20) calendar days.

**3(c)(2).** **Ongoing Change.** If any aspect of CONTRACTOR's settlement compensation will be changing on an ongoing basis, CARRIER shall provide CONTRACTOR a proposed addendum containing the change at least twenty (20) calendar days in advance by hand, fax, overnight delivery, U.S. First Class Mail, or other written notice. If CONTRACTOR wishes to continue operating on CARRIER's behalf, CONTRACTOR shall, by the effective date and time shown on the addendum, sign the addendum and deliver it to CARRIER by hand, fax, or overnight delivery (CARRIER shall thereupon deliver to CONTRACTOR for CONTRACTOR's files a paper copy of the executed addendum). If this action is not taken by CONTRACTOR, the addendum shall operate as a notice of termination under Section 2 of this Agreement, and this Agreement shall terminate as of the date and time set forth on the addendum, provided that, in such event, CONTRACTOR shall not be subject, either before or after termination, to the change(s) proposed in the addendum.

**3(c)(3).** **Addendums.** Copies of any fully-signed addendum pursuant to Subsections (b)(1) or (b)(2) above shall be attached by CONTRACTOR

BIGE_00005

and CARRIER to their respective copies of the Agreement.

### 3(d).   Earnings Adjustments.

**3(d)(1).   Billing Error.** If CARRIER discovers and corrects an error in, or in CARRIER's sole judgment decides to retroactively increase or decrease, the amount of any item billed to CARRIER's customer on a shipment that CONTRACTOR hauled and for which CONTRACTOR was compensated on a percentage-of-revenue basis pursuant to Section 3(a) above, CARRIER shall credit to, or deduct from, CONTRACTOR's Settlement Compensation and any other amounts due CONTRACTOR from CARRIER at the next settlement a share – corresponding to the percentage of such revenue normally payable to CONTRACTOR under Sections 3(a) above respectively – of the additional amount CARRIER actually collects or refunds in remedying the error. CARRIER shall provide CONTRACTOR, before or at the time of settlement, with a copy of the amended rated freight bill or a computer-generated document that contains the same information, or, in the case of contract carriage, any other form of documentation actually used for a shipment containing the same information that would appear on a rated freight bill, and shall otherwise meet the requirements of Section 4(d) of this Agreement with respect to the shipment.

**3(d)(2).   Billed Amount Uncollectible.** If, after making a commercially reasonable effort to do so, CARRIER is unable to collect from a customer the full amount of any item billed to the customer for a shipment that CONTRACTOR hauled and for which CONTRACTOR was compensated on a percentage-of-revenue basis pursuant to Section 3(a) above, CARRIER shall deduct at the next settlement or otherwise recover pursuant to Section 5(a) of this Agreement a share of the unpaid amount that corresponds to the percentage of such revenue normally payable to CONTRACTOR pursuant to Section 3(a) above for the shipment. CARRIER shall give CONTRACTOR, before or at the time of settlement, a written explanation of CARRIER's efforts to collect from its customer and the computation of the amount being deducted or otherwise recovered pursuant to Section 5(a).

### 4.   SETTLEMENT PERIOD AND DOCUMENT REVIEW.

**4(a).   Payment Period.** CARRIER shall settle with and pay the required compensation to CONTRACTOR with respect to services provided under this Agreement within fifteen (15) calendar days after CONTRACTOR's submission, in proper form, of those documents necessary for CARRIER to secure payment from CARRIER's customers, including the signed freight bill, delivery receipt, or bill of lading (regardless of whether it is one to which no exceptions have been taken by the shipper or consignee), detention ticket signed by consignee and filled out with cause of delay and specific times in and out, and any

specific documents required by the shipper, plus properly-completed logs as required by DOT (collectively "Trip Documents") – and shall, whenever possible, settle with and pay CONTRACTOR every Friday for all trips for which CONTRACTOR has delivered Trip Documents by hand-delivery to CONTRACTOR's designated dispatch office, or by dropping them in a Trip Pak drop-box, by 11:59 p.m. Eastern Time on Saturday of the preceding week. In addition but not as a condition of settlement and payment, after completion of each trip in the service of CARRIER, CONTRACTOR shall submit to CARRIER all fuel-purchase receipts; mileage reports; damage reports; state or federal inspection reports; accident reports; driver daily vehicle condition reports; weight slips; trip manifests; receipts for tolls reimbursable pursuant to **Attachment A (CONTRACTOR Payment Rates)** (not necessary if CARRIER's customer furnishes an electronic toll-paying device); detention documents; expense tickets, and any other reports required by this Agreement or governmental regulation. To expedite CARRIER reimbursement, CONTRACTOR is encouraged, but not required, to include expense receipts for all expenses authorized by CARRIER in Trip Documents.

**4(b).   Settlement Compensation.** At each weekly settlement, CARRIER shall pay CONTRACTOR any compensation due under Section 3 – less any deductions under Sections 5 and 6, or other provisions or Attachments, of this Agreement, plus any other amounts owed to CONTRACTOR by CARRIER (together referred to throughout this Agreement as "Settlement Compensation") – that have been posted up to that time, by whichever payment option CONTRACTOR elects in Section 3 of Attachment B (CONTRACTOR Election Form).

**4(c).   Settlement Statement.** At each weekly settlement, CARRIER shall directly or through an agent hand-deliver or send to CONTRACTOR, by fax, email, or U.S. First Class Mail to the address required by Section 24 (Notices) of this Agreement, a statement detailing all debit and credit entries since the preceding statement ("Settlement Statement").

**4(d).   Documentation.** If compensation is based on a percentage of the revenue for a shipment, CARRIER shall provide CONTRACTOR, before or at the time of settlement, with a copy of the rated freight bill or a computer-generated document that contains the same information, or, in the case of contract carriage, any other form of documentation actually used for a shipment containing the same information that would appear on a rated freight bill. CONTRACTOR shall be permitted to examine CARRIER's tariffs, or in the case of contract carriage, other documents from which rates and charges are computed, and documents underlying any computer-generated document, at CARRIER's main headquarters during normal business hours. If rates and charges are computed from a contract, CONTRACTOR is entitled to examine only those portions of the contract containing the same information as would appear on a rated freight bill. CARRIER may delete the names of shippers and consignees shown on the freight bill or other form of documentation.

BIGE_00006

4(e). <u>Removal of Identification.</u> Upon termination of the Agreement, as a condition precedent to CARRIER's final payment of compensation, CONTRACTOR shall remove from the Equipment, and return to CARRIER, all Equipment identification devices of CARRIER. If the identification devices have been lost or stolen, a letter from CONTRACTOR certifying the removal of such devices from the Equipment shall satisfy this requirement.

5.   <u>DEDUCTIONS FROM COMPENSATION.</u>

5(a). <u>List of Deductions.</u> CONTRACTOR hereby authorized CARRIER to deduct the items in the deductions table below ("Deductions Table"), or in any Addendum to this Agreement, from CONTRACTOR's compensation at the time of settlement and from other amounts CARRIER owes CONTRACTOR, and, only upon termination of this Agreement, from CONTRACTOR's escrow fund under this Agreement. Where no dollar figure is listed in the Deductions Table below, the deductions will

vary in amount and will be computed as indicated in the column headed "Amount, or Method of Computation, of Deduction." Except as otherwise indicated in that column or in another provision of this Agreement or Addendum, (a) CARRIER shall charge CONTRACTOR no administrative ("admin.") fee or markup and (b) CARRIER shall credit CONTRACTOR with all rebates, discounts, credits, or refunds that correspond to particular deductions and that CARRIER receives while the Agreement is in effect or, in the case of taxes and fees, even after the Agreement is terminated. Instead of or in addition to making the deductions authorized by this Section from CONTRACTOR's settlement compensation and from other amounts CARRIER owes CONTRACTOR, and, upon termination of this Agreement, from CONTRACTOR's escrow funds under the Agreement, CARRIER shall have a right to recover, through collection agencies, arbitration, the right of setoff, and all other available legal means, any such amounts CONTRACTOR owes, or comes to owe, CARRIER under the Agreement.

| DEDUCTION ITEM | AMOUNT, OR METHOD OF COMPUTATION, OF DEDUCTION |
|---|---|
| Advances of CONTRACTOR's compensation that CONTRACTOR elects to have CARRIER issue. CONTRACTOR agrees to use any advances received via CARRIER Fuel Card or Preauthorized Check for business or commercial purposes only and not for personal, consumer, household, or payment-of-income-tax purposes. | 1. Advance via CARRIER Fuel Card. *See* "Fuel purchases" row below)  2. Advance via Preauthorized Check. Amount of CONTRACTOR's compensation that, at CONTRACTOR's request and with CARRIER's consent, CARRIER advanced by authorizing CONTRACTOR to write a Preauthorized Check, plus a one-and-a-half-percent (1.5%) admin. fee to CARRIER and a $0.85-per-Check fee to Check issuer. |
| Alternative Use of Equipment payment to CARRIER if OWNER-OPERATOR fails to make such payment to CARRIER within twenty (20) calendar days of completion of a trip pursuant to Agreement § 18 | *See* Agreement § 18(b) |
| C.O.D. Charges | Amount of freight revenue from shippers, sublease carriers, or others not collected, or collected but not remitted, by CONTRACTOR to CARRIER when such actions were required by the Agreement |
| Claims for damages, losses, court costs, fines, penalties, attorneys' fees, and other expenses (together "Damages") CARRIER incurs arising out of CONTRACTOR's negligence, gross negligence, willful misconduct, or other culpable acts or omissions under the Agreement, pursuant to § 12(a) ("Indemnification"), subject to maximums established by §§ 12(b)-(d) | Amount CARRIER paid or otherwise incurred, subject to indemnity limits set forth in Agreement §§ 12(b)-(d) |
| Detention, accessorial, and other customer-charge revenue not collected by CARRIER from CARRIER's Customer because of CONTRACTOR's failure to transmit to CARRIER the necessary documentation supplied by the shipper or consignee | Amount CARRIER was unable to collect from CARRIER's Customer as a result of CONTRACTOR's failure to transmit to CARRIER the necessary documentation supplied by the Customer, provided that no deduction shall be made from CONTRACTOR's compensation if CONTRACTOR contacted CARRIER's dispatch regarding issue prior to departure from Customer (consignor or consignee) location |
| Drug and alcohol testing | Amount CARRIER paid outside vendor |
| Earnings Adjustment, pursuant to Agreement § 3(d) | *See* Agreement § 3(d) |
| Electronic Onboard Recorder, if lost or damaged under circumstances described in Agreement § 8(g)(4) | Amount CARRIER paid outside vendor |
| Escrow fund contributions by CONTRACTOR | *See* Agreement § 16(a) |
| Express mail (U.S.P.S. or private providers), | Amount CARRIER paid outside vendor |

BIGE_00007

| DEDUCTION ITEM | AMOUNT, OR METHOD OF COMPUTATION, OF DEDUCTION |
|---|---|
| TripPak SCANNING, TRANSFLO, or other package delivery service If CONTRACTOR charges the service to CARRIER's account with the delivery service vendor or requests the service under the Agreement | |
| Fines, penalties, and related court costs, attorneys' fees, and other legal expenses | Amount CARRIER paid or otherwise incurred in connection with fines or penalties that Agreement §§ 8(b) and (c) make CONTRACTOR responsible for |
| Fuel and mileage taxes and fuel reporting | See Agreement § 8(d) |
| Fuel Purchases that CONTRACTOR elects to make, using CONTRACTOR's CARRIER Fuel Card, at CARRIER's bulk-fueling facilities or third-party fuel retailers | 1. Purchases at CARRIER's Bulk-Fueling Facilities. When CONTRACTOR elects to purchase fuel at CARRIER's bulk-fueling facilities using CARRIER Fuel Card, CARRIER shall deduct (and show on CONTRACTOR's Settlement Statement) or otherwise recover pursuant to Agreement § 5(a) a dollar amount computed by multiplying the number of gallons purchased by the most recent Weekly Retail On-Highway Diesel Price--Average All Types (per gallon, all taxes included), published by the Energy Information Administration of the U.S. Department of Energy ("EIA"), at http://tonto.eia.doe.gov/oog/info/wohdp/diesel.asp or successor website, for the EIA "Region" (including California) in which the bulk-fueling facility is located. This price may result in a markup to CARRIER over the amount CARRIER paid for the fuel.<br>2. Purchases at Third-Party Fuel Retailers. When CONTRACTOR elects to purchase fuel from third-party vendors using CARRIER Fuel Card, CARRIER shall deduct (and show on CONTRACTOR's Settlement Statement) or otherwise recover pursuant to Agreement § 5(a) an amount computed by multiplying the number of gallons purchased by a price per gallon no greater than the price posted at the fuel vendor's pump. The amount deducted, if less than the pump price, is the result of a discount to CONTRACTOR that CARRIER has negotiated with the fuel vendor or Card issuer. If CARRIER receives any additional discount on CONTRACTOR's fuel purchases or if the fuel purchases of all CARRIER's contractors combined reach certain volumes and result in CARRIER's receiving rebates from some fuel vendors, CARRIER shall retain all such discounts and rebates and NOT share them with CONTRACTOR or other contractors.<br>3. Fee for Card-Replacement or Cash Advance. If CONTRACTOR loses his/her CARRIER Fuel Card or needs a cash advance from CARRIER for a fuel purchase because CONTRACTOR is not then carrying the Card, CARRIER shall deduct a fee of thirty-five dollars ($35) for each cash advance or replacement Card.<br>4. No Obligation to Use Card or Bulk-Fueling Facilities. CONTRACTOR is under no obligation to use the CARRIER Fuel Card for fuel purchases or to purchase fuel at CARRIER's bulk-fueling facilities. |
| Garnishment orders (including but not limited to child-support orders) by courts and tax liens against CONTRACTOR compensation | Amount CARRIER paid in compliance with any lawfully-issued order or lien, a copy of which CARRIER shall supply to CONTRACTOR at or before the first deduction relating to it, plus an admin. fee to CARRIER in the amount of the lower of $100 per order or lien or such other amount as may be authorized by law. After termination of, but not during, this Agreement, CARRIER shall deduct from CONTRACTOR's Escrow Fund (after all deductions authorized by this Deductions Table) the portion of any garnishment or lien amount due that exceeds the balance in CONTRACTOR's Settlement Compensation. |
| Identification decals | Amount CARRIER paid outside vendor for identification materials (other than the first set, which is provided by CARRIER at no charge) and, if CONTRACTOR elects to have CARRIER affix the materials (other than the first set, for which there shall be no affixing charge) to the |

