**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| GCC MOVING, LLC and | ) | |
| GARY COOK d/b/a GCC MOVING | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ESTES EXPRESS LINES, CORP. d/b/a, *alias*, | ) | |
| BIG E TRANSPORTATION; and | ) Case No. 1:16-cv-11538-RGS | |
| BIG E TRANSPORTATION, LLC d/b/a, *alias*, | ) | |
| ESTES EXPRESS LINES; | ) | |
| JOHN DOES 1-10, JANE DOES 1-10 and | ) | |
| XYZ CORPORATIONS 1-10 | ) | |
| Defendants | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF DEFENDANT BIG E TRANSPORTATION, LLC'S
MOTION FOR SUMMARY JUDGMENT**

Defendant and Counterclaim Plaintiff, Big E Transportation, LLC ("Big E"), respectfully

submits the following points and authorities in support of its Motion for Summary Judgment.

## INTRODUCTION

Plaintiff Gary Cook ("Cook") is the sole owner and member of Plaintiff GCC Moving,

LLC, which provided transportation services to Big E pursuant to written Independent

Contractor Operating Agreements ("ICOAs") and the Federal Leasing Regulations, 49 C.F.R.

Part 376. Big E and Cook d/b/a GCC Moving first signed an ICOA in March 2012.[1] Although

Cook personally provided driving services under that ICOA for the first fifteen months of the

contract, he eventually transitioned to making his living not by driving trucks but by running

GCC Moving. Instead of personally performing the transportation services GCC Moving

contracted to provide, Cook recruited and employed more than 20 different drivers, operated as

---

[1] Cook initially contracted with Big E under a d/b/a "GCC Moving." In late 2014, he chose to incorporate his business as a limited liability company, GCC Moving, LLC. *SOF*, ¶ 45. Throughout this memorandum, references to "GCC Moving" refer to both Plaintiffs in this matter—Cook d/b/a GCC Moving, as well as GCC Moving, LLC.

many as thirteen trucks simultaneously, and spent his time managing his business, which generated nearly $1 million in revenue annually. By June 2013, he only drove a truck when he needed to fill in for one of his employees. Cook hired a payroll company, filed business taxes, and kept extensive business records. In 2015, Cook signed a second ICOA on behalf of GCC Moving under which he operated until August 2015.

Notwithstanding the scope of his extensive business endeavor, Cook now claims that he was improperly classified as an independent contractor under Mass. Gen. Laws Ann. ch. 149, § 148B ("Section 148B"). Cook claims that he is entitled to damages under Mass. Gen. Laws Ann. ch. 149, §§ 148 and 150 (respectively, "Section 148" and "Section 150"). Alternatively, Cook and GCC Moving seek damages under common law principles of unjust enrichment.

Throughout the time GCC Moving contracted with Big E, Cook retained control of who he hired, what transportation opportunities he chose to accept and assign his drivers, what routes he and his drivers drove, how his trucks were loaded, how much he paid his drivers, where he leased his equipment, and all other facets of his business. He had the opportunity to determine how much profit or loss he made each year and made a profit of approximately $100,000 each year GCC Moving contracted with Big E. Nothing in Cook's relationship with Big E resembles an employment relationship. Cook was properly classified as an independent contractor, and he cannot recover damages under the Massachusetts Wage Act. Cook and GCC Moving's unjust enrichment claim also fails because the relationship at issue was governed by a contract. Big E is entitled to summary judgment on each of Plaintiffs' claims.

## STATEMENT OF UNDISPUTED FACTS

In accordance with Rule 56.1 of the Local Rules of the United States District Court for the District of Massachusetts, Big E submitted its Statement of Undisputed Material Facts

("SOF") contemporaneously with its Motion for Summary Judgment. Big E incorporates its SOF here by reference and briefly states as follows:

Big E is a motor carrier licensed by the Federal Motor Carrier Safety Administration ("FMCSA"). *SOF*, ¶ 1. Big E is wholly-owned subsidiary of Estes Express Lines ("Estes") and provides transportation services to Estes and other customers. *SOF*, ¶¶ 2-3. Big E has no employee drivers and instead contracts with independent contractors to perform transportation services for Big E's customers. *SOF*, ¶ 4. In March 2012, Cook signed an ICOA with Big E on behalf of GCC Moving to provide last-mile transportation services, which is the movement and delivery of goods from a terminal, transportation hub, or retailer to the end consumer. *SOF*, ¶¶ 41-42. In November 2014, Cook incorporated GCC Moving as a limited liability company. *SOF*, ¶ 45. In January 2015, Cook signed a second ICOA on behalf of GCC Moving. *SOF*, ¶ 46.