BIGE_00008

| DEDUCTION ITEM | AMOUNT, OR METHOD OF COMPUTATION, OF DEDUCTION |
|---|---|
| | Equipment, the amount CARRIER paid outside vendor or otherwise incurred. |
| Inspections of Equipment | Amount CARRIER paid vendor of inspections services or, if inspection is performed at a CARRIER facility, the cost CARRIER paid for parts and labor, with no markup. |
| Insurance coverages that CONTRACTOR elects, via the "Certificate of Insurance" in Attachment B (CONTRACTOR Election Form), to have CARRIER facilitate or that CARRIER maintains at CARRIER's expense because CONTRACTOR failed to provide proper evidence of the purchase or maintenance of the required coverages under Agreement § 6 | Cost to CONTRACTOR initially – see "Certificate of Insurance" in Attachment B (CONTRACTOR Election Form) for more details: 1. Non-Trucking Liability Insurance: $35/month, billed at $8.08/week 2. Occupational Accident Insurance: $134/month each for CONTRACTOR and any Co-Driver (travels in the Equipment with CONTRACTOR), billed at $30.92/week 3. Physical Damage Insurance: one and six-tenths percent (1.6%) annually (billed weekly) times CONTRACTOR-specified value of tractor<br><br>The above costs are amounts the insurer(s) charged for the required and optional coverages that CONTRACTOR selected (and for those required coverages that CONTRACTOR failed to provide CARRIER proper evidence of CONTRACTOR's purchase and maintenance of them). For Non-Trucking Liability, Occupational Accident, and Physical Damage coverages, CARRIER shall deduct $5 per month each in admin. fees in addition to the costs shown above. All above costs are subject to possible increases (see Agreement § 6(e)). |
| Maintenance, repairs, tires, and other parts that CONTRACTOR elects to purchase from third-party maintenance vendors | Amount CARRIER paid third-party maintenance vendor, plus admin. fee to CARRIER of one and a half percent (1.5%) of amount paid to vendor |
| Maintenance, repairs, tires, and other parts that CONTRACTOR elects to purchase from CARRIER or CARRIER's affiliate | For tires and parts, amount CARRIER or CARRIER's affiliate paid third-party vendor, plus markups resulting in prices (which shall be provided to CONTRACTOR upon request at the time CONTRACTOR purchases or places order for items) competitive with other vendors in the relevant market(s). For labor in connection with maintenance and repairs, CARRIER's (or CARRIER's affiliate's) hourly labor rate as posted at the facility performing the work and competitive with other vendors in the relevant market(s). All amounts will be subject to an admin. fee to CARRIER of one and a half percent (1.5%). |
| Medical examinations | Amount CARRIER paid third-party vendor |
| Motor vehicle reports | Amount CARRIER paid third-party vendor |
| Operating expenses not otherwise listed in this table for which CONTRACTOR is responsible under the Agreement § 5(b) | Amount CARRIER paid or otherwise incurred. For use of CARRIER Fuel Card or Preauthorized Checks to pay for fuel, maintenance, repairs, or tires, see line items for Advances above. |
| Performance completion charges, pursuant to Agreement §§ 11 and 14 | Amount CARRIER paid or otherwise incurred to complete CONTRACTOR's required performance under the Agreement. See Agreement §§ 11 and 14 |
| Permit fees, pursuant to Agreement § 8(f)(2) | See Agreement § 8(f)(2) |
| Taxes, to the extent Contractor requests, and Carrier agrees, to pay federal Heavy Highway Vehicle Use Tax and State, local, and foreign taxes on the Equipment and its operation (other than fuel and mileage taxes, covered by the "Fuel and mileage taxes" row above and Agreement § 8(d)) | Amount CARRIER paid to the taxing jurisdiction |
| Termination-related expenses pursuant to Agreement § 14 | Amount CARRIER paid or otherwise incurred. See Agreement § 14 |
| Truck washes if CONTRACTOR requests a wash | Amount CARRIER paid to third-party vendor |
| Weigh-station bypass fees | Amount CARRIER paid to third-party vendor |

5(b). Other Deductions. From time to time, CONTRACTOR may be permitted to purchase fuel, products or services, including repairs, which are charged to CARRIER. When CONTRACTOR does so, CONTRACTOR hereby authorizes CARRIER to deduct or otherwise recover pursuant to Section 5(a) of this

BIGE_00009

Agreement amounts equal to such charges. CONTRACTOR is never to charge any amounts to CARRIER's account – or execute or endorse any negotiable instrument for or on behalf of CARRIER – without CARRIER's express written permission in advance, and CONTRACTOR and CARRIER shall not incur or authorize any other debts in the name of the other.

5(c). Information Regarding Deductions. CARRIER shall provide CONTRACTOR with a written explanation and itemization of any deductions for cargo or property damage before making them. With respect to all deductions, CARRIER shall make available to CONTRACTOR, upon request, copies of those documents that are necessary to determine the validity of the deduction.

5(d). Changes in Existing Deduction Items. If an item in any of the above columns will be changing, CONTRACTOR shall be so notified by personal delivery, fax, or other written notice. In any event, CONTRACTOR shall not be subject to any change until twenty (20) calendar days after such notice or such later time as is set forth in the notice. CONTRACTOR's failure, by the end of twenty calendar days after such notice, to notify CARRIER of any objection to the change shall constitute CONTRACTOR's express consent and authorization to CARRIER to implement the change and modify accordingly the amount deducted or otherwise recovered pursuant to Section 5(a) of this Agreement, beginning immediately after the twenty-day period. Such modified amounts shall replace and supersede those shown in the table in Section 1 above. If CONTRACTOR fails to notify CARRIER of CARRIER's objection within the twenty-day period – or if CONTRACTOR notifies CARRIER of CONTRACTOR's objection within the twenty-day period and the parties are then unable to resolve the matter, the parties shall each have the right to terminate this Agreement immediately thereafter. Once the change becomes effective, CONTRACTOR still retains the right to terminate this Agreement in accordance with the procedures set forth in Section 2 of this Agreement (although CONTRACTOR shall remain subject to the change until the effective date and time of its termination).

6. INSURANCE. The respective obligations of the parties shall be as follows:

6(a). CARRIER's Insurance Obligations.

6(a)(1). CARRIER shall maintain public liability insurance (bodily-injury/property-damage coverage and environmental restoration coverage), and cargo loss-and-damage coverage, in at least such amounts as are required by FMCSA regulations promulgated under 49 U.S.C. § 13906 and pursuant to applicable state laws, covering the Equipment (as well as any trailers owned by CONTRACTOR or CARRIER) at all times it is being operated on behalf of CARRIER.

6(a)(2). CARRIER's bodily injury/property damage insurance policy and cargo

insurance policy shall list CONTRACTOR as an additional insured. CARRIER's possession of such insurance, however, shall in no way affect CARRIER's rights of indemnification against CONTRACTOR as provided for in the Agreement.

6(b). CONTRACTOR's Insurance Obligations. CONTRACTOR shall maintain, at CONTRACTOR's expense, the following minimum insurance coverages during the Agreement:

6(b)(1). Non-Trucking Liability Insurance. CONTRACTOR shall procure, carry, and maintain public liability and property damage insurance that provides coverage to CONTRACTOR whenever the Equipment (as well as any CARRIER's trailer) is being operated on behalf of CARRIER in a combined single limit of others pursuant to an alternative use of the Equipment under Section 3 of the Agreement or whenever the Equipment is being operated on behalf of CONTRACTOR alone) in a combined single limit of not less than one million dollars ($1,000,000), with a deductible no greater than one thousand dollars ($1,000) for injury or death to any person or for damage to property in any one occurrence. Such coverage shall be no less comprehensive than the coverage CARRIER may facilitate on CONTRACTOR's behalf if CONTRACTOR so chooses, as provided in Subsection (d) of this Section. In addition, such coverage shall be primary, as between CARRIER and CONTRACTOR, to any other insurance that may be available from CARRIER. CONTRACTOR shall be responsible for all deductible amounts and for any loss or damage in excess of the policy limit.

6(b)(2). Workers' Compensation/ Occupational Accident Insurance.

6(b)(2)(A). Workers' Compensation Coverage. CONTRACTOR shall, to the extent required or permitted by law, procure workers' compensation insurance coverage (or, if CONTRACTOR prefers, occupational accident insurance coverage pursuant to Section 6(b)(2)(B) of this Agreement where both state law allows and CARRIER approves) for CONTRACTOR and those of CONTRACTOR's drivers, helpers, employees, agents, and other persons required to be principally covered under the workers' compensation law of the state in which CONTRACTOR is domiciled and in amounts not less than the statutory limits required by such state's law. The workers' compensation insurance policy shall provide principal coverage in the state in which CONTRACTOR is domiciled (which state, if CONTRACTOR is a resident of North Carolina, shall be deemed to be North Carolina), and shall provide "other states coverage" that excludes only North Dakota, Ohio, Washington, and Wyoming. If CONTRACTOR is domiciled in any of the five foregoing states, CONTRACTOR shall have state-fund coverage. As evidence of

BIGE_00010

such coverage, CONTRACTOR shall provide CARRIER with a copy of the insurance policy declarations page for CARRIER's verification before operating the Equipment under the Agreement.

6(b)(2)(B). Occupational Accident Coverage. CONTRACTOR may, as an alternative to obtaining workers' compensation coverage, obtain an occupational accident insurance policy that includes either an endorsement or a separate policy provision whereby an admitted insurer provides, or agrees to provide, workers' compensation coverage that becomes effective for a claim by CONTRACTOR alleging employee status, but CONTRACTOR may elect this alternative ONLY IF:

6(b)(2)(B)(1). CONTRACTOR either

(I). is the sole owner, and the sole operator, of the Equipment, or

(II). Has workers and the state in which CONTRACTOR is domiciled both exempts CONTRACTOR from maintaining workers' compensation coverage of himself-herself and CONTRACTOR's workers and protects CARRIER from being considered the employer of either CONTRACTOR or CONTRACTOR's workers;

6(b)(2)(B)(2). The state in which CONTRACTOR is domiciled is not Colorado, Massachusetts, Nevada, New Hampshire, New Jersey, New York, or North Carolina. CONTRACTOR is required to maintain statutory workers' compensation insurance coverage for all of CONTRACTOR's workers, including himself/herself, that are domiciled in any of these states;

6(b)(2)(C). The occupational accident insurance coverage is no less comprehensive than the coverage CARRIER may facilitate on CONTRACTOR's behalf if CONTRACTOR so chooses, as provided in Subsection (d) of this Section; and

6(b)(2)(D). CARRIER approves the coverage.

6(b)(3). Other Insurance. In addition to the insurance coverages required under the Agreement, it is CONTRACTOR's responsibility to procure, carry, and maintain any fire, theft, uninsured and/or underinsured motorist, physical damage (collision), and any other insurance coverage that CONTRACTOR may desire for the Equipment or for CONTRACTOR's life, health care, dental care, vision care, or other needs. As provided in the Agreement, CONTRACTOR holds CARRIER harmless with respect to loss of or damage to CONTRACTOR's Equipment, trailer, or other property, and CARRIER has no responsibility to procure, carry, or maintain any insurance covering loss of or damage to CONTRACTOR's Equipment, trailer, or other property. CONTRACTOR acknowledges that CARRIER may, and CONTRACTOR hereby authorizes CARRIER to, waive, reject, or reduce no-fault, uninsured, and underinsured motorist coverage from CARRIER's insurance policies to the extent allowed under the laws of Virginia (the state in which CARRIER's insurance policies are delivered), and CONTRACTOR shall cooperate in the completion of all necessary documentation for such waiver, election, rejection, or reduction.

6(c). Requirements Applicable to All of Contractor's Insurance Coverages. CONTRACTOR shall procure insurance policies providing the above-described coverages solely from insurance carriers that are rated at least "A" by A.M. Best (or of equivalent financial strength in the commercially-reasonable judgment of CARRIER), and CONTRACTOR shall not operate the Equipment under the Agreement unless and until CARRIER has determined that the policies are acceptable (CARRIER's approval shall not be unreasonably withheld). CONTRACTOR shall furnish to CARRIER written certificates obtained from CONTRACTOR's insurance carriers showing that all insurance coverages required above have been procured from insurance carriers rated at least "A" by A.M. Best (or of equivalent financial strength in the commercially-reasonable judgment of CARRIER), that the coverages are being properly maintained, and that the premiums thereof are paid. Each insurance certificate shall specify the name of the insurance carrier, the policy number, and the expiration date; list CARRIER as an additional insured with primary coverage; and show that written notice of cancellation or modification of the policy shall be given to CARRIER at least thirty (30) days prior to such cancellation or modification.

6(c)(1). Contractor's Liability If Required Coverages Are Not Maintained. In addition to CONTRACTOR's hold harmless/indemnity obligations to CARRIER under the Agreement, CONTRACTOR agrees to defend, indemnify, and hold CARRIER harmless from any direct, indirect, or consequential loss, damage, fine, expense, including reasonable attorney fees, actions, claim for injury to persons, including death, and damage to property that CARRIER may incur arising out of or in connection with CONTRACTOR'S failure to maintain the insurance coverages required by the Agreement. In addition, CONTRACTOR, on behalf of CONTRACTOR's insurer, expressly waives all subrogation rights against CARRIER, and, in the event of a subrogation action brought by CONTRACTOR's insurer, CONTRACTOR agrees to defend, indemnify, and hold CARRIER harmless from such claim.

BIGE_00011

6(d).   Availability of Insurance Facilitated By Carrier.

6(d)(1).   CONTRACTOR may, if CONTRACTOR so chooses by initialing one or more boxes in the right-hand column of the attached "CERTIFICATE OF INSURANCE," authorize CARRIER to facilitate, on CONTRACTOR's behalf, the insurance coverages required or made optional by the Agreement. In any such case, CARRIER shall deduct or otherwise recover pursuant to Section 5(a) of this Agreement amounts reflecting all of CARRIER's expense and cost in obtaining and administering such coverage, as indicated in the Deductions Table of Section 5(a) of the Agreement (and under any notice and revised Certificate of Insurance pursuant to Subsection (e) of this Section.

6(d)(2).   If CONTRACTOR fails to provide proper evidence of the purchase or maintenance of the insurance required above, then CARRIER is authorized but not required to obtain such insurance at CONTRACTOR's expense and deduct or otherwise recover pursuant to Section 5(a) of this Agreement amounts reflecting all of CARRIER's expense in obtaining and administering such coverage, as indicated in the Certificate of Insurance in Attachment B (CONTRACTOR Election Form).

6(d)(3).   CONTRACTOR recognizes that CARRIER is not in the business of selling insurance, and any insurance coverage requested by CONTRACTOR from CARRIER is subject to all of the terms, conditions and exclusions of the actual policy issued by the insurance underwriter.

6(d)(4).   CARRIER shall ensure that CONTRACTOR is provided with a certificate of insurance (as required by 49 C.F.R. § 376.12(j)(2)) for each insurance policy under which the CONTRACTOR has authorized CARRIER to facilitate insurance coverage from the insurance underwriter (each such certificate to include the name of the insurer, the policy number, the effective dates of the policy, the amounts and types of coverage, the cost to CONTRACTOR for each type of coverage, and the deductible amount for each type of coverage for which CONTRACTOR may be liable), and CARRIER shall provide CONTRACTOR with a copy of each policy upon request.