Prior to contracting with Big E, Cook provided professional truck driving and transportation services for various companies for more than 15 years as both an employee and an independent contractor. *SOF*, ¶¶ 27-28. In 2004, Cook d/b/a GCC Moving began doing business as a motor carrier and obtained operating authority from the U.S. Department of Transportation ("DOT"). *SOF*, ¶ 29. GCC Moving operated under its own authority from 2004 to 2009 as an independent contractor with General Transportation Services ("GTS"), operating three trucks simultaneously using drivers and helpers Cook hired. *SOF*, ¶¶ 30-32. While under contract with Big E, GCC Moving operated at certain times under its own DOT authority and at other times under Big E's authority. *SOF*, ¶¶ 43, 44, 46.

As of June 2013, Cook ceased performing daily driving services for GCC Moving and instead only drove when he needed to fill in for one of his employee drivers. *SOF*, ¶¶ 62, 81. Instead of driving, Cook spent most of his time managing his business which quickly grew to include the operation of up to thirteen trucks at seven terminals located in four different states.

3

*SOF*, ¶¶ 63, 82. During the three years GCC Moving had a contract with Big E, Cook recruited and hired more than 20 different employee drivers, many of whom he knew from his prior industry experience. *SOF*, ¶¶ 64, 65. In his sole discretion, Cook decided how much he paid those drivers. *SOF*, ¶ 68. Cook also chose to pay another non-driver as an employee of his company. *SOF*, ¶ 73.

Cook retained control over the operations of GCC Moving by determining what transportation opportunities he would accept or reject (*SOF*, ¶¶ 10, 11, 52), who he would hire (*SOF*, ¶¶ 13, 14, 53) and how much he would pay them (*SOF*, ¶¶ 17, 55, 68), from where he would lease or purchase his vehicles, insurance, and fuel (*SOF*, ¶¶ 25, 54-56, 60, 69), what routes he or his drivers would take (*SOF*, ¶¶ 21, 67), and how he and his drivers loaded their trucks (*SOF*, ¶¶ 20, 66). Cook hired a payroll company to help him administer his business. *SOF*, ¶ 70. He filed business tax returns, deducted all the business expenses he could, and kept extensive business records. *SOF*, ¶¶ 77, 78, 80. Cook kept GCC Moving's profits for himself, which amounted to approximately twice what he chose to pay the drivers he employed. *SOF*, ¶ 86. In fact, GCC Moving generated more revenue each year than more than 90% of businesses in the U.S. Census Bureau's Economic Census. *SOF*, ¶ 88.

## ARGUMENT

### A.    Summary Judgment Standard

A court must grant summary judgment on a claim, or part of a claim, when the requesting party demonstrates that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although all reasonable inferences from the evidence must be drawn in favor of the nonmoving party, only a controversy as to material facts—those "that might affect the outcome of the suit under the governing law"—preclude summary judgment. *Gadson v. Concord Hosp.*, 966 F.2d 32, 33 (1st Cir. 1993) (quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Irrelevant or unnecessary" factual disputes will not defeat summary judgment. *Id.* Thus, a court may grant summary judgment "when a fair-minded jury could reach only one conclusion: in favor of the moving party." *Mitchell v. US Airways, Inc.*, 858 F. Supp. 2d 137, 147 (D. Mass. May 1, 2012).

## B.     Cook and GCC Moving are not employees under Section 148B.

In Count I of the Complaint, Cook asserts he was misclassified as an independent contractor and seeks to recover under Sections 148 and 150 of the Massachusetts Wage Act. Section 148 limits the deductions an employer can make from an employee's compensation. Section 150 permits an individual to bring an action to recover for violations of other provisions of the Wage Act, including Sections 148 and 148B. These allegations are all derivative of Cook's misclassification claim. To the extent this Court finds Big E properly classified Cook and GCC Moving as independent contractors, Big E is entitled to summary judgment on all of Cook's derivative Wage Act claims.[2]

Section 148B is the Massachusetts independent contractor law that creates a presumption of employment for purposes of the Massachusetts Wage Act. Under Section 148B, "an individual performing any service" is considered an employee, unless:

(1)     the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; ["Prong 1"]; and
. . .

(2)     the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed ["Prong 3"].

---

[2] Although Count I purports to contend that Cook alone was misclassified under Section 148B, paragraph 107 of the Complaint alleges that the entire case is "governed by the Massachusetts Wage Act." It therefore appears that GCC Moving is also alleging improper classification under Section 148B. Accordingly, this memorandum addresses the merits of the claim that Defendants improperly classified GCC Moving.

Mass. Gen. Laws Ann. ch. 149, § 148B(a). Section 148B also contains a Prong 2 requiring the alleged employer to demonstrate that "the service [of the alleged employee] is performed outside the usual course of the business of the employer" in order to rebut the employment presumption. *Id.* The First Circuit Court of Appeals, this Court, and the Massachusetts Supreme Judicial Court have all held that Prong 2 impermissibly impacts the rates, routes, and services of transportation companies and is therefore preempted by the Federal Aviation Administration Authorization Act of 1994 ("FAAAA"), 49 U.S.C. § 14501(c)(1). *Schwann v. FedEx Ground Sys., Inc.*, 813 F.3d 429, 438-40 (1st Cir. 2016); *Chambers v. RDI Logistics, Inc.*, 476 Mass. 95 (2016). Prong 2 therefore does not weigh on the analysis in this case.