6(e).   Changes in Cost or Other Details of Coverages.   If CARRIER is facilitating any insurance coverages for CONTRACTOR pursuant to Subsection (d) of this Section and the cost to CONTRACTOR for, or other details of, a coverage is changing from the information listed in the "CERTIFICATE OF INSURANCE" in Attachment B (CONTRACTOR Election Form) or the Deductions Table in Section 5(a) of the Agreement, CONTRACTOR shall be so notified by personal delivery, fax, or other written notice. In any event, CONTRACTOR shall not be subject to any such change until twenty (20)

calendar days after such notice or such later time as is set forth in the notice. CONTRACTOR's failure, by the end of twenty (20) calendar days after such notice, to notify CARRIER of any objection to the change shall constitute CONTRACTOR's express consent and authorization to CARRIER to implement the change and modify accordingly the amounts deducted or otherwise recovered pursuant to Section 5(a) during the 20-day period. Such modified amounts shall replace and supersede those shown in the Deductions Table in Section 5(a) of this Agreement and CARRIER shall not have an obligation to also provide a revised Deductions Table. CARRIER shall thereupon provide CONTRACTOR with a revised Certificate of Insurance, required by Subsection (e) of this Section, reflecting the change (such certificate to include the name of the insurer, the policy number, the effective dates of the policy, the amounts and types of coverage, the cost to CONTRACTOR for each type of coverage, and the deductible amount for each type of coverage for which CONTRACTOR may be liable) and, upon request by CONTRACTOR, a copy of the corresponding insurance policy. If CONTRACTOR fails to notify CARRIER of any objection within the 20-day period, if CONTRACTOR notifies CARRIER of CONTRACTOR's objection within the 20-day period and CONTRACTOR and CARRIER is then unable to resolve the matter to our mutual satisfaction, or if CONTRACTOR fails to obtain substitute coverage from another source and to meet the requirements, as to that coverage, of Subsections (b) and (c) of this Section, CONTRACTOR and CARRIER shall each have the right to terminate the Agreement effective immediately upon the change becoming effective (although CONTRACTOR shall remain subject to the change until CONTRACTOR's termination's effective date and time).

7.   COMPLIANCE WITH PERTINENT LAWS AND REGULATIONS BY CONTRACTOR.   CONTRACTOR recognizes that CARRIER's separate and distinct business of providing motor carrier freight transportation service to the public is subject to regulation by the federal government acting through DOT, and by various other federal, state, local, and foreign governing bodies. Accordingly, CONTRACTOR shall adhere to and perform the following provisions to aid CARRIER in discharging its legal duties:

7(a).   Drivers.   CONTRACTOR shall provide CONTRACTOR and/or other competent professional drivers who meet CARRIER's minimum driver qualification standards (part of CARRIER Policies and Procedures[1]) and

---

[1] "CARRIER Policies and Procedures" comprise the *Big E Transportation LLC Contractor Manual (Rev. 4/1/10)*, CARRIER's then-current edition of PC*MILER (Practical Miles) computerized mileage guide, and the Federal Motor Carrier Safety Regulations (see "Rules & Regulations" at www.fmcsa.dot.gov). CARRIER shall furnish a paper copy of the *Contractor Manual* to CONTRACTOR, at no charge, at the start of the Agreement and, during the Agreement, shall make the *Manual* available to CONTRACTOR on request for inspection at a CARRIER terminal during normal business hours at no charge. CONTRACTOR may, at CONTRACTOR's expense, inspect, download, and/or print the Federal Motor Carrier Safety Administration

BIGE_00012

all of the requirements of the DOT, including but not limited to, familiarity and compliance with all state and federal motor carrier safety laws and regulations. The parties agree that CARRIER shall have the right to disqualify any driver provided by CONTRACTOR in the event that the driver is found to be unsafe, unqualified pursuant to federal or state law, in violation of CARRIER's minimum qualification standards, or in violation of any policies of CARRIER's customers. Upon a driver's disqualification by CARRIER, CONTRACTOR shall be obligated to furnish another competent, reliable, and qualified professional driver who meets the minimum qualification standards established by CARRIER. This Agreement may be immediately terminated, in CARRIER's discretion, if CONTRACTOR's or CONTRACTOR's driver's Commercial Driver's License is suspended, revoked or cancelled, or in the event CONTRACTOR or CONTRACTOR's driver fails the required DOT medical certification examination.

7(b).   Medical Examinations. CONTRACTOR acknowledges that DOT requires all drivers to undergo a complete medical examination prior to being allowed to drive, in any capacity whatsoever, in CARRIER's service. Such examination shall be performed by physicians approved by CARRIER and shall include testing for use of controlled substances. Drivers may be required to undergo follow-up examinations, from time to time, in accordance with the requirements of 49 C.F.R. §§ 391.41 *et seq.* Additionally, if in the judgment of CARRIER a further medical examination is warranted, such examination shall be undergone. CONTRACTOR shall bear the expense of all medical examinations.

7(c).   Drug   and   Alcohol   Testing. CONTRACTOR and CONTRACTOR's drivers shall, as required by 49 C.F.R. § 382.103, comply with CARRIER's Drug and Alcohol Policy, including participation in CARRIER's random drug and alcohol testing program, and any addendums or revisions thereto.   Violation of CARRIER's Drug and Alcohol Policy, or positive tests for drugs   or   alcohol,   shall   immediately   disqualify CONTRACTOR's driver. CONTRACTOR shall bear the expense of all drug and alcohol tests.

7(d).   Paperwork   Requirements. CONTRACTOR shall submit to CARRIER, on a timely basis, all driver logs and supporting documents (including original toll receipts for CARRIER's reproduction, fuel receipts, and container-interchange documents), physical examination certificates, accident reports, monthly maintenance sheets, vehicle inspection sheets, bills of lading, proof-of-delivery receipts, trip reports, overweight or other citations, and any other required data, documents, or reports, including any documentary evidence that

Regulations by accessing (including, on request, at any CARRIER terminal) the Federal Motor Carrier Safety Administration's "Rules & Regulations" web page indicated above. With respect to *PC\*Miler*, a third-party copyrighted mileage guide, CARRIER shall furnish to CONTRACTOR upon request and at no charge at any CARRIER terminal during normal business hours, prints of a commercially-reasonable number of particular CONTRACTOR-requested city-to-city mileage calculations.

CARRIER requests proving CONTRACTOR has paid all taxes legally due and owing to any governmental body.

7(e).   Shipping Documents. CONTRACTOR agrees that all bills of lading, waybills, freight bills, manifests, or other papers identifying the property carried on the Equipment shall be those of CARRIER, or as authorized by CARRIER, and shall indicate that the property transported is under the responsibility of CARRIER or a carrier with which the Equipment has been subcontracted.

7(f).   Safe Operations.

7(f)(1).   In General.   CONTRACTOR shall ensure that CONTRACTOR and all drivers or other personnel CONTRACTOR furnishes shall (1) drive in a safe manner so as to avoid endangering the public, the driver and/or the property being transported (2) adhere to and perform the terms of this Agreement; the requirements of All Applicable Law, including but not limited to DOT, state, provincial, and local safety, traffic, road, truck size-and-weight, hazardous materials transportation, and cargo security laws and regulations; CARRIER's operating authorities; and, conditioned only upon Section 7(f)(1) above, follow CARRIER Policies and Procedures. CONTRACTOR is required to comply with the federal hours-of-service regulations, and nothing in this Agreement is intended to authorize CONTRACTOR or CONTRACTOR's drivers to operate beyond the limits established by those regulations.

7(f)(2).   CSA   2010   Compliance. Beginning on the date FMCSA makes its Compliance Safety Accountability 2010 ("CSA 2010") Program effective as to CARRIER's and CONTRACTOR's operations under this Agreement, CONTRACTOR shall ensure that CONTRACTOR's Equipment and drivers at all times meet CSA 2010 safety standards sufficient to enable CARRIER to (a) achieve and maintain a "fit" or similar rating that enables CARRIER to operate without FMCSA intervention or restriction pertaining to any of the seven safety evaluation areas measured by CSA 2010, (b) obtain insurance coverage without increased costs associated with driver, equipment, or other performance measures under CSA 2010, and (c) be and remain competitive with similarly-situated carriers as regards any of the seven safety evaluation areas measured under CSA 2010.   In addition, CONTRACTOR shall notify CARRIER in writing within two (2) business days of receiving   notification   from   FMCSA   that CONTRACTOR or any of its drivers have been deemed "unfit" or "marginal" based on their safety, inspection, and compliance performance.

7(g).   Maintenance and Inspection.

7(g)(1).   CONTRACTOR,   at CONTRACTOR's expense, shall equip and maintain the Equipment in safe condition and in complete compliance with All Applicable Law.   In order to

BIGE_00013

ensure compliance with such Laws, CONTRACTOR shall, at the start of this Agreement, make the Equipment available for a full DOT inspection pursuant to 49 C.F.R. § 396.17, at CONTRACTOR's expense, at a maintenance facility operated or approved by CARRIER and shall have any necessary maintenance or repairs done at CONTRACTOR's expense.  During this Agreement, CONTRACTOR shall, at CONTRACTOR's expense, have a full DOT inspection of the Equipment performed every one hundred eighty (180) days at a maintenance facility operated or approved by CARRIER.  CONTRACTOR shall make the Equipment available to CARRIER for inspection upon reasonable request by CARRIER.

7(g)(2).  To facilitate CARRIER's compliance with 49 C.F.R. Part 396, CONTRACTOR shall keep and maintain, or cause to be kept and maintained, systematic records of the repair and maintenance of the Equipment, and shall, when requested orally or in writing by CARRIER, promptly forward to CARRIER all inspection, maintenance, and repair records for the Equipment.  CONTRACTOR shall forward to CARRIER, at least monthly, a summary of all maintenance performed on the Equipment on a form prescribed by the CARRIER.  CONTRACTOR shall provide CARRIER with a copy of the Annual Inspection report upon completion of the inspection.

8.   **CONTRACTOR'S EXPENSES.**

8(a).  Operating Expenses.  CONTRACTOR shall, at CONTRACTOR's expense, provide the Equipment to CARRIER ready to operate and fully roadworthy, and shall furnish all lubricants, fuel, tires (including changing or repairing tires), parts, supplies, equipment, and repairs necessary for the safe and efficient operation and maintenance of the Equipment.  CONTRACTOR shall pay all expenses incident to the operation of the Equipment, including, but not limited to, fuel and fuel taxes; weight tickets; ferry, bridge, tunnel, and road tolls; fares; registration fees and base plates (and any unused portions of such plates); detention and accessorial charges not collected by CARRIER because of CONTRACTOR's failure to provide the required documentation; maintenance and repair costs; wages and remuneration of operators, drivers, and helpers, including, but not limited to, overtime and bonuses; CONTRACTOR's drivers' or other workers' wages, workers' compensation premiums, unemployment insurance, social security payments or other similar insurance, taxes, or employee benefits; Federal Highway Heavy Vehicle Use Tax; and state or local axle, weight, mileage, property or indefinite-situs, and other taxes, licenses, permits (including International Fuel Tax Agreement ("IFTA") fuel tax permits), fees (including Unified Carrier Registration fees), charges, assessments, or exactions relating to the Equipment, provided that if CONTRACTOR elects to use a CARRIER-furnished PrePass or other weigh station-bypass transponder instead of stopping at roadside weigh stations, CARRIER shall also cover the cost of all tolls, incurred in the service of this Agreement, that the transponder is utilized to pay (such

tolls generally being reimbursed by CARRIER's Customers).

8(b).  Fines.  Except as otherwise provided under "Overweight and Oversized Shipments" below, CONTRACTOR or CONTRACTOR's drivers (as professional drivers engaged in a separate and distinct profession) agree to pay all fines and penalties, including but not limited to parking, moving-violation, and other traffic fines and penalties, imposed for violation of any law or regulation by any federal, state, provincial, local, or foreign authority, where such violation results, at least partially, from the acts or omissions of CONTRACTOR.  CONTRACTOR shall notify CARRIER immediately of any such violation.

8(c).  Overweight and Oversized Shipments.  CONTRACTOR or CONTRACTOR's drivers (as professional drivers engaged in a separate and distinct profession) shall have the duty to determine that all shipments are in compliance with the size and weight laws of the states, provinces, and localities in which or through which the Equipment will travel and to notify CARRIER if the vehicle is overweight, oversized, or in need of permits before commencing the haul.  Except when the violation results from the acts or omissions of CONTRACTOR, CARRIER shall assume the risks and costs of fines for overweight and oversize trailers when such trailers are preloaded, sealed, or the load is containerized, or the trailer or lading is otherwise outside of CONTRACTOR's control, or for improperly permitted oversized and overweight loads.  CARRIER shall reimburse CONTRACTOR for any fines or penalties paid by CONTRACTOR, provided that CONTRACTOR shall pay, or reimburse CARRIER, for any costs, fines, or penalties due to CONTRACTOR's failure to weigh each shipment or to notify CARRIER that the Equipment is overweight, oversized, or in need of permits.

8(d).  Fuel Tax and Mileage Tax Reporting.  If CONTRACTOR elects, by initialing **Option 1** in Section 1 of **Attachment B (CONTRACTOR Election Form)**, or an addendum, to the Agreement, to obtain CONTRACTOR's own IFTA Fuel Tax Permit CONTRACTOR and perform CONTRACTOR's own fuel and mileage tax reporting, CONTRACTOR shall be solely responsible for calculating, reporting, and paying all fuel taxes owed for the operation of the Equipment; *and shall indemnify, defend, and hold Carrier harmless against all claims arising out of or relating to such fuel tax reporting and payment and the indemnity limits of Section 12(b)-(d) shall not apply.*  If CONTRACTOR instead elects, by initialing **Option 2** in Section 1 of **Attachment B (CONTRACTOR Election Form)**, to have CARRIER perform (directly or through an outside vendor) all fuel and mileage reporting on CONTRACTOR's behalf, CONTRACTOR hereby agrees that:

8(d)(1).  To facilitate the parties' compliance with the various states' tax reporting and payment laws (which generally hold the motor carrier liable if an independent vehicle operator performing transportation services on the carrier's behalf fails to make the required tax payments), CARRIER shall be deemed the reporting entity with respect to the

BIGE_00014

Equipment and the fuel consumed by the Equipment. In such event, CARRIER shall settle with CONTRACTOR monthly and submit quarterly, in CONTRACTOR's name as indicated herein, all the applicable reports and payments of fuel taxes required of it by the taxing bodies and authorities of the appropriate states, provinces, and other governmental bodies with respect to the Equipment operated under the Agreement. To assist in Carrier's computing and payment of fuel taxes, it shall issue CONTRACTOR a limited-purpose credit card issued by a third-party financial-services company and made available by CARRIER ("CARRIER Fuel Card") that CONTRACTOR may use for fuel purchases. CONTRACTOR and CONTRACTOR's drivers are free not to use CARRIER's Fuel Card but, to the extent they choose not to, CONTRACTOR shall provide CARRIER promptly with all properly completed driver logs, original fuel receipts (each to be submitted with the corresponding log indicating the fuel purchase for which the receipt was obtained), original toll receipts, and an accurate accounting of all fuel purchases and miles traveled by state.

8(d)(2).   CARRIER shall deduct or otherwise recover pursuant to Section 5(a) of this Agreement quarterly any net fuel use tax owed at that time with respect to CONTRACTOR's operations in all taxing jurisdictions combined, along with a quarterly flat charge, set forth in Section 1 of Attachment B (CONTRACTOR Election Form), covering the permit fee and CARRIER's tax reporting administrative fee, but not any additional fuel tax that CONTRACTOR may owe, and shall credit quarterly to CONTRACTOR's next settlement any net fuel use tax credit or refund due CONTRACTOR at that time with respect to CONTRACTOR's operations in all taxing jurisdictions combined. CARRIER shall ensure that CONTRACTOR receives, at least quarterly, summaries of credits and debits for fuel taxes on a state-by-state basis either on CONTRACTOR's Settlement Statements or through separate accountings, at CARRIER's option.