### 1. Section 148B does not apply to either GCC Moving or Cook.

GCC Moving cannot recover under the Massachusetts Wage Act because GCC Moving contracted with Big E as a business and operated a separate business enterprise. In *Weinberg v. Grand Circle Travel, LCC,* 891 F. Supp. 2d 228 (D. Mass. 2012), Judge Young held that Section 148B does not apply to contracts between companies. *Weinberg* is dispositive of GCC Moving's claims—Section 148B has no application to relationships between Big E and GCC Moving because the law only applies to "*individuals* who have been misclassified." *Id.* at 240.

Even if this Court is reluctant to grant summary judgment to Big E on the sole grounds that GCC Moving is a business, the result is the same as to both Plaintiffs under other authority from this district that is directly on point. In *Debnam v. FedEx Home Delivery*, 2013 WL 5434142 (D. Mass. Sept. 27, 2013), the plaintiff, a delivery driver who operated multiple trucks, claimed to be an employee of the defendant under Section 148B. The court rejected the plaintiff's contention because the scope of the plaintiff's business operation removed him from

the definition of an "individual" within the meaning of Section 148B. In so holding, the court

noted:

> [T]he work performed under Debnam's contract with FedEx Ground involved far
> more than his personal services. It is undisputed that Debnam simultaneously
> operated up to nine delivery routes, each route requiring the employment of a
> separate driver and vehicle. Over the course of five years, his businesses
> employed sixty other drivers to perform the work. He filed business tax returns,
> which disclose substantial business income. In short, the plaintiff's relationship
> with FedEx Ground was that of what the Massachusetts Attorney General's
> advisory terms a "legitimate independent contractor" in a "business-to-business
> relationship." On the undisputed facts, he cannot, as a matter of law, be
> considered an "individual" within the meaning of § 148B.

*Id.* at *1; *Cf. Clinton v. City of New York*, 524 U.S. 417, 428 n.13 (1998) (individual refers to

single human being and does not include business entities).

Like the plaintiff in *Debnam,* Cook simultaneously operated numerous trucks (as many as

13 at once), and each required the employment of separate drivers. *SOF*, ¶ 63. Over the course of

approximately three years, GCC Moving employed more than twenty drivers to perform the

work it agreed to under its contract with Big E. *SOF*, ¶ 64. Cook filed tax returns disclosing

substantial business income and taking business deductions from his operation of GCC Moving.

*SOF*, ¶ 78. In short, GCC Moving is simply *not* an individual within the meaning of Section

148B, and the statute applies to neither it nor Cook.

**2.      Prong 1 - Cook was free from Big E's direction and control.**

Even if Section 148B applied to GCC Moving's relationship with Big E, the indisputable

facts demonstrate Cook was free from Big E's direction and control. The Massachusetts Attorney

General stated that the direction and control inquiry under Prong 1 turns on whether the

"worker's activities and duties [were] actually . . . carried out with minimal instruction. For

example, an independent contractor completes the job using his or her own approach with little

direction and dictates the hours that he or she will work on the job." *Sebago v. Boston Cab*

*Dispatch, Inc.*, 28 N.E.3d 1139, 1149 (Mass. 2015) (citing Advisory 2008/1, An Advisory from the Attorney General's Fair Labor Division in M.G.L. c. 149, s. 148B). Here, Cook operated GCC Moving with no direction from Big E and chose to work when, where, and how he wanted, both under the terms of the ICOAs he signed on behalf of GCC Moving and in fact.

> ### a.   Cook was free from Big E's direction and control under the terms of the ICOAs.

Under the terms of the ICOAs, Cook was granted absolute latitude, within the confines of federal law, to run his business how he saw fit. Under the ICOAs, GCC Moving agreed to provide Big E "professional truck driving services [and] other incidental transportation related services and the use of [GCC Moving's] equipment" in exchange for the compensation specified in the agreement. *SOF*, ¶ 49. By signing the ICOA, Cook acknowledged that GCC Moving's relationship with Big E was that of an independent contractor and *not* an employee. *SOF*, ¶ 50. The ICOA was a nonexclusive agreement, meaning GCC Moving was free to offer similar services and equipment to any other party, provided GCC Moving complied with certain federal requirements. *SOF*, ¶ 51. Under both ICOAs, GCC Moving was:

- free to accept or reject any shipment offered;
- responsible for providing drivers and ensuring all of its drivers drove in a safe manner and in compliance with all laws;
- solely responsible for providing, equipping, maintaining, and covering all expenses associated with equipment used under the contract;
- solely responsible for maintaining necessary insurance coverages, including statutory workers' compensation coverage for any workers domiciled in Massachusetts;
- explicitly *not* required to purchase any products, equipment, or services from Big E; and
- able to terminate the agreement upon 20 days' written notice.