8(d)(3).   Ordinarily CARRIER shall compute CONTRACTOR's fuel use and mileage taxes on a fleetwide average basis. If, however, CONTRACTOR fails to provide CARRIER complete and accurate fuel-tax-related records, as required by the second sentence of this paragraph, in time for CARRIER's computation, on the seventh (7th) day of each month, of CARRIER's fuel and mileage tax reports and payments for the preceding month, CARRIER shall compute CONTRACTOR's fuel use taxes based on total miles dispatched by CARRIER at a five (5) miles-per-gallon rate.

8(e).   Fuel Purchases.   If CONTRACTOR elects to purchase fuel (when CARRIER makes it available) from CARRIER's bulk-fuel facilities or, using the CARRIER Fuel Card, from third-party fuel vendors, CONTRACTOR hereby authorizes CARRIER to deduct or otherwise recover pursuant to Section 5(a) such purchases on the

terms set forth under "Fuel Purchases" in the Deductions Table in Section 5(a) of this Agreement.

8(f).   Base   Plate   and   Permits. CONTRACTOR shall obtain, and properly display on or retain in (whichever is required by law) the Equipment, the license base plate and permits necessary to operate the Equipment lawfully on CARRIER's behalf in all jurisdictions in or through which CARRIER's customers' freight needs to be transported.

8(f)(1).   Base Plates.   If CONTRACTOR chooses to have CARRIER (directly or through a third-party vendor) obtain a base plate on CONTRACTOR's behalf and deduct or other recover the expense pursuant to Section 5(a) of this Agreement, CONTRACTOR shall so indicate by initialing Option 2 in Section 2 of Attachment B (CONTRACTOR Election Form). If this Agreement is terminated prior to CONTRACTOR's complete reimbursement of this combined amount, CARRIER is hereby authorized to deduct or otherwise recover any remaining amount pursuant to Section 5(a) of this Agreement.

8(f)(2).   Permits.

8(f)(2)(A).   Unified   Carrier Registration Fee.   In 2005, Congress enacted the Unified Carrier Registration ("UCR") fee as a replacement for numerous states' Single-State Registration System ("SSRS") fees, effective with the 2007 calendar year.   The UCR fee amount that is assessed by the States to CARRIER each year shall be deducted or otherwise recovered pursuant to Section 5(a) of this Agreement in an annual pro rata lump sum from CONTRACTOR (and all other CARRIER contractors) at the rate of the full annual fee divided by the number of trucks in CARRIER's fleet as of the preceding December 31, at CONTRACTOR's first settlement of the new year.

8(f)(2)(B).   Other Permits.   If CONTRACTOR accepts a shipment in or through jurisdictions that require an overweight or other permit, CONTRACTOR hereby authorizes CARRIER to deduct or otherwise recover pursuant to Section 5(a) of the Agreement the cost (with no administrative fee to CARRIER). These deductions shall be made at CONTRACTOR's first settlement after receiving such additional permit and at the first settlement following permit-renewal dates thereafter.

8(f)(3).   Return of Base Plate and Permits.   Upon termination of the Agreement, CONTRACTOR shall return to CARRIER all base plates, permits, and licenses issued in CARRIER's name.   If CARRIER then receives a refund or credit for any such base plate(s) or resells them to another CONTRACTOR,   CARRIER   shall   refund   to

BIGE_00015

CONTRACTOR a prorated share of the amount received by CARRIER, less any transfer or replacement fees owed to the plating jurisdictions. No refund shall be made to CONTRACTOR, upon termination of the Agreement, by CARRIER of the costs of any permits issued in CARRIER's name, even if the returned permits are re-used by CARRIER. CONTRACTOR shall be liable to CARRIER for all expenses incurred by CARRIER due to CONTRACTOR's failure to return all such permits.

8(g).   Communications Equipment.

8(g)(1).   Mobile Phone.  For safety and customer-service purposes, CONTRACTOR shall obtain, maintain in an operable condition, and carry at all times while the Equipment in CARRIER's service – and ensure that all of CONTRACTOR's drivers do the same – a wireless mobile telephone, and maintain a corresponding contract for nationwide wireless telephone service, all at CONTRACTOR's expense, and shall supply to CARRIER in the signature block of the Agreement the telephone number by which to reach such mobile telephone.  CARRIER shall furnish CARRIER a list of the mobile phone numbers of all of CONTRACTOR's drivers, immediately update the list in a written notification to CARRIER whenever such drivers or numbers change.  CONTRACTOR shall ensure that neither CONTRACTOR nor any of CONTRACTOR's drivers operate the voice, data, texting, or other features of any mobile phone while driving, except in a health, safety, or security emergency.

8(g)(2).   Electronic Onboard Recorder. To help enable CARRIER to document its compliance with FMCSA hours-of-service regulations with respect to drivers of the Equipment:

8(g)(2)(A).   Installation and Use of CARRIER-Furnished Recorder.  CARRIER shall, at CARRIER's expense, furnish, install, and maintain in an operable condition in each unit of Equipment, a Turnpike Global Communications, Inc. RouteTracker or other electronic onboard recorder of CARRIER's choosing.   CARRIER shall pay all usage charges in connection with the RouteTracker.

8(g)(2)(B).   Repair and Return of CARRIER-Furnished Recorder. CONTRACTOR shall be responsible for preserving and, immediately upon any request from CARRIER or the termination of this Agreement (in accordance with Section 2(b) of this Agreement), returning each CARRIER-furnished electronic onboard recorder to CARRIER.  A qualified technician selected by CARRIER shall remove the recorder.  If during this Agreement or upon its termination, the recorder is lost, damaged as a result of CONTRACTOR's negligence, or not returned upon request or upon termination of the Agreement, CONTRACTOR hereby authorizes CARRIER to deduct or otherwise recover

pursuant to Section 5(a) the entire expense incurred by CARRIER in repairing or replacing the recorder, together with all collection costs. CARRIER shall not be responsible for any loss or damage to CONTRACTOR's Equipment arising or resulting from the installation, use, or removal of the CARRIER-furnished recorder.

8(h).   Uniforms.    To  meet  customer expectations regarding security, efficiency, and professionalism, CONTRACTOR and all of CONTRACTOR's drivers, helpers, and other workers shall wear uniforms, and, if required by CARRIER, an identification device while before CARRIER's customers, at an agency of CARRIER, or at CARRIER's headquarters in the performance of services for CARRIER. CONTRACTOR shall bear the full expense of all such uniforms, and hereby authorizes CARRIER to deduct or otherwise recover such expense pursuant to Section 5(a) of this Agreement.

9.   USE OF CARRIER'S TRAILER.  For every trailer CARRIER makes available to CONTRACTOR ("CARRIER's Trailer"), the following provisions shall apply:

9(a).   CARRIER shall be responsible for all expenses relating to regular maintenance of axles, brakes, and other electrical and mechanical systems, repairs of damage to CARRIER's Trailer attributable to reasonable wear and tear, and purchases of replacement tires, provided that all such expenses are approved by CARRIER before the work is performed.

9(b).   CONTRACTOR shall be responsible for daily pre-trip and post-trip inspections; proper inflation of tires; prompt informing of CARRIER upon experiencing defective or mal-performing tires, brakes, or other electrical or mechanical features of CARRIER's Trailer; at CONTRACTOR's expense, proper lubrication; and, at CONTRACTOR's expense, all damage to CARRIER's Trailer other than reasonable wear and tear, and CONTRACTOR hereby authorizes CARRIER to deduct or otherwise recover pursuant to Section 5(a) of this Agreement all such amounts.  All repairs and maintenance to CARRIER's Trailer shall be performed at facilities designated or approved by CARRIER.

9(c).   CONTRACTOR agrees to return CARRIER's Trailer in the same good condition as received by CONTRACTOR, reasonable wear and tear excepted immediately upon CARRIER's request or upon termination of this Agreement.  In the event CARRIER's Trailer is not in as good condition as it was delivered by CARRIER, CONTRACTOR hereby authorizes CARRIER to restore the Trailer to proper condition and to charge back to CONTRACTOR the costs of such repairs or reconditioning. In the event CONTRACTOR for any reason fails to comply with this provision and return CARRIER's Trailer, CONTRACTOR agrees to reimburse CARRIER for all reasonable expense, including attorney fees, incurred by CARRIER in recovery of CARRIER's Trailer or other property from CONTRACTOR or CONTRACTOR's drivers. CONTRACTOR agrees that in the event it is necessary for CARRIER to enter upon private property or remove private

BIGE_00016

properly in order to recover CARRIER's Trailer, CONTRACTOR hereby irrevocably grants CARRIER, or CARRIER's duly authorized agents, permission to do so and further agrees to indemnify and hold harmless CARRIER and CARRIER's duly authorized agents from any form of liability whatsoever in connection with such repossession.

9(d). For each accident or incident CONTRACTOR shall be liable for, and pay, the entire amount of direct, indirect, and consequential damage (other than reasonable wear and tear), including but not limited to, towing charges, replacement costs for a total loss, arising out of, or in connection with, CONTRACTOR's use of CARRIER's Trailers or CARRIER's customer's trailers.

9(e). Before deducting the amount of any damage from CONTRACTOR's compensation, CARRIER shall provide CONTRACTOR with a written explanation and itemization of such deduction.

9(f). CONTRACTOR agrees and warrants that, except with CARRIER's prior written consent, any CARRIER's Trailer will only be used by CONTRACTOR and CONTRACTOR's drivers to transport shipments tendered to CONTRACTOR by CARRIER.

10.   ACCIDENTS AND DELAYS.

10(a). _Accidents._   CONTRACTOR shall immediately report all accidents, potential or actual claims, bodily injuries, losses or damages (including to cargo and to any container, chassis, trailer, or tires provided by CARRIER or CARRIER's customers), shortages, over-weights, or overages to CARRIER involving operations under this Agreement. If any such occurrence is not reported immediately to CARRIER, CONTRACTOR agrees to reimburse CARRIER for all expense incurred as a result of the delay in reporting. CONTRACTOR and CONTRACTOR's drivers shall cooperate fully with CARRIER with respect to any legal action, regulatory hearing or other similar proceeding arising from the operation of the Equipment, the relationship created by this Agreement or the services performed hereunder. CONTRACTOR shall, upon CARRIER's request and at CONTRACTOR's expense, provide written reports or affidavits, attend hearings and trials, and assist in securing evidence or obtaining the attendance of witnesses. CONTRACTOR shall provide CARRIER with any assistance as may be necessary for CARRIER or CARRIER's representatives or insurers to investigate, settle, or litigate any accident, claim, or potential claim by or against CARRIER.

10(b). _Delays._   CONTRACTOR agrees to cause no delay in delivering all assigned freight. CONTRACTOR or CONTRACTOR's employees or agents shall report to CARRIER as soon as possible any delays or Equipment breakdown that might interrupt a timely delivery.

11.   CARRIER'S           COMPLETION           OF CONTRACTOR'S PERFORMANCE.

11(a). Should CONTRACTOR for any reason fail to complete delivery of a load CONTRACTOR accepted (including CONTRACTOR's dropping a load at a facility CARRIER operates or utilizes rather than at the consignee's location), CARRIER may arrange for completion of such trip at CONTRACTOR's expense. CONTRACTOR hereby waives any recourse against CARRIER in such action and agrees to reimburse CARRIER for any expense arising out of completion of such trip and to pay CARRIER any damages for which CARRIER may be liable to the shipper or others arising out of CONTRACTOR's failure to complete the trip. CONTRACTOR hereby authorizes CARRIER to deduct or otherwise recover pursuant to Section 5(a) of this Agreement all such damages and expense.

11(b). When CONTRACTOR's failure to complete performance consists of not making a pickup or delivery of a container (loaded or empty) from or to Ports or other sites designated by CARRIER's customer and dispatched by CARRIER and this failure makes it necessary for CARRIER to perform, or pay another person to perform, the pickup or delivery, CONTRACTOR hereby authorized CARRIER to deduct or otherwise recover pursuant to Section 5(a) the actual cost incurred by CARRIER.

12.   INDEMNIFICATION BY CONTRACTOR.

12(a). CONTRACTOR agrees to defend, indemnify, and hold CARRIER harmless from any claim (including any for which CARRIER is not indemnified by CONTRACTOR's insurance and any claim of loss of or damage to the Equipment or to CONTRACTOR's other property) of direct, indirect, or consequential loss, damage, delay, fine, civil penalty, or expense, including reasonable attorneys' fees and costs of litigation (together "Damages") that CARRIER pays or otherwise incurs arising out of or in connection with CONTRACTOR's (including CONTRACTOR's agents' or employees') negligence, gross negligence, willful misconduct, breach of the Agreement, or other culpable acts or omissions. CONTRACTOR hereby authorizes CARRIER to deduct or otherwise recover pursuant to Section 5(a) of this Agreement any amounts due CARRIER under this Section 12. CARRIER shall furnish CONTRACTOR with a written explanation and itemization of any deduction for cargo or property damage before the deduction is made. In the event that CONTRACTOR operates the Equipment for any purpose other than the carriage of CARRIER's lading, CONTRACTOR shall hold CARRIER harmless and indemnify CARRIER for any damage (including attorneys' fees) arising from such use.

12(b). With respect to claims of personal injury (including death) or damage to the property of third-parties, CONTRACTOR's indemnity obligation under Section 12(a) above shall, if involving CONTRACTOR's (including CONTRACTOR's agents' or employees') negligence, be limited to a maximum of one thousand dollars $1,000) of the total amount in Damages that CARRIER paid or otherwise incurred per occurrence.

BIGE_00017

12(c). With respect to claims of cargo loss, damage, or delay, CONTRACTOR's indemnity obligation under Section 12(a) above shall, if involving CONTRACTOR's (including CONTRACTOR's agents' or employees') negligence, be limited to a maximum of two thousand five hundred dollars ($2,500) of the total amount in Damages that CARRIER paid or otherwise incurred per occurrence.

12(d). With respect to claims of loss of or damage to CARRIER's Trailer or other CARRIER property, CONTRACTOR's indemnity obligation under Section 12(a) above shall, if involving CONTRACTOR's (including CONTRACTOR's agents' or employees') negligence, be limited to a maximum of two thousand five hundred dollars ($2,500) of the total amount in Damages that CARRIER paid or otherwise incurred per occurrence.

12(e). The dollar limits in Sections 12(b), (c), and (d) shall not apply, in addition to in those circumstances described elsewhere in this Agreement, to amounts advanced by CARRIER for emergency road service for or towing of the Equipment or CARRIER's Trailer or to Damages arising out of or in connection with such claims if involving CONTRACTOR's (including CONTRACTOR's agents' or employees') gross negligence, willful misconduct, breach of the Agreement, or other culpable acts or omissions.

12(f). CARRIER has secured certain insurance policies and coverages directly relevant to certain risks and liabilities for which CONTRACTOR has agreed to indemnify CARRIER under this Section (for example, automobile liability, general liability, and cargo liability arising out of or in connection with CONTRACTOR's (including CONTRACTOR's agents' or employees') negligence, gross negligence, willful misconduct, or other culpable acts or omissions). Such policies are expressly for the benefit of CARRIER and incidentally may benefit CONTRACTOR. Terms of such policies may change (for example, higher or lower deductibles, length of coverage, UM/UIM waivers or limitations, or insurance underwriters). CONTRACTOR has neither any obligations under the policies nor any right to change the terms of coverages.