*SOF*, ¶¶ 52-57.

The facts Cook points to in the Complaint as evidence of the control Big E exercised over him are requirements of federal law or of Big E's customers as opposed to control by Big E. As

Big E's expert declared, Big E had no choice but to comply with these requirements. *SOF*, ¶¶ 6, 59. For example, Cook states that Big E required him and his drivers to meet minimum driver qualification standards (*Compl.*, ¶¶ 33, 43, 44), undergo medical tests (*Compl.*, ¶ 34), comply with Big E's drug and alcohol testing policy (*Compl.*, ¶ 35), "brand" his trucks with the name of Estes or Big E (*Compl.*, ¶ 30), complete and provide summaries of vehicle maintenance inspections (*Compl.*, ¶ 36, 37), obtain consent before operating vehicles leased to Big E on behalf of other companies (*Compl.*, ¶ 45), and obtain the necessary governmental permits, licenses, and plates to operate the vehicles (*Compl.*, ¶ 46). None of the allegations withstand scrutiny.

The requirements Cook alleges constitute Big E's control over his business operations are no more than recitations of federal DOT requirements. *See, e.g.*, 49 C.F.R. Part 391 (in particular §§ 391.11 (general driver qualification standards), 391.43 (medical exams)); 49 C.F.R. Part 382 (drug and alcohol testing); 49 C.F.R. § 376.12(c)(2) (requiring carrier to have exclusive possession, control, and use of the equipment); 49 C.F.R. §§ 396.3, 396.17 (requiring carrier to ensure systematic inspections of all equipment operating under its authority and maintain records of such inspections); 49 C.F.R. § 390.21 (requiring motor carrier's name and DOT number be marked on vehicles operated under carrier's DOT authority); *see also SOF*, ¶ 6. Moreover, when Cook operated under his own DOT authority he was responsible for meeting all of these requirements. *SOF*, ¶ 7.

This Court regularly recognizes that contractual requirements dictated by federal regulations are not evidence of control. *See, e.g., Ruggiero v. Am. United Life Ins. Co.*, 137 F. Supp. 3d 104, 114 (D. Mass. 2015) (branding and promotional requirements and requirements that agency be a legal entity were attributable to federal securities law, not the putative employer's control and direction); *Santangelo v. N.Y. Life Ins. Co.*, Civ. Action No. 12–11295–

NMG, 2014 WL 3896323, at *9 (D. Mass. Aug. 7, 2014) ("A company does not exercise the requisite control necessary to create an employer-employee relationship merely because it restricts the manner or means of their work in order to comply with statutory and regulatory requirements."), *aff'd*, 785 F.3d 65 (1st Cir. Apr. 6, 2015); *see also Sebago, v. Bos. Cab Dispatch, Inc.*, 28 N.E.3d 1139, 1150 (Mass. 2015) (restrictions on taxi drivers' "appearance, cellular phone usage, ability to smoke, procedures for obtaining or refusing passengers, standards for the treatment of passengers, meter rates, and geographical areas of operation" were imposed by municipal regulation governing taxicabs, and not by defendant medallion owners or radio associations; plaintiffs were otherwise free from control and direction of defendants).

Nor are other allegations Cook points to as evidence of control indicative of the type of control Section 148B is concerned with because they are customer requirements or reflect generic necessities attendant to the provision of any delivery services. *See Jan-Pro Franchising Int'l, Inc. v. Depianti*, 712 S.E.2d 648 (Ga. Ct. App. 2011) ("Because some form of control—by a client or otherwise—is inherent in the performance of every service, such a strict reading of the [Massachusetts Independent Contractor] statute would yield the absurd result that every worker is an employee, no matter who exerts the control."); *Depianti v. Jan-Pro Franchising Intern., Inc.*, 39 F.Supp.3d 112, 125-26 (D. Mass. 2014) (adopting Georgia court's ruling on federal claim preclusion grounds and noting that "*Depianti Georgia* appears to be consistent with Massachusetts law."), *aff'd* No. 16-2256, 2017 WL 4324323 (1st Cir. Sept. 29, 2017).

For example, Cook argues the requirement that he and his employee drivers maintain cell phones (*Compl.*, ¶ 38) and the requirement that they wear uniforms or have other forms of identification (*Compl.*, ¶¶ 40, 41) indicate control. As stated in the ICOAs, those requirements reflect the dynamic nature of the services GCC Moving agreed to provide and the security concerns of customers, including residential customers in whose homes deliveries were made by

GCC Moving. *SOF*, ¶ 59. Similarly, instructing Cook or his drivers when and where to pick up and deliver cargo (*see Compl.*, ¶ 29) is a fundamental customer requirement. *SOF*, ¶ 59. Moreover, if no such information was provided to contractor drivers, there would be no way for them to perform the work Cook and GCC Moving agreed to perform—Plaintiffs' contention to the contrary is akin to hiring a contractor to deliver goods to a home but not telling the contractor the home's address or when the homeowner will be available to accept the delivery. Similarly, if drivers are not assigned any identifying number, it would be impossible for Big E to know which driver completed a given delivery and make sure the contractor is compensated. *SOF*, ¶ 59. The ICOAs set forth requirements necessary to outline the services to be provided, limited customer requirements, and compliance with federal law.[3] Cook was free from Big E's direction and control under the terms of the ICOAs, and the terms of the agreements support the conclusion that Cook entered his relationship with Big E understanding that he was an independent contractor responsible for his own business.[4]