13.   INDEMNIFICATION BY CARRIER

13(a). CARRIER agrees to defend, indemnify, and hold CONTRACTOR harmless from any claim (including any for which CONTRACTOR is not indemnified by CARRIER's insurance) of direct, indirect, or consequential loss, damage, delay, fine, civil penalty, or expense, including reasonable attorneys' fees and costs of litigation (together "Damages") that CONTRACTOR pays or otherwise incurs arising out of or in connection with CARRIER's (including CARRIER's agents' or employees') negligence, gross negligence, willful misconduct, or other culpable acts or omissions, or breach of the Agreement. This indemnification shall not apply to any claim of loss or damage to the Equipment or to

CONTRACTOR's other property or to any claim arising out of or in connection with CONTRACTOR's operation of the Equipment for any purpose other than the performance of CONTRACTOR's obligations under this Agreement. CONTRACTOR shall furnish CARRIER with a written explanation and itemization of any claim for cargo or property damage.

13(b). CONTRACTOR's indemnity obligation under Section 13(a) above shall, if involving CARRIER's (including CARRIER's agents' or employees') negligence, be limited to a maximum of one thousand dollars ($1,000) of the total amount in Damages that CONTRACTOR paid or otherwise incurred per occurrence. This dollar limit shall not apply to Damages arising out of or in connection with such claims if involving CARRIER's (including CARRIER's agents' or employees') gross negligence, willful misconduct, breach of the Agreement, or other culpable acts or omissions.

13(c). CARRIER shall credit to CONTRACTOR's next Settlement Compensation any amounts due CONTRACTOR under this Section 13 from CARRIER.

14.   CONTRACTOR'S OBLIGATIONS UPON TERMINATION. At the termination of this Agreement:

14(a). CONTRACTOR shall, unless otherwise instructed by CARRIER, complete performance of all transportation and other services required by CARRIER or any bills of lading pertaining to any shipment or shipments that CONTRACTOR may be engaged in hauling at the time of termination. CONTRACTOR shall receive no compensation for any shipment with respect to which CONTRACTOR has failed to complete all required transportation and other services. In the event CARRIER instructs CONTRACTOR not to complete performance of transportation or other services that CONTRACTOR is willing and able to perform, CARRIER shall pay CONTRACTOR compensation determined in accordance with Section 3 of this Agreement for the portion of such services that CONTRACTOR performed prior to termination. CONTRACTOR agrees to reimburse CARRIER for any expense arising out of completion of a trip and to pay CARRIER any damages for which CARRIER may be liable to the shipper or others arising out of CONTRACTOR's failure to complete the trip. CONTRACTOR hereby authorizes CARRIER to deduct or otherwise recover pursuant to Section 5(a) of this Agreement any such expense or damages.

14(b). CONTRACTOR shall, immediately upon termination of the Agreement or the completion of the transportation or other services provided for herein, whichever occurs later, both remove all of CARRIER's identification devices from the Equipment and, except in the case of identification painted directly on the Equipment, return them to CARRIER via prepaid hand-delivery, overnight delivery, or certified mail (provided that if the identification device has been lost or stolen, a written notice (letter) certifying its removal shall satisfy this requirement); return all of CARRIER's property, including CARRIER's

BIGE_00018

Trailer, pin locks, load locks, CARRIER's Fuel Card, permits and other paperwork, freight, and CARRIER's other property to any of CARRIER's facilities; and pay CARRIER all amounts CONTRACTOR owes CARRIER at that time under this Agreement.

14(c). If CONTRACTOR fails to return CARRIER's property or freight to CARRIER or remove and return all of CARRIER's identification from the Equipment and/or pay all advances and other amounts owed to CARRIER pursuant to Section 5(a) above upon termination of this Agreement, CONTRACTOR shall pay CARRIER all expenses (including reasonable attorneys' fees) CARRIER incurs in seeking the return of such items, and CARRIER may pursue all other remedies allowed by law or authorized in the Agreement against CONTRACTOR. Such remedies include withholding CONTRACTOR's last settlement payment until CONTRACTOR removes and, except in the case of identification painted directly on the Equipment, returns all of CARRIER's identification devices or delivers to CARRIER a letter certifying that such devices have been removed, and making deductions from any such remaining compensation and from CONTRACTOR's Escrow Fund for the replacement value of CARRIER's unreturned property and for other amounts CONTRACTOR owes CARRIER, as provided by Sections 5 and 6 of this Agreement; and setting off all advances and other amounts owed to CARRIER against any other monies CARRIER owes, or later comes to owe, CONTRACTOR. CONTRACTOR shall bear the expense of removing CARRIER's identification from the Equipment, including any damage caused to the Equipment by such removal.

### 15.  CARRIER RESPONSIBILITIES.

15(a).  Exclusive Possession and Responsibility.  CARRIER and CONTRACTOR intend to relate to each other entirely as independent contractors, not as employer and employee. Nevertheless, solely to comply with 49 C.F.R. § 376.12(c)(1), CARRIER shall have exclusive possession, control, and use of the Equipment for the duration of this Agreement. CONTRACTOR may operate the Equipment for other motor carriers, shippers, or others during this Agreement only with the prior written consent of CARRIER pursuant to 49 C.F.R. § 376.12(c)(2), as applicable, and the terms of Section 18 of this Agreement. CARRIER shall not sublease the Equipment to another carrier without CONTRACTOR's prior written consent (which consent shall not be unreasonably withheld). CARRIER shall assume complete responsibility for the operation of the Equipment for the duration of this Agreement, except when the Equipment is under sublease by CARRIER to another authorized carrier. Any such sublease shall state that the sublessee-carrier shall have exclusive possession, control, and use of the Equipment, and shall assume complete responsibility for the operation of the Equipment, for the duration of the sublease. This subsection is set forth solely to comply with FMCSA regulations and shall not be used for any other purposes, including any attempt to classify CONTRACTOR as an employee of CARRIER. As 49 C.F.R. § 376.12(c)(4) provides, nothing in the provisions required by 49 C.F.R. § 376.12(c)(1) is intended to affect whether CONTRACTOR or CONTRACTOR's drivers are independent contractors or

employees of CARRIER and "an independent contractor relationship may exist when a carrier lessee complies with 49 U.S.C. § 14102 and attendant administrative requirements."

15(b).  Identification of Equipment.  CARRIER shall furnish CONTRACTOR all identification devices, placards, and other materials required to identify the Equipment, and CONTRACTOR agrees to affix, or permit CARRIER to affix, such identification to the Equipment in the manner required by law. CARRIER shall deduct or otherwise recover pursuant to Section 5(a) of this Agreement the cost (with no markup or administrative fee to CARRIER) of the identification materials and its affixing of them, if CONTRACTOR elects to have CARRIER perform the service, to the Equipment. CONTRACTOR shall, at CONTRACTOR's expense, first remove any paint, decals, or other items that, in CARRIER's reasonable judgment, would interfere with such identification. Upon termination of the Agreement or any other time the Equipment is being operated on behalf of any other carrier or shipper pursuant to Section 18 of this Agreement, CONTRACTOR shall immediately, at CONTRACTOR's expense, remove, paint over, or, in the case of operations on behalf of another entity, completely cover over, all of CARRIER's identification (see § 14(b) above for additional requirement at termination of Agreement). At no time during the Agreement shall CONTRACTOR place any carrier identification, paint, artwork, logo, or design upon the Equipment, except that of CARRIER, without CARRIER's prior written consent pursuant to Section 18 of this Agreement or otherwise (which consent shall not be unreasonably withheld).

### 16.  ESCROW FUND.  CONTRACTOR authorizes CARRIER, and CARRIER agrees, to establish and administer a required escrow fund ("Escrow Fund"), which shall be governed by the following terms and conditions:

16(a).  Principal.  The amount of principal to be held in the Escrow Fund shall be a minimum of two thousand five hundred dollars ($2,500) per unit of Equipment (up to $10,000 for all units of such Equipment combined), which shall be deducted or otherwise recovered pursuant to Section 5(a) of this Agreement at fifty dollars ($50) per settlement, beginning the first week of services provided by CONTRACTOR under the Agreement, until the full amount is deposited. If, at any time, the principal amount in escrow falls below the foregoing required amount of principal, CONTRACTOR authorizes CARRIER to deduct or otherwise recover pursuant to Section 5(a) of this Agreement payments at the same rate until the full principal amount is replenished.

16(b).  Specific Items to Which Escrow Fund May Be Applied.  The Escrow Fund shall be held by CARRIER for the purpose of ensuring compliance with the provisions of the Agreement. The specific items to which the Escrow Fund shall apply – and only upon termination of the Agreement – are all advances, expenses, taxes, fees, fines, penalties, damages, losses, or other amounts paid, owed, or incurred by CARRIER, or owed by CONTRACTOR to a third party under a purchase or rental contract, that are CONTRACTOR's responsibility under the

BIGE_00019

Agreement – specifically, the deduction items set forth in the Deductions Table in Section 5(a) of this Agreement (hereafter "Escrow Items") – to the extent that the amounts owed by CONTRACTOR for such Escrow Items exceed CONTRACTOR's Settlement Compensation at the time of the final accounting.

16(c).  Accountings.  While the Escrow Fund is under CARRIER's control, CARRIER shall provide an accounting to CONTRACTOR, no less frequently than monthly, of all transactions involving such fund by clearly indicating on individual Settlement Statements the amount and description of any deduction or addition made to the Escrow Fund.  In addition, upon CONTRACTOR's request, CARRIER shall provide CONTRACTOR with an accounting of any transactions involving CONTRACTOR's Escrow Fund.

16(d).  Interest.  CARRIER shall pay interest on the Escrow Fund to CONTRACTOR's next settlement on a quarterly basis ("interest period") beginning with receipt of the first CONTRACTOR contribution of principal.  The interest rate shall be established on the date the interest period begins and shall be equal to the average yield of 91-day, 13-week U.S. Treasury bills, as established in the weekly auction by the Department of Treasury.  For purposes of calculating the balance on which interest is paid, CARRIER may deduct a sum equal to the average advance (including all other deductions) made to CONTRACTOR during the period of time for which interest is paid.

16(e).  Final Settlement.  Following termination of the Agreement, CONTRACTOR shall make payments to CARRIER for all Escrow Items.  At the time of the return of any remaining balance in the Escrow Fund, CARRIER may deduct monies for all Escrow Items then still owed to CARRIER.  Such deductions shall be limited to amounts CARRIER actually spends, incurs, or owes to a third party, or that CONTRACTOR owes to CARRIER or a third party under a purchase or rental contract, before termination of the Agreement or, with respect to any CONTRACTOR obligation triggered by termination, including any expenses (including reasonable attorneys' fees) incurred by CARRIER in seeking the return of CARRIER's identification devices, CARRIER's Trailer, and other property, all amounts CARRIER actually spends, incurs, or owes to a third party upon termination or within forty-five (45) days thereafter.  CARRIER shall not make deductions from the Escrow Fund for items for which, by the end of forty-five (45) days after termination, neither CONTRACTOR nor CARRIER has yet made an expenditure or incurred a quantified, legally binding obligation to pay.  CARRIER shall provide a final accounting to CONTRACTOR of all such final deductions made from the Escrow Funds within forty-five (45) days from the date of termination of the Agreement.

16(f).  Return of Escrow Balance.  In no event shall the Escrow Fund, less any final deductions pursuant to the above provision, be returned to CONTRACTOR later than forty-five (45) days from the date of termination of the Agreement.  CARRIER's use, or post-termination return to CONTRACTOR, of any balance in the Escrow Fund shall not constitute a waiver of CARRIER's right to recover, through all available legal means, any additional amounts CONTRACTOR owes, or comes to owe, CARRIER under the Agreement.

17.  CONTRACTOR NOT EMPLOYEE OF CARRIER.

17(a).  In General.  Nothing herein contained shall be construed as inconsistent with CONTRACTOR's independent-contractor status, and that status may not be altered by CONTRACTOR, by the employees, agents, or servants of CARRIER, or by operation of any federal, state, or local law at any time, under any circumstances, or for any purpose.  Subject to the requirements of DOT and of any state regulatory agency having jurisdiction and although required to meet all obligations assumed under the Agreement, CONTRACTOR is entitled to exercise the discretion and judgment of an independent contractor in determining the manner and means of performing those obligations, including in:

17(a)(1).  Selecting, purchasing, and financing the Equipment and deciding when, where, and how maintenance and repairs are to be performed on the Equipment;

17(a)(2).  Selecting all routes (taking into account CARRIER's Customer or delivery requirements), refueling stops, and time and place of rest stops, provided that to meet Customers' demands, CONTRACTOR agrees to make timely and safe deliveries of all loads, and also agrees to notify CARRIER when delivery has been made or when delivery will be delayed for any reason; and

17(a)(3).  Being solely responsible for the direction and control of CONTRACTOR and all of CONTRACTOR's employees, agents, and servants, including selecting, hiring, firing, supervising, directing, assigning work, setting wages, hours, and working conditions, paying, and adjusting grievances of such employees, agents, and servants.

17(b).  CONTRACTOR's Responsibility for Insurance, Taxes, and Operating Expenses Relating to CONTRACTOR's Workers.  CONTRACTOR shall have sole financial responsibility for all workers' compensation insurance (or, if CONTRACTOR prefers, occupational accident insurance coverage pursuant to Section 6(b)(2)(B) of this Agreement where both state law allows and CARRIER approves); withholding, unemployment, and employment taxes due to the federal, state or local governments; and all operating expenses on account of CONTRACTOR, CONTRACTOR's drivers, drivers' helpers, and other workers necessary for the performance of CONTRACTOR's obligations under the terms of the Agreement.  The Indemnification of CARRIER by CONTRACTOR required by Section 12 of the Agreement shall apply in the event, among others, that any claims, actions, administrative proceedings, or arbitrations are brought by employees or other personnel CONTRACTOR furnished, by any union, by the public, or by any federal, state, local, or foreign

BIGE_00020

authority, that arise out of CONTRACTOR's furnishing of drivers, drivers' helpers, and other workers and that hold that any of CONTRACTOR's workers are an employee (but not a statutory employee resulting from CONTRACTOR's failure to comply with law) of CARRIER. In connection with CONTRACTOR's obligations under this paragraph:

17(b)(1). Insurance. CONTRACTOR agrees to maintain in force at all times proper workers' compensation insurance (or, if CONTRACTOR prefers, occupational accident insurance coverage pursuant to Section 6(b)(2)(B) of this Agreement where both state law allows and CARRIER approves), covering all drivers, drivers' helpers, and other workers used by CONTRACTOR in the performance of the Agreement, in accordance with Section 6 of this Agreement.

17(b)(2). Taxes.