### b.    Cook was in fact free from Big E's direction and control.

Not only was Cook free from Big E's direction and control under the terms of the ICOAs, but the undisputed evidence shows he was *in fact* free from such direction and control. Subject to the minimum driver requirements set by federal law, Cook was free to hire whomever he liked, and he frequently reached out to individuals he already knew to come and work for him. *SOF*, ¶¶

---

[3] Several requirements Cook cites as indicative of Big E's control are inaccurate. For example, Cook asserts he pulled trailers owned by Big E or Estes (Compl. ¶ 25), was required to "install and maintain the equipment used to ship [Big E's or Estes'] trailers in a safe condition" (Compl. ¶ 36), and had electronic onboard recorders installed and maintained by Big E in his trucks (Compl. ¶ 39). These allegations must be disregarded as there is no dispute that Cook drove box trucks that did not haul trailers and had no onboard recording devices. *SOF*, ¶¶ 21, 24.

[4] Cook's allegation that he never read the ICOAs is of no moment. It is a well-accepted principle of contract law that parties to a contract are presumed to have read and understood the contract's terms. *See, e.g., Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 170 F.3d 1, 23 (1st Cir. 1999); *Abbasciano v. Home Lines Agency, Inc.*, 144 F. Supp. 235, 236 (D. Mass. 1956) (recognizing well-settled law that "a party to a contract is legally bound by its terms whether or not he read them")

6, 13, 14, 53, 64, 65. Cook could negotiate the rates he received from Big E and paid his employees whatever he chose. *SOF*, ¶¶ 12, 17, 68. He chose to issue his employees debit cards to purchase fuel wherever they saw fit. *SOF*, ¶ 69. Cook could select the source from which he leased his vehicles and what type of insurance he purchased. *SOF*, ¶ 24, 55-57, 60. He was free to accept or reject any offered delivery opportunities, which allowed him to grow his business as he saw fit. *SOF*, ¶ 52, 63. He (or his drivers) determined what routes they would drive to complete GCC Moving's deliveries and were free to accept or reject any offered load. *SOF*, ¶¶ 19, 21. Cook and his drivers were not supervised by Big E with respect to how they loaded GCC Moving's vehicles or made deliveries. *SOF*, ¶¶ 20, 66, 67. GCC Moving's drivers worked out in the field alone.

In addition, Big E provided no training to Cook or his drivers; instead Cook himself trained his drivers by riding with them for at least the first day after he hired them. *SOF*, ¶¶ 16, 18, 84. Cook's operation became so substantial that he eventually chose not to personally drive at all and instead hired others to drive for him. *SOF*, ¶ 62, 81. He decided to not hire any helpers and instead served as a helper himself when needed. *SOF*, ¶ 76. He chose to hire a payroll company to help him manage his business affairs. *SOF*, ¶ 70. Cook also paid at least one individual who never drove as an employee of GCC Moving. *SOF* ¶¶ 73, 75. He chose whether to operate under Big E's DOT operating authority or his own authority (*SOF*, ¶ 43, 44, 46) and was the primary point of contact to relay customer requirements to his drivers. *SOF*, ¶ 83.

The undisputed facts demonstrate that Big E did not exercise—by contract or in fact—the type of direction or control indicative of an employer-employee relationship. Big E is entitled to summary judgment on Prong One of Section 148B.

### 3.      Prong 3 - Cook operated an independently established business.

Prong 3 of Section 148B asks whether the contractor is customarily engaged in an independently established trade, occupation, profession, or business. The critical inquiry under this prong is whether "the worker is capable of performing the service to anyone wishing to avail themselves of the services or, conversely, whether the nature of the business compels the worker to depend on a single employer for the continuation of the services." *Sebago,* 28 N.E.3d 1139, at 1153 (quoting *Athol Daily News v. Bd. of Review of the Div. of Emp. & Training*, 786 N.E.2d 365, 373 (Mass. 2003)). The facts here compel the answer "Yes."

Cook obtained DOT operating authority in 2004 when he was under contract with GTS—eight years before he first signed a contract with Big E—and he still holds that authority today. *SOF*, ¶¶ 29, 34. Cook used that authority to contract his services to GTS for five years. *SOF*, ¶ 31. While working as an independent contractor for GTS, Cook conducted his business in a similar manner as he did with Big E, initially operating just one truck but then choosing to hire multiple drivers and helpers and run multiple trucks to increase his profits. *SOF*, ¶ 32. Cook chose to end his contract with GTS in 2009 because "it wasn't profitable to do business with them anymore." *SOF*, ¶ 33.