17(b)(2)(A). *CONTRACTOR's Form of Business and Agreement to File Returns and Pay Taxes.* As an independent contractor, CONTRACTOR is free to choose the form in which to operate CONTRACTOR's business. Regardless of the form of business entity selected, CONTRACTOR shall file all federal, state, local, and foreign income, withholding, employment, and federal heavy vehicle use tax forms and returns associated with CONTRACTOR's business (together, "Tax Returns") that CONTRACTOR may be required by law to file, on account of CONTRACTOR and all drivers, drivers' helpers, and other workers used by CONTRACTOR in the performance of the Agreement at the time and place that may be specified in the applicable federal, state, local, and foreign laws, and to pay when due all taxes and contributions reported in such forms and returns. In that regard, CONTRACTOR further agrees that CONTRACTOR knows:

17(b)(2)(A)(1). Of CONTRACTOR's, or as appropriate, CONTRACTOR's business entity's, responsibilities to pay estimated social security taxes and state and federal income taxes with respect to remuneration received from CARRIER;

17(b)(2)(A)(2). That the social security tax CONTRACTOR, or as appropriate, CONTRACTOR's business entity, must pay is higher than the social security tax the individual would pay if he or she were an employee; and

17(b)(2)(A)(3). That the service provided by CONTRACTOR to CARRIER pursuant to the Agreement is not work covered by the unemployment compensation laws of any state, including Georgia; provided, however, that should

CONTRACTOR employ or use drivers, helpers, or other workers to fulfill its obligations under the Agreement, and such drivers, helpers, or other workers are covered by the unemployment laws of any state, including Georgia, CONTRACTOR is solely responsible for providing unemployment insurance for such drivers, helpers, or other workers.

17(b)(2)(B). Access to CONTRAC-TOR's Tax Records. CONTRACTOR agrees to furnish CARRIER such evidence of compliance with the foregoing as CARRIER shall reasonably require, including but not limited to proof of income and payroll taxes currently paid by CONTRACTOR (including as provided in Section 17(b)(2)(C) below) or withheld by CONTRACTOR from the wages of CONTRACTOR's drivers and other workers.

17(b)(2)(C). CONTRACTOR's Required Submission of IRS Form 4669 to CARRIER. CARRIER shall, itself or through an agent, file federal income tax IRS Form 1099s with the Internal Revenue Service with respect to CONTRACTOR if the amount of compensation CARRIER pays CONTRACTOR during a calendar year reaches the level at which federal law requires such forms to be filed. For each Form 1099 filed, CARRIER shall, itself or through an agent, furnish CONTRACTOR with both a copy of the completed Form 1099 and a copy of IRS Form 4669, entitled "Statement of Payments Received" on which CARRIER shall have filled in CONTRACTOR's name and address as "Payee" (Line 1), CONTRACTOR's Social Security Number or Federal Taxpayer ID Number (Line 2), CARRIER's name and address as "Payor" (Line 3), the Calendar Year for which the Form 1099 was filed (Line 4), and the "Amount of Payments [to CONTRACTOR] on Which Income Tax and Social Security Tax Were Not Withheld" by CARRIER [the amount reported on the Form 1099] (Line 5). CONTRACTOR shall fill out the remaining Lines 6, 7 (if applicable), 8, 9, and 10, sign (Line 11), and date (Line 12) of the Form 4669, and mail or otherwise deliver the original signed form to CARRIER or CARRIER's designated agent within thirty (30) days of filing, with the IRS, an income tax return or employment tax return relating to the income reported on the Form 1099.

17(c). The Parties' Financial Obligations If Contractor Is Determined to Be an Employee. If whether on CONTRACTOR's initiative or not, CONTRACTOR is found to be an employee of CARRIER by any federal, state, local, or foreign court, administrative agency, or other governmental body, CONTRACTOR and CARRIER hereby agree, notwithstanding any other provision of this Agreement:

17(c)(1).  CONTRACTOR shall immediately owe CARRIER, for each week or other period this Agreement was in effect, all Settlement Compensation, as defined by Section 4(b) of this Agreement, previously paid to CONTRACTOR by CARRIER and all rights in any balances in required or voluntary escrow funds then under CARRIER administration that are traceable to compensation previously paid to CONTRACTOR by CARRIER, PLUS any cash advances provided by CARRIER to CONTRACTOR that CONTRACTOR used for personal, household, or other expenses not in performance of CONTRACTOR's obligations under this Agreement or that CONTRACTOR retained unspent, and LESS any expenses (including, for Equipment, other equipment, or tools used in performing work for CARRIER, any actual rent or installment-purchase payments made by CONTRACTOR or, if none, payments that would equal fair-market rent for items of similar kind, age, and condition) CONTRACTOR incurred in performance of CONTRACTOR's obligations under this Agreement that were not paid by CARRIER;

17(c)(2).  CARRIER shall immediately owe CONTRACTOR, for all work activities during each week or other period this Agreement was in effect (including any activities for which CARRIER has not yet paid CONTRACTOR), only the then-applicable federal minimum hourly wage, or if higher a State's then-applicable minimum hourly wage but only to the extent CONTRACTOR's wage-earning activities occurred in that State, multiplied by CONTRACTOR's total hours actually performing on-duty work for CARRIER, consisting of both driving and non-driving time, under the FMCSA Hours of Service Regulations, 49 C.F.R. Part 395, or under a State's hours of service regulations to the extent applicable.  The total hours worked shall be computed based on any relevant, reliable evidence, which may include CONTRACTOR Settlement Statements, driver logs (or, if logs are no longer available, the total hours that the applicable hours of service regulations would have permitted CONTRACTOR to be on-duty working for CARRIER during each relevant period), shipment and/or vehicle tracking data, bills of lading, fuel receipts, toll receipts, and testimony; and

17(c)(3).  Because reclassification of CONTRACTOR's status from independent contractor to employee would fundamentally change the parties' contracting assumptions and expectations, either party may terminate this Agreement upon the number of days notice to the other set forth in Section 2(b) of the Agreement. The provisions of this Section be deemed to survive any termination of the Agreement.

18.    ALTERNATIVE USES OF EQUIPMENT.

18(a).  Exclusive-Use Requirement of Federal Leasing Regulations.  CARRIER and CONTRACTOR intend to relate to each other entirely as independent contractors, not as employer and employee.  Nevertheless, solely to comply with 49 C.F.R. § 376.12(c)(1), CARRIER shall have exclusive possession, control, and use of the Equipment for the duration of this Agreement.  CONTRACTOR may operate the Equipment for other motor carriers, shippers, or others during this Agreement only with the prior written consent of CARRIER pursuant to 49 C.F.R. § 376.12(c)(2), as applicable, and Subsection (b) of this section.  CARRIER shall not sublease the Equipment to another carrier without CONTRACTOR's prior written consent.  CARRIER shall assume complete responsibility for the operation of the Equipment for the duration of this Agreement, except when the Equipment is under sublease by CARRIER to another authorized carrier.  Any such sublease shall state that the sublessee-carrier shall have exclusive possession, control, and use of the Equipment, and shall assume complete responsibility for the operation of the Equipment, for the duration of the sublease.  This subsection is set forth solely to comply with FMCSA regulations and shall not be used for any other purposes, including any attempt to classify CONTRACTOR as an employee of CARRIER.  As 49 C.F.R. § 376.12(c)(4) provides, nothing in the provisions required by 49 C.F.R. § 376.12(c)(1) is intended to affect whether CONTRACTOR or CONTRACTOR's drivers are independent contractors or employees of CARRIER and "an independent contractor relationship may exist when a carrier lessee complies with 49 U.S.C. § 14102 and attendant administrative requirements."

18(b).  Subleases and Other Alternative Uses of Equipment.  At CONTRACTOR's request, CARRIER may, if CARRIER so chooses with respect to any trip or trips, approve uses of the Equipment to perform transportation services other than on behalf of CARRIER only under the terms and conditions set forth in this Subsection (b).  Such other uses may consist of (together, "Alternative Uses of Equipment"): (i) Sublease – CARRIER subleases the Equipment (including driving services furnished by CONTRACTOR) to another authorized for-hire motor carrier of property ("Sublease Carrier") for the provision of for-hire motor carriage, exempt or non-exempt from the jurisdiction of the U.S. Secretary of Transportation under 49 U.S.C. §§ 13501 et seq., to Sublease Carrier's customers pursuant to Sublease Carrier's operating authority; and (ii) CONTRACTOR Motor Carriage. CONTRACTOR uses its own motor carrier operating authority to provide for-hire motor carriage, exempt or non-exempt from the jurisdiction of the U.S. Secretary of Transportation under 49 U.S.C. §§ 13501 et seq., to a shipper (directly or through a motor freight broker).

18(b)(1).  Carrier's Authorization and Release.  To obtain CARRIER's authorization for each Alternative Use of Equipment, CONTRACTOR shall take the following steps before accepting a trip:

18(b)(1)(A).  For Alternative Uses of Equipment Involving Subleases.  Have the

BIGE_00022

Sublease Carrier complete, sign, date, and then fax, or scan and email, to CARRIER a sublease in the form appended hereto (CARRIER shall provide a blank form if needed), together with the Sublease Carrier's certificate of insurance required by Section 5 of the form of Sublease appended as **Attachment C** of the Agreement; and

18(b)(1)(B).   For Alternative Uses of Equipment Involving CONTRACTOR Motor Carriage.   Telephone or email CARRIER's dispatch and provide it with valid information about CONTRACTOR and about the trips (dates, times, and city and state of pickup and delivery), and CONTRACTOR shall obtain an oral or emailed release from CARRIER's dispatch.   CONTRACTOR shall display the CARRIER release number on the trip sheet submitted to CARRIER after the trip.

18(b)(2).   Compensation For All Alternative-Use-of-Equipment Operations.   In connection with a Sublease or other Alternative Use of Equipment, CONTRACTOR agrees that:

18(b)(2)(A).   CONTRACTOR shall submit any necessary Sublease- or other Alternative Use-related shipping documents to, and obtain settlement compensation directly and exclusively from, Sublease Carrier (in the case of Sublease trips) or the shipper (in the case of CONTRACTOR Motor Carriage). Notwithstanding anything in this Agreement to the contrary, CARRIER shall have no responsibility for collecting freight charges or paying settlement compensation to CONTRACTOR for any Alternative-Use-of-Equipment trip; and

18(b)(2)(B).   CONTRACTOR shall pay CARRIER the percentage indicated below of gross revenue billed to the customer before any reductions for accessorial charges, fuel surcharges, or any other amounts and before any charge-backs or deductions from settlement compensation ("Gross Revenue") for each Alternative-Use-of-Equipment trip. CONTRACTOR shall furnish CARRIER, with such payment, a copy of the applicable settlement compensation statement and rated freight bill from the Sublease Carrier or, in the case of CONTRACTOR Motor Carriage shipments, a copy of the rated freight bill CONTRACTOR submitted to the shipper or private carrier. If CONTRACTOR fails to make such payments to CARRIER within twenty (20) days of completing the trip, CARRIER shall be authorized to deduct or otherwise recover pursuant to Section 5(a) of the Agreement the amounts for trips performed on CARRIER's behalf under the Agreement:

18(b)(2)(B)(1).   Ten percent (10%) of all gross revenue billed by Sublease Carrier to its customer for a Sublease trip; and

18(b)(2)(B)(2).   Ten percent (10%) of all gross revenue billed by CONTRACTOR to its customer for an CONTRACTOR Motor Carriage trip.

18(b)(3).   Carrier's Identification.

18(b)(3)(A).   Subleases.   For the duration of any Sublease, CONTRACTOR shall remove or cover up all of CARRIER's identification on the Equipment and display instead the Sublease Carrier's identification; and

18(b)(3)(B).   CONTRACTOR Motor Carriage.  For any trip under CONTRACTOR's own operating authority to provide for-hire motor carriage, exempt or non-exempt from the jurisdiction of the U.S. Secretary of Transportation under 49 U.S.C. §§ 13501 et seq., to a shipper or private carrier, CONTRACTOR shall remove or cover up all of CARRIER's identification on the Equipment and display instead CONTRACTOR's identification. If CONTRACTOR possesses interstate or intrastate operating authority and no other motor carrier booked the shipment, the shipment, even if exempt from the jurisdiction of the U.S. Secretary of Transportation under 49 U.S.C. §§ 13501 et seq., shall be deemed to be one involving CONTRACTOR Motor Carriage for purposes of this Subsection (b).

18(b)(4).   Control of and Responsibility for the Equipment.   As required by 49 C.F.R. § 376.12(c)(1), CARRIER, except for Sublease trips, shall with respect to the public have exclusive possession, control, and use of the Equipment, and assume complete responsibility for the operation of the Equipment, for the duration of this Agreement. For Sublease trips, CARRIER's sublease to Sublease Carrier shall, in accordance with 49 C.F.R. § 376.22(c)(2), provide that Sublease Carrier shall have exclusive possession, control, and use of the Equipment, and shall assume complete responsibility for the operation of the Equipment, for the duration of the Sublease. In addition, for CONTRACTOR Motor Carriage trips, which also constitute subleasing, CONTRACTOR shall have exclusive possession, control, and use of the Equipment, and shall assume complete responsibility for the operation of the Equipment, for the duration of trip.

18(b)(5).   Insurance.   For Alternative-Use-of-Equipment trips, just as for trips performed on behalf of CARRIER, CARRIER's and CONTRACTOR's insurance obligations shall be as set forth in Sections 6(a) and (b) of this Agreement, provided that:

BIGE_00023

**18(b)(5)(A).** Subleases.   As between Sublease Carrier and CARRIER, the sublease shall provide that Sublease Carrier's public liability insurance (bodily-injury/property-damage coverage and environmental restoration coverage) and cargo loss-and-damage insurance shall cover the Equipment for the duration of the Sublease; be in at least such amounts as are required by FMCSA regulations promulgated under 49 U.S.C. § 13906 and by applicable state laws (for public liability insurance, in a combined single limit of not less than one million dollars ($1,000,000), with a deductible no greater than one thousand dollars ($1,000), for injury or death to any person or for damage to property in any one occurrence); and be primary to any insurance coverages that CARRIER may maintain; and

**18(b)(5)(B).**   CONTRACTOR Motor Carriage.  With respect to Alternative-Use-of-Equipment trips involving CONTRACTOR Motor Carriage (using CONTRACTOR's own operating authority), CONTRACTOR shall, and hereby warrants that it does, maintain public liability insurance (bodily-injury/property-damage coverage and environmental restoration coverage) and cargo loss-and-damage coverage, in at least such amounts as are required by FMCSA regulations promulgated under 49 U.S.C. § 13906 and by applicable state laws (for public liability insurance, in a combined single limit of not less than one million dollars ($1,000,000), with a deductible no greater than one thousand dollars ($1,000), for injury or death to any person or for damage to property in any one occurrence), covering the Equipment for the duration of the Alternative-Use-of-Equipment trips. CONTRACTOR shall provide a valid certificate of insurance evidencing such coverages to CARRIER before accepting any Alternative-Use-of-Equipment trips involving CONTRACTOR Motor Carriage. On such trips, as between CONTRACTOR and CARRIER, CONTRACTOR's public-liability insurance and cargo loss-and-damage insurance policies shall be primary to any insurance coverages that CARRIER may maintain.

**18(b)(6).**  Remaining Agreement Terms. In all other respects, the terms of this Agreement shall apply to CONTRACTOR's Alternative-Use-of-Equipment operations.