When another business opportunity arose with Big E, Cook again chose to operate GCC Moving under his own DOT authority shorting after commencing work under the first ICOA. *SOF*, ¶ 43. He later decided to operate under Big E's authority, and then again operated under his own authority in 2015 under a new ICOA. *SOF*, ¶¶ 44, 46. Cook understood that in doing so, he would receive higher compensation. *SOF*, ¶ 46.

As a motor carrier, Cook was free provide services to any other carrier, shipper, or other entity. *SOF*, ¶¶ 25, 51. Nothing prohibited Cook from expanding his business to perform services for others. *SOF*, ¶ 51. Indeed, some of Big E's contractors do in fact use vehicles leased to Big E

for other purposes. *SOF*, ¶ 25. As an independent contractor with Big E, Cook was free to accept or reject any transportation opportunity offered to him by Big E or by any other company. *SOF*, ¶¶ 10, 11, 52.

In addition to the flexibility to provide services to whomever he chose, all other facts indicate Cook was operating a large and profitable independent business. For example, Cook kept his own detailed business records, engaged a payroll company, and filed business tax returns. *SOF*, ¶¶ 70, 77, 78, 80. He had substantial opportunity to expand his business with Big E and indeed expanded his operations from one truck he drove himself to 13 trucks out of seven terminals located in four different states. *SOF*, ¶ 63, 82. He could negotiate rates with Big E and accept or reject any opportunity or route offered to him. *SOF*, ¶¶ 10, 12, 52, 67. Cook could choose to hire whoever he wanted and pay them whatever he wanted. *SOF*, ¶¶ 13, 14, 17, 53, 55, 68. "Fundamentally, an employee cannot hire someone to perform their job at a lower wage rate then profit from the difference." *Expert Report of Robert W. Crandall* (attached to SOF as Exhibit D), ¶ 23.

Cook's earnings far exceeded those of his drivers. While Cook's drivers earned approximately $48,000 per year, he earned around $100,000 per year. *SOF*, ¶ 86. He made managerial and operational decisions that impacted his profit and loss. *SOF*, ¶ 85. For example, Cook reduced the number of trucks GCC Moving leased between 2014 and 2015, so that he generally had more drivers than trucks and could keep trucks moving with a higher utilization per truck in 2015 resulting in increased profits. *SOF*, ¶ 85. In addition, Cook chose whether to drive himself or act as a fill-in driver, which decision substantially impacted his profits. *SOF*, ¶ 62. He also chose not to hire helpers and instead served as a helper himself because then he could avoid the cost of paying another person and he found it easier to fill in himself on short notice. *SOF*, ¶ 76.

14

As further evidence that he operated an independent business, in late 2014, Cook formed a limited liability company under which he conducted his business. *SOF*, ¶¶ 26, 45. In fact, he even formed a second limited liability company, CT/VT Transportation, because his operations had grown so much that he had to subdivide his trucks between the two companies in order to obtain the necessary auto liability insurance. *SOF*, ¶¶ 46, 47. The evidence demonstrates without question that Cook operated GCC Moving as an independent business enterprise. For example, in *Debnam*, this Court granted defendant's summary judgment motion on independent contractor status because, among other reasons, the plaintiff's business employed others and filed business tax returns showing "substantial business income" that demonstrated a "legitimate independent contractor" relationship existed. *Debnam*, 2013 WL 5434142. In *Kubinec*, the court found that a taxi cab driver was an independent contractor because, in part, he established himself as an entrepreneur before entering any agreement with the defendants, he decided when and where to drive his cab, and he was not required to accept dispatches. *Kubinec v. Top Cab Dispatch, Inc.*, 2014 WL 3817016 at *14 (Mass. Supp. 2014); *accord Jan-Pro Franchising Int'l, Inc. v. Depianti*, 712 S.E.2d 648, (Ga. Ct. App. 2011).

## C.     The FAAAA preempts Plaintiffs' re-classification claims.

Regardless of the outcome under an analysis under Section 148B, Plaintiffs' claims nevertheless fail because the FAAAA preempts any state law or claim advanced under state law that "relate[s] to a price, route, or service of any motor carrier . . . broker, or freight forwarder with respect to the transportation of property." 49 U.S.C. § 14501(c)(1) (2013). By enacting the FAAAA, Congress expressed an "overarching goal . . . to help ensure transportation rates, routes, and services that reflect the maximum reliance on competitive market forces, thereby stimulating efficiency, innovation, and low prices, as well as variety and quality." *Rowe v. New Hampshire Motor Transp. Ass'n,* 552 U.S. 364, 371 (2008) (internal quotations omitted). The Supreme

Court has explained that the "ban on enacting or enforcing any law 'relating to rates, routes, or services' is most sensibly read . . . to mean States *may not seek to impose their own public policies* or theories of competition or regulation *on the operations* of [a motor] carrier." *American Airlines, Inc. v. Wolens,* 513 U.S. 219, 229 n.5 (1995) (emphasis added).[5] In other words, by enacting the FAAAA, Congress eliminated government interference with the private arrangements made between willing market participants in the transportation industry.