**19.   CONTRACTOR NOT REQUIRED TO PURCHASE OR RENT PRODUCTS, EQUIPMENT, OR SERVICES FROM CARRIER.**  CONTRACTOR is not required to purchase or rent any products, equipment, or services from CARRIER as a condition of entering into this Agreement.  In the event CONTRACTOR elects to purchase or rent equipment from CARRIER or from any third party, for which the purchase or rental contract gives CARRIER the right to make deductions from CONTRACTOR's settlement, the terms of each such contract shall be specified in an attachment to this Agreement.

**20.   NO PASSENGERS.**  CONTRACTOR shall not allow any passengers to ride in the Equipment.

**21.   LOADING AND UNLOADING.**  CONTRACTOR shall be responsible for loading and unloading freight onto and from the Equipment (if CARRIER, shipper, or consignee does not assume such responsibilities), with no additional compensation for this service, except to the extent set forth in Section 3 of this Agreement.

**22.   CONFIDENTIALITY.**  CONTRACTOR hereby recognizes and acknowledges that any list of CARRIER's customers, any list of CARRIER's owner-operators or employees, and information regarding rates paid by or to CARRIER (the "Confidential Information") as they may exist now or from time to time, are valuable, special and unique assets of the business of CARRIER.  CONTRACTOR agrees, during and after the term of this Agreement, not to disclose Confidential Information or any part thereof to any person, firm, corporation, association, or other entity for any reason or purpose whatsoever without CARRIER's prior written consent. CONTRACTOR agrees to preserve as "Confidential Matters", all trade secrets, know how and information relating to CARRIER's business, forms, processes, developments, sales and promotional systems, prices and operations, which information may be obtained from tariffs, contracts, freight bills, letters, reports, disclosures, reproductions, books, records, or other contractors, and other sources of any kind resulting from this Agreement.  CONTRACTOR agrees to regard such Confidential Matters as the sole property of CARRIER, and shall not publish, disclose or disseminate the same to others without the written consent of CARRIER.  In the event of any breach or threatened breach by CONTRACTOR of the provisions of this Section, CARRIER shall be entitled to an injunction, restraining CONTRACTOR from disclosing, in whole or in part, the list of CARRIER's customers, and all other Confidential Matters.  CONTRACTOR agrees that CARRIER will be irreparably damaged in the event of any breach of this provision by CONTRACTOR.  Accordingly, in addition to any other legal or equitable remedies that may be available to CARRIER, CONTRACTOR agrees that CARRIER will be able to seek and obtain immediate injunctive relief in the form of a temporary restraining order without notice, preliminary injunction, or permanent injunction against CONTRACTOR to enforce this confidentiality provision. CARRIER shall not be required to post any bond or other security and shall not be required to demonstrate any actual injury or damage to obtain injunctive relief from the courts. Nothing hereunder shall be construed as prohibiting CARRIER from pursuing any remedies available to CARRIER at law or in equity for such breach, including the recovery of monetary damages from CONTRACTOR.

**23.   BENEFIT AND ASSIGNMENT.**  This Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their respective successors. CONTRACTOR shall not assign or subcontract this Agreement or all or any portion of CONTRACTOR's rights

or obligations to another party without the prior written consent of CARRIER.

24. NOTICES. All notices required or permitted by this Agreement shall be in writing (unless permitted elsewhere in this Agreement to be oral) and shall be deemed to have been fully given (unless otherwise specified in the Agreement) (a) upon delivery if delivered in person or by facsimile transmission; (b) on the next business day after being deposited with an overnight delivery company with the express charges prepaid; or (c) on the date indicated on the return receipt, or if there is no such receipt, on the third business day after being deposited in the United States Mail with first-class postage prepaid; in each event properly addressed to the other party at the address or fax number shown at the end of this Agreement. CARRIER and CONTRACTOR shall be under a continuing duty to provide a correct address and telephone number to the other party, and CARRIER and CONTRACTOR (if the latter has a fax machine) to provide a correct fax number to the other. Notice of an address, telephone-number, or fax-number change shall be given in writing.

25. NON-WAIVER. The failure or refusal of either party to insist upon the strict performance of any provision of this Agreement, or to exercise any right in any one or more instances or circumstances shall not be construed as a waiver or relinquishment of such provision or right, nor shall such failure or refusal be deemed a customary practice contrary to such provision or right.

26. SEVERABILITY. If any provision (including any sentence or part of a sentence) of this Agreement is deemed invalid for any reason whatsoever, this Agreement shall be void only as to such provision, and this Agreement shall remain otherwise binding between the parties. Any provision voided by operation of the foregoing shall be replaced with provisions which shall be as close to the parties' original intent as permitted under applicable law.

27. GOVERNING LAW AND CHOICE OF FORUM. This Agreement is to be governed by the laws of the United States and of the Commonwealth of Virginia, without regard to the choice-of-law rules of Virginia or any other jurisdiction. THE PARTIES AGREE THAT ANY CLAIM OR DISPUTE ARISING FROM OR IN CONNECTION WITH THIS AGREEMENT, WHETHER UNDER FEDERAL, STATE, LOCAL, OR FOREIGN LAW (INCLUDING BUT NOT LIMITED TO 49 C.F.R. PART 376), SHALL BE BROUGHT EXCLUSIVELY IN THE STATE OR FEDERAL COURTS SERVING RICHMOND, VA. CARRIER AND CONTRACTOR HEREBY CONSENT TO THE JURISDICTION AND VENUE OF SUCH COURTS.

28. COMPLETE AGREEMENT AND WAIVER. Immediately upon this Agreement's becoming effective –

28(a). This Agreement, including any Appendices attached and addendums, shall constitute the entire agreement between the parties pertaining to the subject matter contained herein, and terminate, fully replace, and supersede all prior and contemporaneous agreements, representations, and undertakings, oral and written, expressed or implied, or practices, between the parties pertaining to such subject matter.

28(b). All compensation and other amounts due CONTRACTOR from CARRIER, and all advances and other amounts due CARRIER from CONTRACTOR, pursuant to any written agreement between the Parties that this Agreement replaces, shall remain due and payable. The amounts of compensation for trips started, and the amount of advances and other amounts due CARRIER, before the effective date of this Agreement shall be determined under the predecessor agreement; the payment procedures shall be determined under this Agreement; and the payment timing shall be determined under the predecessor agreement or this Agreement, whichever requires payment earlier. Any balance in any required escrow fund established pursuant to the predecessor agreement shall be transferred into the required Escrow Fund under this Agreement.

28(c). No supplement, modification, or amendment to this Agreement shall be binding unless in writing and signed by both CARRIER and CONTRACTOR, except as otherwise provided with respect to deductions in Sections 5 and 6 of the Agreement.

28(d). No waiver of any of the provisions of this Agreement shall constitute a waiver of any other provisions whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be deemed effective or binding upon the CONTRACTOR unless execute in writing by the party making the waiver.

29. COPIES OF THIS AGREEMENT AND STATEMENT OF LEASE. CARRIER shall, as set forth in 49 C.F.R. § 376.12(l), keep the original of this Agreement, with a copy to be retained by CONTRACTOR. Pursuant to 49 C.F.R. § 376.11(c)(2), a "Statement of Lease" shall be carried on the Equipment for those periods that the Equipment is operated by or for CARRIER under this Agreement.

Rev. 4/1/10

BIGE_00025

IN WITNESS WHEREOF, CARRIER and CONTRACTOR hereby sign this Agreement.

CARRIER:  BIG E TRANSPORTATION LLC

CONTRACTOR: _G.C.C. moving_

Check one:
- ☐ Corporation
- ☒ Limited Liability Company
- ☐ Partnership
- ☐ Sole Proprietorship

Organized in State of: _Rhode Island_
With Employer ID No.: ▮▮▮▮▮▮▮▮▮
OR Social Security No.

By: _Michael Raill_
Signature
Authorized Rep.'s Name (Typed or Printed) _Michael Raill_

Title _President Manage / Mgr_

Address (Street, P.O. Box)

City, State & Zip Code
Mobile Telephone Number _866-4pp-2691_   Fax Number

Email Address _mraill@eskc-express.com_

Date _5/10/17_

By: _Gary Cook_
Signature
Authorized Rep.'s Name (Typed or Printed) _Gary Cook_

Title _Owner_

Address (Street, P.O. Box) _690 Devils Foot rd_
_north Kingstown, Rhode Island 02852_
City, State & Zip Code
Mobile Telephone Number _401-932-1965_   Fax Number

Email Address _gary 8585 at cox.net_

Date _5-10-12_

BIGE_00026

## RECEIPT FOR POSSESSION OF CONTRACTED EQUIPMENT

Received from ___Gary Cook___ ("CONTRACTOR")
Printed Name of CONTRACTOR
the following Equipment:

| Year | Make | Model | Serial (VIN) # | CARRIER Unit # |
|------|------|-------|----------------|----------------|
| 2007 | International | 4000 series | 1HTMMAAL67H524918 | 19200 |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

Equipment received at ___Terminal___ in ___Northford CT___, ___, on

___Monday March 19, 20 12___ at ___6:00___ o'clock __a.__M. ___ Time.

BIG E TRANSPORTATION LLC ("CARRIER")

By: _____
CARRIER representative's signature

___Gary Cook___
Printed Name

## RECEIPT FOR RETURN OF CONTRACTED EQUIPMENT

Received from CARRIER the unit(s) of Equipment described above that are marked "RETURNED.".

Equipment received at _____, in _____, ____ on

_____, 20 ___ at ___:___ o'clock ____.M. _____ Time.

By: _____
CONTRACTOR representative's signature

_____
Printed Name

BIGE_00027

<u>ATTACHMENT A</u>

CONTRACTOR PAYMENT RATES

As total compensation for all of the Equipment and services CONTRACTOR furnishes CARRIER under this Agreement, CARRIER shall pay CONTRACTOR Base Compensation plus Additional Compensation as follows:

1.   <u>BASE COMPENSATION.</u> For any given CARRIER-dispatched move, CONTRACTOR shall receive Base Compensation under only one of the Subsections (a)-(c) of this Section, as determined by the type of move involved:

1(a).   <u>Flat-Rate Compensation.</u> For each CARRIER-dispatched move described in any attached Supplement 1 to Attachment A, as a White Glove Delivery, CONTRACTOR shall receive the flat amount of $40.00 per stop.

1(b).   <u>Percentage-Rated Compensation.</u> For each CARRIER dispatched move described in any attached Supplement 1 to Attachment A, as an LTL Shipment, CONTRACTOR shall receive 75% of the Base Revenue as billed and described in Supplement 1 to Attachment A.

1(c).   Minimum Weekly Compensation - $1750.00

2.   <u>ADDITIONAL COMPENSATION.</u> CARRIER shall also pay CONTRACTOR, as applicable:

2(a).   <u>Additional Fuel-Related Compensation.</u> See Supplement 2 to Attachment A.

2(b).   <u>Additional Mileage Rate</u> – Applicable ONLY to White Glove Delivery shipments, as described in Attachment A, Section 1(a), CONTRACTOR will be compensated $1.00 (one dollar) for each mile over 60 miles travelled from the CONTRACTOR's domiciled Big E terminal to the customer's location. Additional mileage rate is based on one way mileage only. Mileage to be calculated using the Big E TMS system.

2(c).   <u>Accessorial Charges</u> - Applicable ONLY to White Glove Delivery shipments, as described in Attachment A, Section 1(a), CONTRACTOR, will be compensated 75% (seventy five percent) of the rate charged to the customer for all accessorial charges as defined in Supplement 3 to Attachment A.

3.   <u>Identification of Equipment.</u> - In Reference to Section 16(b) of this agreement, should CONTRACTOR quit or be terminated within the first 120 ( one hundred and twenty ) days of the initial effective date of this agreement, CARRIER will deduct the cost of CARRIERS logo, including installation from CONTRACTORS final settlement. This deduction does not effect or replace the CONTACTORS requirement to remove the logos, at CONTRACTORS cost, in the event of termination of this agreement.

THIS ATTACHMENT A, which completely replaces and supersedes any earlier attachment, addendum, or other provisions of this Agreement relating to the same subjects, is agreed to by the undersigned parties and shall be effective [CHECK ONLY ONE BOX]:

☒ At the date and time set forth on page 1 of this Agreement.

☐ At _____ m., Eastern Time, _____, _____ 20___.

CARRIER: BIG E TRANSPORTATION LLC

By: _____
    Signature

Michael Ravil
Authorized Rep.'s Name (Typed or Printed)

Northeast Regional Mgr
Title

3/10/12
Date

CONTRACTOR: Gro Co Co mov Inc
Social Security or Employer ID No.: ███████

By: _____
    Signature

Gary Cook
Authorized Rep.'s Name (Typed or Printed)

Owner
Title

3-10-12
Date

BIGE_00028

<u>SUPPLEMENT 2 TO ATTACHMENT A</u>

ADDITIONAL FUEL-RELATED COMPENSATION PROGRAM

1.     Subject to Section 2 below, CARRIER shall pay CONTRACTOR the following Additional Fuel-Related Compensation on all of the Equipment's CARRIER-dispatched Deliveries, based on the most recent national ("U.S.") average "Weekly Retail on-Highway Diesel Price – Average All Types," posted on the website of the Energy Information Administration of the U.S. Department of Energy as of the date of Settlement.

2.     Additional Fuel-Related Compensation listed below is paid on a Per Stop basis Only.

| Fuel Range | | | | Proposed FSC |
|---|---|---|---|---|
| $ | 2.00 | – | $ 2.24 | $ – |
| $ | 2.25 | – | $ 2.49 | $ – |
| $ | 2.50 | – | $ 2.74 | $ 0.75 |
| $ | 2.75 | – | $ 2.99 | $ 1.50 |
| $ | 3.00 | – | $ 3.24 | $ 2.25 |
| $ | 3.25 | – | $ 3.49 | $ 3.00 |
| $ | 3.50 | – | $ 3.74 | $ 3.75 |
| $ | 3.75 | – | $ 3.99 | $ 4.50 |
| $ | 4.00 | – | $ 4.24 | $ 5.25 |
| $ | 4.25 | – | $ 4.49 | $ 6.00 |
| $ | 4.50 | – | $ 4.74 | $ 6.75 |
| $ | 4.75 | – | $ 4.99 | $ 7.50 |
| $ | 5.00 | – | $ 5.24 | $ 8.25 |
| $ | 5.25 | – | $ 5.49 | $ 9.00 |
| $ | 5.50 | – | $ 5.74 | $ 9.75 |
| $ | 5.75 | – | $ 5.99 | $ 10.50 |

3.     CARRIER shall not pay Additional Fuel-Related Compensation when and if the National U.S. Department of Energy national average diesel fuel price is below two dollars and fifty cents ($2.50) per gallon. If the National U.S. Department of Energy national average diesel fuel price is above five dollars ninety-nine cents ($5.99) per gallon, the CARRIER and CONTRACTOR will meet to discuss Fuel-related Compensation.

THIS SUPPLEMENT 2 TO ATTACHMENT A, which completely replaces and supersedes any earlier supplement, addendum, or other provisions of this Agreement relating to the same subjects, is agreed to by the undersigned parties and shall be effective [CHECK ONLY ONE BOX]:

☒ At the date and time set forth on page 1 of this Agreement.
☐ At _____ m., Eastern Time, _____, ____, 20___.