The FAAAA precludes Plaintiffs from using Massachusetts public policy regarding who should be considered an employee, embodied in Section 148B, as a basis to disrupt the enforcement and operation of the contracts they signed with Big E. The Supreme Court has explained that allowing such claims to proceed would be antithetical to Congress' deregulatory goals. "The stability and efficiency of the market depend fundamentally on the enforcement of agreements freely made, based on needs perceived by the contracting parties at the time." *Id.* at 230 (internal quotation omitted).

The First Circuit recently reached precisely this conclusion under Massachusetts law in *Schwann v. FedEx Ground Package System, Inc.*, 813 F.3d 429 (1st Cir. 2016). In *Schwann*, the First Circuit considered whether the FAAAA preempted an employee re-classification claim advanced under Prong 2 of Section 148B. *Id.* at 432. In deciding the claim was preempted, the court reasoned that "[t]he decision whether to provide a service directly, with one's own employee, or to procure the services of an independent contractor is a significant decision in designing and running a business." *Id.* at 438. It concluded that imposing the state's policy judgment about such a decision violates the mandate of the FAAAA because "[s]uch an

---

[5] The phrase of the FAAAA, "related to a price, route, or service," is taken from the earlier Airline Deregulation Act ("ADA"). *See Rowe*, 552 U.S. at 370. Consistent with the FAAAA's text and history, the Supreme Court has instructed that, in interpreting the FAAAA's preemption provision, courts should follow decisions interpreting the ADA's preemption clause. *Id.* at 371.

application of state law poses a serious potential impediment to the achievement of the FAAAA's objectives because a court, rather than the market participant, would ultimately determine what services that company provides and how it chooses to provide them." *Id.*

Here, Cook, on behalf of his company GCC Moving, entered into ICOAs with Big E to provide transportation services, including equipment and labor, as an independent contractor. *SOF*, ¶¶ 45, 46, 49, 50. The ICOAs detail the scope of the transportation services GCC Moving would provide, along with the financial terms for doing so. *SOF*, ¶ 48. The ICOAs include no requirement that GCC Moving recruit other drivers, but instead gave Cook the flexibility to perform driving services personally or by hiring other qualified drivers. *SOF*, ¶¶ 9, 13, 49, 53. Cook used this flexibility offered by the ICOAs to grow his business to operate as many as 13 trucks simultaneously and employ more than 20 drivers over the course of just three years. *SOF*, ¶ 63. In fact, Cook stopped personally providing driving services on a daily basis and instead hired others to perform the work, while earning double the income of his drivers. *SOF*, ¶¶ 62, 64, 86. Cook also used this flexibility to, at times, operate under his own DOT operating authority and earn a larger percentage of the revenue Big E received from the customer. *SOF*, ¶¶ 43, 46.

If this Court finds that Plaintiffs' proffered application of Section 148B compels classification of one or both of them as an employee of Big E, the result will run contrary to the FAAAA's deregulatory purpose of ensuring that the transportation industry is shaped by market forces and not the policies of Massachusetts. This is precisely the result Congress sought to eliminate when it enacted the FAAAA, which prohibits state regulation that impacts the services of carriers, brokers and freight forwarders to the detriment of the competitive market. *Rowe*, 552 U.S. at 372 ("[T]he effect of the regulation is that carriers will have to offer . . . services that differ significantly from those that, in the absence of the regulation, the market might dictate."). The FAAAA preempts Plaintiffs' reclassification claims.

**D.    The unjust enrichment claim fails because the relationship is governed by a contract.**

In Count II of the Complaint, Plaintiffs seek to recover under an alternative theory of unjust enrichment. But it is undisputed that GCC Moving's relationship with Big E emanates from the ICOAs Gary Cook signed on behalf of GCC Moving. *Compl.*, ¶¶ 21-23; *SOF*, ¶ 42. The ICOAs contain express provisions regarding the independent contractor relationship formed between the parties along with the costs GCC Moving and Cook agreed to bear—the same basis upon which GCC Moving and Cook's unjust enrichment claim seeks damages. *Compare* ¶¶ 5(a), 6, 8(a), 15(a), 17, 18(a), and Attachment B of the 2012 and 2015 ICOAs (attached to SOF as Exhibits J and M)*, with Compl.*, ¶ 109. The ICOAs therefore preclude recovery on the unjust enrichment claim, and Big E is entitled to summary judgment on that claim. *See In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 182 (D. Mass. 2003) ("Where a contract does govern the parties' relationship, the contract provides the measure of the plaintiff's right and no action for unjust enrichment lies.").

**E.    Cook and GCC Moving cannot recover deductions they authorized in the ICOAs.**

To the extent Big E is not granted summary judgment on GCC Moving and Cook's claims in their entirety, certain categories of damages Plaintiffs appear to seek are unrecoverable because the claims are preempted by the Leasing Regulations, 49 C.F.R. Part 376.