CARRIER: BIG E TRANSPORTATION LLC

By: _____
Signature
Michael Raill
Authorized Rep.'s Name (Typed or Printed)
Northeast Regional Mgr
Title
Date 3/10/12

CONTRACTOR: Core Cola moving
Social Security or Employer ID No.: ████████

By: _____
Signature
Corey Cook
Authorized Rep.'s Name (Typed or Printed)
Owner
Title
Date 3-10-12

ATTACHMENT B

CONTRACTOR ELECTION FORM
For Fuel Tax Reporting, Settlement Compensation Disbursement, and Insurance

1.    FUEL TAX REPORTING. *CONTRACTOR SHOULD INITIAL ONE OF THESE TWO OPTIONS:*

    *G+C*  OPTION 1: CONTRACTOR shall obtain the IFTA permit, and perform all fuel and mileage tax reporting services, with respect to the Equipment at CONTRACTOR's expense.

    _____  OPTION 2: CARRIER shall, directly or through a third-party vendor, obtain the IFTA permit, and perform all fuel and mileage tax reporting services, with respect to the Equipment at CARRIER's expense.

2.    METHOD OF PAYMENT OF SETTLEMENT COMPENSATION. *CONTRACTOR SHOULD INITIAL ONE OF THESE TWO OPTIONS:*

    *GcCc*  OPTION 1 (Weekly Payments via Direct Deposit to CONTRACTOR's Bank Account): CARRIER shall pay Settlement Compensation (with CARRIER charging no administrative fee) by making an electronic direct-deposit into CONTRACTOR's bank account in accordance with a CARRIER-supplied form that CONTRACTOR shall complete.

    _____  OPTION 2 (Weekly Payments via CARRIER Bank Check – Mailed): CARRIER shall pay Settlement Compensation (with CARRIER charging no administrative fee) by sending a bank check by U.S. First Class Mail to the address required by Section 24 (Notices) of this Agreement.

3.    CERTIFICATE OF INSURANCE. CONTRACTOR hereby requests CARRIER, through CARRIER's insurer, to facilitate on CONTRACTOR's behalf (if they are available) the insurance coverages that CONTRACTOR has selected by placing CONTRACTOR's initials on the "YES" line in the right-hand column below.

*CONTRACTOR SHOULD INITIAL "YES" OR "NO" IN THE RIGHT-HAND COLUMN OF EACH INSURANCE COVERAGE BLOCK:*

| TYPE OF COVERAGE *[NEED TO FILL IN]* | INITIAL "YES" TO REQUEST COVERAGE |
|---|---|
| 1. Non-Trucking Liability Insurance:<br><br>*Name of Insurer:* Hudson Insurance Company<br><br>*Policy No:* CBA41001-BE<br><br>*Effective Date(s) of Coverage:* From the effective date (below) of this Certificate of Insurance through the next succeeding August 1, and each subsequent annual renewal period, subject to CONTRACTOR's payment of insurance cost and other policy terms and conditions.<br><br>*Amount of Coverage:* $1,000,000 per occurrence<br><br>*Current Cost to CONTRACTOR:* $35 per month, billed at $8.06 per week, for each unit of Equipment, plus $5 per month admin. fee to CARRIER<br><br>*Deductible for Which CONTRACTOR is Liable:* $1,000 per occurrence | *GcCc* YES<br><br>_____ NO |

Big E Transportation LLC Independent Contractor Operating Agreement
Page B-2

Rev. 4/1/10

BIGE_00030

| TYPE OF COVERAGE *[NEED TO FILL IN]* | INITIAL "YES" TO REQUEST COVERAGE |
|---|---|
| **2.** Occupational Accident Insurance:<br><br>*Name of Insurer:* One Beacon Insurance<br><br>*Policy No:* 216-000-423<br><br>*Effective Date(s) of Coverage:* From the effective date (below) of this Certificate of Insurance through the next succeeding March 1, and each subsequent annual renewal period, subject to CONTRACTOR's payment of insurance cost and other policy terms and conditions<br><br>*Amount of Coverage:* $1,000,000 maximum lifetime benefit<br><br>*Current Cost to CONTRACTOR:* $134/month, billed at $30.92/week, each for CONTRACTOR and any other drivers employed by CONTRACTOR (not including Co-Driver), plus $5-per-month admin. fee to CARRIER<br><br>*Deductible for Which CONTRACTOR is Liable:* $0 | _G+C_ YES<br><br>_____ NO |
| **3.** Physical Damage Insurance on Tractor:<br><br>*Name of Insurer:* Hudson Insurance Company<br><br>*Policy No:* CBAD1000<br><br>*Effective Date(s) of Coverage:* From the Effective Date (below) of this Certificate of Insurance through the next succeeding June 30, and each subsequent annual renewal period, subject to CONTRACTOR's payment of insurance cost and other policy terms and conditions<br><br>*Amount of Coverage:* CONTRACTOR-specified value of tractor or straight truck of $_____ (any tractor or straight truck claims, however, will be paid at only the fair market value of insured tractor or straight truck at time of occurrence, in accordance with insurance policy)<br><br>*Current Cost to CONTRACTOR:* One and six-tenths percent (1.6%) annually (billed weekly) times CONTRACTOR-specified value of tractor, plus $5-per-month admin. fee to CARRIER<br><br>*Deductible for Which CONTRACTOR is Liable:* $1,000 per occurrence | _G+C_ YES<br><br>_____ NO |

THIS ATTACHMENT B, which completely replaces and supersedes any earlier attachment, addendum, or other provisions of this Agreement relating to the same subjects, is agreed to by the undersigned parties and shall be effective *[CHECK ONLY ONE BOX]*:

☒ At the date and time set forth on page 1 of this Agreement.

☐ At _____ _____ m., Eastern Time, _____, 20___.

CARRIER: BIG E TRANSPORTATION LLC

By: _~signature~_
Signature

Michael Raith
Authorized Rep.'s Name (Typed or Printed)

Northeast Regional Mgr
Title

3/10/12
Date

CONTRACTOR: G+C G   MOVING
Social Security or Employer ID No.: ██████████

By: _~signature~_
Signature

Gary Cook
Authorized Rep.'s Name (Typed or Printed)

owner
Title

3-10-12
Date

BIGE_00031

ATTACHMENT C –

SUBLEASE OF EQUIPMENT LEASED TO

Through this agreement ("Sublease"), the undersigned _G.C.C. MOVING_ ("Sublease Carrier")

agrees to lease from BIG E TRANSPORTATION LLC ("CARRIER"), and CARRIER to lease to Sublease Carrier, the following

commercial motor vehicle equipment ("EQUIPMENT"), currently under lease from _Gary Cook_

("CONTRACTOR"):

| CONTRACTOR'S EQUIPMENT | CARRIER UNIT # | YEAR | MAKE | MODEL | SERIAL (VIN) # | BASE PLATE # |
|---|---|---|---|---|---|---|
| Tractor · | | | | | | |

1.       TERM.  Absent default, this Sublease shall begin at the time(s) set forth on completed EQUIPMENT Receipt(s), in the form attached hereto, that Sublease Carrier shall furnish to CARRIER ("Effective Date"), and end when possession of the EQUIPMENT is returned to CARRIER.  This Sublease may be terminated at any time for any reason by either party on an end, followed by written, notice of termination to the other party.  If, up to and including the date of termination, one or more events occur that give rise, before or after that date, to a liability or entitlement of Sublease Carrier or CARRIER under this Sublease, such liability or entitlement shall continue, notwithstanding the termination of this Sublease, until such liability or entitlement is satisfied in full.

2.       IDENTIFICATION OF EQUIPMENT.  Sublease Carrier shall ensure that for the duration of the Sublease, the identification of equipment requirements in 49 C.F.R. § 376.11(c) are complied with by removing or covering up all of CARRIER's identification on the EQUIPMENT and displaying instead Sublease Carrier's identification.

3.       CONTROL AND RESPONSIBILITY.  Sublease Carrier shall have exclusive possession, control, and use of the EQUIPMENT, and shall assume complete responsibility for the operation of the EQUIPMENT, for the duration of the Sublease from the time possession is taken by the Sublease Carrier and the receipt required under 49 C.F.R. § 376.11(b) is given to CARRIER until possession of the EQUIPMENT is returned to CARRIER. The foregoing declarations are made in order to comply with FMCSA regulations (49 C.F.R. § 376.12(c)(1)) and shall not be used to classify CONTRACTOR as an employee of Sublease Carrier or CARRIER.  As 49 C.F.R. § 376.12(c)(4) provides, nothing in the provisions required by 49 C.F.R. § 376.12(c)(1) is intended to affect whether CONTRACTOR and CONTRACTOR's drivers are independent contractors or employees of Sublease Carrier or CARRIER and "an independent contractor relationship may exist when a carrier lease complies with 49 U.S.C. § 14102 and attendant administrative requirements".

4.       INDEMNIFICATION.  Sublease Carrier shall defend, indemnify, and hold harmless CARRIER from any claim (including any for which CARRIER is not indemnified by CARRIER's insurance and any claim of loss of or damage to the EQUIPMENT or to CARRIER's other property) of direct, indirect, and consequential loss, damage, delay, fine, civil penalty, or expense, including reasonable attorney's fees and costs of litigation (together "Damages") that CARRIER pays or otherwise incurs arising out of or in connection with the Sublease Carrier's or CONTRACTOR's (including their respective agents' or employees') negligence, gross negligence, willful misconduct, or other culpable acts or omissions;

5.       INSURANCE.  Sublease Carrier agrees to, and warrants that it does, maintain public liability insurance (bodily-injury/property-damage coverage and environmental restoration coverage) and cargo loss-and-damage coverage, in at least such amounts as are required by Federal Motor Carrier Safety Administration regulations promulgated under 49 U.S.C. § 13906 and pursuant to applicable state laws, covering the EQUIPMENT for the duration of this Sublease.  Such insurance coverages shall be primary, as between Sublease Carrier and CARRIER, to any insurance coverages that CARRIER may maintain.  Sublease Carrier shall evidence such insurance coverages by furnishing to CARRIER, along with this executed Sublease, a valid certificate of insurance.

6.       SUBLEASE CARRIERS' COMPENSATION OF CONTRACTOR.  Sublease Carrier shall enter into an independent contractor operating agreement with CONTRACTOR regarding compensation (including the sublease payments owed to CARRIER pursuant to Section 7 below) and other terms that complies with the Federal Truth-in-Leasing Regulations, 49 C.F.R. Part 376, and shall pay CONTRACTOR the agreed compensation, within (fifteen) 15 calendar days after CONTRACTOR submits to Sublease Carrier the driver log books required by the U.S. Department of Transportation and those documents necessary for Sublease Carrier to secure payment of freight charges from the shipper (together "Sublease Trip Documents").

BIGE_00032

7.    SUBLEASE PAYMENTS.  As consideration for this Sublease, Sublease Carrier shall remit to CONTRACTOR at the same time Sublease Carrier pays compensation to CONTRACTOR for a trip, and CONTRACTOR has agreed to remit the same amount to CARRIER, ten percent (10%) of all Gross Revenue billed by the Sublease Carrier to Sublease Carrier's customer for each load handled by CONTRACTOR under the Sublease, before any reductions for accessorial charges, fuel surcharges, or any other amounts and before any deductions from compensation.  For each such trip, Sublease Carrier shall furnish to CONTRACTOR for forwarding to CARRIER a copy of the rated freight bill that Sublease Carrier sent to Sublease Carrier's customer.

8.    INDEPENDENT CONTRACTOR RELATIONSHIP.  It is the intent of the parties to this Sublease that Sublease Carrier, CARRIER, and CONTRACTOR shall all be independent contractors.

9.    COPY OF SUBLEASE.  Sublease Carrier shall ensure that a copy of the Sublease is carried in the EQUIPMENT for the duration of the Sublease.

10.    GENERAL.  If any provision (including any sentence or part of a sentence) of this Sublease (including its attachments and addendums) is deemed invalid for any reason whatsoever, the Sublease shall be void only as to such provision, and this Sublease shall remain otherwise binding between the parties.  This Sublease (including the Attachments and any addendums) constitute the entire Sublease between CARRIER and Sublease Carrier pertaining to the subject matter contained herein and fully replace and supersede all prior and contemporaneous agreements, representations, and understandings.  No supplement, modification, or amendment to this Sublease shall be binding unless in writing and signed by both parties.  Original, faxed, or otherwise imaged signatures shall be equally valid.

11.    GOVERNING LAW AND FORUM.  This Sublease shall be interpreted in accordance with, and governed by, the laws of the United States and, of the Commonwealth of Virginia, without regard to the choice-of-law rules of Virginia or any other jurisdiction.  THE PARTIES AGREE THAT ANY CLAIM OR DISPUTE ARISING FROM OR IN CONNECTION WITH THIS SUBLEASE, WHETHER UNDER FEDERAL, STATE, LOCAL, OR FOREIGN LAW (INCLUDING BUT NOT LIMITED TO 49 C.F.R. PART 376), SHALL BE BROUGHT EXCLUSIVELY IN THE STATE OR FEDERAL COURTS SERVING RICHMOND, VA.  CARRIER AND SUBLEASE CARRIER HEREBY CONSENT TO THE JURISDICTION AND VENUE OF SUCH COURTS.

IN WITNESS WHEREOF, the parties hereby execute this Sublease on this 18 day of march, 2012

CARRIER: Big E Transportation LLC

By: _____
Signature
Michael Roill
Authorized Rep.'s Name (Typed or Printed)
Nuclear Regime Mgr
Title
_____
Address (Street, P.O. Box)
_____
City, State & Zip Code
860-480-3641
Mobile Telephone Number        Fax Number
mroill@esks-express.com
Email Address

SUBLEASE CARRIER: GCiC moving
Fed. Taxpayer ID No. _____

By: _____
Signature
Gary Cooll
Authorized Rep.'s Name (Typed or Printed)
owner
Title
650 Devils Foot rd
Address (Street, P.O. Box)
north kingstown, RI 02852
City, State & Zip Code
401-932-1965
Mobile Telephone Number        Fax Number
Gary_8585@att.cox.net
Email Address

Big E Transportation LLC Sublease of Equipment –
Page 2

Rev. 4/1/10

BIGE_00033

ATTACHMENT D —

### EQUIPMENT LIST

The units of Equipment subject to this Agreement are:

| Year | Make | Model | Serial (VIN) # | CARRIER Unit # |
|------|------|-------|----------------|----------------|
| 2007 | International | 4000 series | 1HTMMAAL67H524918 | 19200 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

THIS ATTACHMENT D, which completely replaces and supersedes any earlier attachment, addendum, or other provisions of this Agreement relating to the same subjects, is agreed to by the undersigned parties and shall be effective *[CHECK ONLY ONE BOX]:*

☑ At the date and time set forth on page 1 of this Agreement.
☐ At _____ __ m., Eastern Time, _____, ____, 20___.

CARRIER: BIG E TRANSPORTATION LLC

By: _____
Signature
Michael Rail
Authorized Rep.'s Name (Typed or Printed)
Northeast Regional Mgr
Title
3/10/12
Date

CONTRACTOR: G-L-L moving
Social Security or Employer ID No.: ██████████

By: _____
Signature
Gary L Bolt
Authorized Rep.'s Name (Typed or Printed)
Owner
Title
3-10-12
Date

BIGE_00034