The Leasing Regulations allow owner-operators and motor carriers to choose how owner-operators will be paid for leasing their trucks to the carriers (i.e., as a percentage of gross revenue, by the mile, or any other agreed method). 49 C.F.R. § 376.12(d). The regulations also permit the parties to decide who shall be responsible for the costs and expenses of operating the trucks and allow such costs to be "initially paid for by the authorized carrier, but ultimately deducted from the lessor's compensation at the time of payment or settlement." *Id.* §§, (e), (h). If

the owner-operator is a party to an equipment rental contract, the Leasing Regulations expressly allow the parties to agree that the motor carrier pay, through settlement deductions, amounts the owner-operator owes the equipment rental company for truck lease or rental payments. *Id.*, § (i). Likewise, owner-operators can agree to purchase insurance through the carrier. *Id.*, § (j). The regulations also allow the parties to agree upon an escrow fund. *Id.*, § (k).

In the consolidated case *Remington v. J.B. Hunt Transport, Inc.*, Nos. 15-10010-RGS, 15-13019-RGS, 2016 WL 4975194, at *3 (D. Mass. Sept. 16, 2016), this Court held that owner-operators' claims of improper deductions were preempted by the Leasing Regulations "insofar as these deductions constitute permitted cost-sharing under a compliant lease." This Court reached its conclusion because "State law cannot dictate contract terms when federal law provides the freedom to negotiate." *Id.* at *5; *see also Valadez v. CSX Intermodal Terminals, Inc.*, No. 15-cv-5433, 2017 WL 1416883, at *7 (N.D. Cal. Apr. 10, 2017) ("[Plaintiffs'] claims are also preempted if the California Labor Code prohibits activities that the [Leasing Regulations] permit."); *Rodriguez v. RWA Trucking Co.*, 352 P.3d 881 (Cal. 2015).

It is far from clear precisely what GCC Moving and Cook are attempting to recover through this lawsuit, but it appears Cook seeks to recover expenses associated with trucks he didn't drive and business expenses he deducted on his tax returns. *SOF*, ¶ 90. To the extent Cook seeks to recover amounts he specifically authorized to be deducted from the compensation described in the ICOAs pursuant to the Leasing Regulations (for example, amounts for various insurances, cargo damage, permits and fee, etc., *see SOF,* ¶ 58), his claims are preempted by the federal Leasing Regulations.

## CONCLUSION

Cook, an individual with 15-plus years of experience in the transportation industry, including five years operating under his own DOT operating authority as an independent

contractor motor carrier, signed agreements with Big E to provide equipment and transportation services. Cook hired more than 20 drivers and operated up to 13 trucks simultaneously. As of June 2013, he only personally drove on an as-needed basis to fill in for his drivers. Big E paid Cook all compensation bargained for in the ICOAs—which compensation was sufficient to cover all his expenses and still earn him approximately $100,000 per year in profits. Section 148B does not apply to business entities like the one operated by Cook. But even if it did, the indisputable evidence demonstrates that Cook operated his own independent business, free from Big E's direction and control. As Cook testified, he "did what [he] wanted to." *SOF*, ¶ 76. In addition, Plaintiffs' claims are preempted by the FAAAA because successful prosecution of those claims would run contrary to the FAAAA's deregulatory purpose of ensuring that the transportation industry is shaped by market forces and not the policies of individual states. Cook's claim for recovery under a theory of unjust enrichment likewise fails because there can be no dispute that the ICOAs governed Cook's and GCC Moving's relationship with Big E. Finally, to the extent Plaintiffs seek to recover amounts deducted from their settlements pursuant to the ICOAs and the federal Leasing Regulations, those claims are preempted by those regulations. Big E is entitled to summary judgment on all of Plaintiffs' claims.

Respectfully submitted,


Dated: January 12, 2017

/s/ James T. Spolyar
Braden K. Core (Admitted *Pro Hac Vice*)
James T. Spolyar (Admitted *Pro Hac Vice*)
Scopelitis Garvin Light Hanson & Feary, P.C.
10 W. Market Street, Suite 1400
Indianapolis, IN 46204
Phone: (317) 637-1777
jspolyar@scopelitis.com
bcore@scopelitis.com

and

Judith A. Leggett (BBO#635346)
Leggett Law Firm, LLC
7 Tower Circle, Suite 2
Avon, MA 02322
Phone: (617) 780-7163
judith@leggettlawfirm.com

Attorneys for Defendant,
BIG E TRANSPORTATION, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on January 12, 2018, the foregoing document was filed electronically through the ECF System and is available for viewing and downloading from the ECF System, that it will be sent electronically to counsel of record identified as registered participants on the Notice of Electronic Filing, and that paper copies will be sent to those indicated as non-registered participants.

*/s/ James T. Spolyar*

4849-7243-9896, v. 14