**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| GCC MOVING, LLC | ) |
| GARY COOK d/b/a GCC MOVING, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| ESTES EXPRESS LINES, CORP, d/b/a, alias | )   Case No. 1:16-cv-11538-RGS |
| BIG E TRANSPORTATION (so-called), and | ) |
| BIG E TRANSPORTATION, LLC d/b/a, alia | ) |
| ESTES EXPRESS LINES (so-called); JOHN | ) |
| DOES 1-10, JANE ROES 1-10 and XYZ | ) |
| CORPORATIONS 1-10, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF DEFENDANT ESTES EXPRESS LINES'
MOTION FOR SUMMARY JUDGMENT**

Defendant Estes Express Lines respectfully submits the following points and authorities

in support of its Motion for Summary Judgment.

**INTRODUCTION**

In this action, Plaintiffs GCC Moving, LLC and Gary Cook d/b/a GCC Moving ("Cook"

and collectively with GCC Moving, LLC, "Plaintiffs") have sued defendants "Estes Express

Lines, Corp. d/b/a, *alias*, Big E. Transportation" ("Estes")[1] and "Big E Transportation, LLC

d/b/a, *alias* Estes Express Lines" ("Big E," and collectively with Estes, "Defendants"), alleging

that Defendants misclassified Cook as an independent contractor and, as a result, Cook suffered

damages in the form of lost wages and other expenses incurred.  (*See* Dkt. #1.)  The primary

reason Cook appears to have included Estes as a Defendant in this lawsuit is because Cook

mistakenly believed that Estes and Big E are "the same company."  However, as shown below,

---

[1] The Complaint incorrectly names Estes Express Lines as "Estes Express Lines, Corp."  (*See* Dkt. # 1 at 1.)

Big E and Estes are separate entities and Cook maintained no direct employment relationship of any kind with Estes.  As such, Estes is not responsible for any harm Cook allegedly incurred due to Big E's purported misclassification of him as an independent contractor, and all claims against Estes should be dismissed with prejudice.

In addition to the arguments set forth herein showing that Estes had no employment relationship with Plaintiffs and therefore cannot be held liable for any harm Plaintiffs allegedly incurred due to any purported misclassification as an independent contractor, Estes further adopts in full the arguments Big E asserts in its separate motion for summary judgment, including that (1) Plaintiffs were not misclassified as an independent contractor under Mass. Gen. Laws Ann. Ch. 149, § 148B, (2) the Federal Aviation Administration Authorization Act of 1994 preempts Plaintiffs' re-classification claims, (3) Plaintiffs' unjust enrichment claim fails because the relationship was governed by a contract, and (4) Plaintiffs cannot recover deductions Cook authorized in the ICOAs because those alleged damages are preempted by the Leasing Regulations, 49 C.F.R. Part 376.

## PROCEDURAL HISTORY

Plaintiffs filed their Complaint on July 26, 2016 (*see* Dkt. #1), and Estes answered on September 8, 2016 (*see* Dkt. #12).  The parties engaged in discovery pursuant to the Court's scheduling orders (*see* Dkt. #'s 29, 38, & 43), which set a final deadline of January 12, 2018 for filing dispositive motions (Dkt. # 43).  Estes files this timely motion for summary judgment seeking dismissal of all claims brought in this action.

## STATEMENT OF UNDISPUTED FACTS

Pursuant to Rule 56.1 of the Local Rules of the United States District Court for the District of Massachusetts, Estes has submitted its Statement of Undisputed Material Facts ("SOF") contemporaneously with its Motion for Summary Judgment.  Estes incorporates its SOF here by reference and briefly states as follows:

Estes is in the freight transportation (trucking) business, and operates nationwide as a "less than truckload motor carrier."  (SOF 1.)  Less than truckload "means the shipments that are tendered to the company are less than a truckload," so that "there are multiple shipments for multiple customers on the same truck."  (SOF 2.)  Both full-time and part-time employees, as well as independent contractors, assist Estes with transporting freight.  (SOF 3.)

Big E is a motor carrier that holds motor carrier operating authority granted by the U.S. Department of Transportation Federal Motor Carrier Safety Administration.  (SOF 4.)  Big E is a wholly owned subsidiary of Estes and provides Estes with independent contractors to assist Estes with specialized freight delivery services.  (SOF 5.)  Besides Estes, Big E provides independent contractor services to a number of other customers, including Amazon, Lord and Taylor, and Home Depot.  (SOF 6.)  The number of independent contractors Big E maintains depends on various factors, such as the amount of customers Big E has and the volume of work the customers provide to Big E.  (SOF 16.)  The needs of all of Big E's customers are weighed together when deciding whether Big E needs additional independent contractors.  (*Id.*)

From 2012 to 2015, Mike Raill worked as Big E's Northeast Regional Manager.  (SOF 42.)[2]  During that time, Keith Davis also worked for Big E as the Southeast regional manager, and was Raill's boss.  (SOF 43.)  As a regional manager of Big E, Raill's job responsibilities included recruiting new contractors for Big E when Big E's customers required additional

---

[2] Raill left in 2016 due to a reduction in business.  (SOF 42.)

delivery capacity.  (SOF 44.)  Raill provided the contractors information regarding the scope of

services needed.  (*Id.*)

Plaintiff Cook had previously worked with Raill at Bernie's Audio Video, where Cook

was a delivery driver.  (SOF 40.)  Raill and Cook were friends and regularly kept in touch.  (SOF

41.)  On or about February 2012, Raill contacted Cook and asked if Cook was interested in

working as an independent contractor for Big E.  (SOF 45.)  Cook filled out an "Application to

Become an Independent Contractor for Big E Transportation."  (SOF 47.)  Raill explained to

Cook that the application was for an independent contractor position.  (*Id.*)  According to Cook,

he "asked [Raill] who Big E was, and [Raill] said it's a company owned by Estes," which to

Cook that meant it was the same company.  (SOF 46.)

After Cook's application was approved, Cook d/b/a GCC Moving executed a "Big E

Transportation LLC Independent Contractor Operating Agreement" on or about March 10, 2012,

which was updated in or around November 2013 (the "2012 ICOA").  (SOF 48.)  In late 2014,

Cook formed two LLCs, GCC Moving, LLC (a party to this suit) and CT/VT Transportation,

LLC.  (SOF 49, 51.)  On or around January 1, 2015, Cook (on behalf of both GCC Moving, LLC

and CTVT Transportation, LLC) and Raill (on behalf of Big E), executed a second "Big E

Transportation LLC Independent Contractor Operating Agreement."  (SOF 50 (collectively with

the 2012 ICOA, the "ICOAs").)[3]

By signing the ICOAs, Cook acknowledged that his relationship with Big E was one of

independent contractor and not employee.  (SOF 57.)  A law firm drafted the ICOAs specifically

for Big E, and Big E oversaw any modifications thereto.  (SOF 48, 50, 53 (all signed by Raill).)

---

[3] As mentioned, Cook initially contracted with Big E under a d/b/a "GCC Moving," but in approximately late 2014, Cook chose to incorporate his business as GCC Moving, LLC.  Throughout this memorandum, references to "GCC Moving" refer to both Plaintiffs in this matter—Cook d/b/a GCC Moving, as well as GCC Moving, LLC.

The contractor's rates under the ICOAs was negotiable.  (SOF 17.)  Before signing such ICOAs,

Big E's independent contractors typically provided the agreements to their personal attorneys

and communicated any questions or concerns to Big E.  (SOF 54.)  Cook never felt like Raill did

not provide him an explanation for any paperwork provided to Cook.  (SOF 55.)

Pursuant to the ICOAs, GCC Moving agreed to provide Big E "professional truck driving

services, other incidental transportation related services and the use of [contractor's specified]

equipment" in exchange for the compensation specified in the agreements.  (SOF 56.)  GCC

Moving was responsible for providing drivers and ensuring all of its drivers drove in a safe

manner and in compliance with all laws.  (SOF 60.)  In addition, GCC Moving was solely

responsible for providing, equipping, maintaining, and covering all expenses associated with

equipment used under the ICOAs.  (SOF 61.)  The ICOAs were nonexclusive agreements,

meaning GCC Moving was free to offer similar services and equipment to any other party,

provided GCC Moving complied with certain federal requirements.  (SOF 58.)

Under the ICOAs, Cook hired his own drivers to service Big E's customers.  (SOF 68.)

When Cook first began as an independent contractor for Big E, he drove one truck, had no

employees of his own, and serviced Big E's customer, Estes.  (*Id.*)  However, not long after

Cook started as an independent contractor, Cook hired a driver who began operating a second

truck under Cook.  (*Id.*)  A few months later, in the fall of 2012, Cook hired another driver who

began operating a third truck under Cook.  (*Id.*)  By September 2013, Cook operated thirteen

(13) trucks that were all driven by Cook's own employees.  (*Id.*)  Cook's employees operated

trucks at multiple locations in multiple states.  (*Id.*)  During the approximate three-year period

that Cook operated as an independent contractor of Big E, Cook hired 20 or more employees to

work for him.  (*Id.*)  Cook also hired at least one non-driver employee to work for his business.  (SOF 86.)

Whenever issues arose with Cook's drivers, Estes did not contact the drivers directly.  (SOF 95.)  Instead, Estes contacted Big E, and Raill from Big E contacted Cook "in regards to [the] drivers that [Cook] was managing."  (SOF 95 ("as a course of policy, it would be Mike Raill would tell [Cook], [and Cook] would tell the drivers").)  Cook testified that by June 2013, he had stopped driving on a regular basis because he "spent most of [his] days on the phone or sending emails back and forth with [Raill]" to coordinate his business.  (SOF 92, 93.)  According to Cook, to manage his business and drive regularly "would be doing two jobs."  (SOF 92.)

With regard to the growth of Cook's business, when a customer like Estes needed another independent contractor, it would contact Big E and request another driver.  (SOF 69.)  Raill from Big E would then call one of its independent contractors, and request another truck.  (*Id.*)  "[T]hat was the extent of Estes' involvement." (*Id.*)  Although Cook could refuse to provide another driver to Big E, he never did because he hoped that he would make money from an additional truck.  (*Id.*)  Cook alleges Big E helped select three drivers for him to hire.  (SOF 97.)  Neither Estes nor Big E ever directed Cook to terminate any of his employees.  (*Id.*)

Cook trained his employee drivers by riding along with them on their first days of work to make sure they properly performed their jobs and showed them how to complete paperwork.  (SOF 23, 96.)  Although not all of Cook's trucks serviced Big E's customer Estes, most of them did.  (SOF 72.)  Cook's trucks would "go to [Estes] terminals and pick up freight" for delivery.  (*Id.*)  Upon arriving at an Estes terminal, Cook's drivers inspected the freight to ensure it was in good condition and loaded the freight on their trucks.  (SOF 75.)  Estes did not direct or

supervise how Cook or his drivers loaded their trucks.  (SOF 76.)  Cook's drivers could refuse freight that that they did not want to deliver.  (SOF 24.)  Nobody from Estes ever instructed Cook or his drivers to take any specific route in making deliveries, and Cook's drivers could select routes in order to complete deliveries more quickly and potentially earn more profit for Cook.  (SOF 77.)  When making deliveries, Cook's drivers wore red polo shirts with "Big E Transportation" for identification.  (SOF 73.)

At the end of each shift, Cook's drivers faxed their manifests to the Big E biller "so that Big E could bill Estes."  (SOF 80.)  Big E paid Cook, and Cook paid his drivers.  (SOF 85.) Cook directed all of his compensation inquiries to Raill at Big E.  (SOF 84.)  "Raill was [Cook's] point of contact for everything," and Cook did not speak with anyone other than Raill.  (SOF 94.) For example, when pay issues arose with Cook's employees, "Raill and [Cook] would have to sit on the phone and go through every pro number that was paid . . . ."  (SOF 84.)  Raill also handled any discrepancies in the amount of money Big E paid to Cook.  (*Id.*)

Due to the large network of trucks and employees that Cook operated, Cook made a substantial amount of money as an independent contractor, the profits of which he kept for himself.  (SOF 89.)  For instance, during the years 2013 and 2014, Cook's business grossed nearly $1 million dollars in revenue, and Cook made a profit of between approximately $99,000 and $110,000.  (*Id.*)  Cook reported GCC Moving's income on his individual tax returns on Schedule C, and deducted all the business expenses he could.  (*Id.*)  Cook engaged a payroll company to handle administration of his payroll and assist him in complying with tax reporting and withholding requirements.  (SOF 81.)  Estes did not instruct Cook what he had to pay his employees.  (SOF 78.)

The 2015 ICOA was terminated due to a reduction in customer demand for services. (SOF 98.)   Raill notified Cook on July 31, 2015 that the 2015 ICOA would be terminated effective August 21, 2015.   (*Id.*)   Thereafter, Cook moved to Florida but continued to run his business under the 2015 ICOA by having his drivers service Big E customers until the ICOA terminated on August 21, 2015.   (*Id.*)

## SUMMARY OF THE ARGUMENT

Through the complaint, Cook seeks recovery under Sections 148 and 150 of the Massachusetts Wage Act ("Wage Act"), alleging that Defendants misclassified him as an independent contractor in violation of Section 148B.   (Dkt. #1 at 1 & ¶¶ 54, 94-105.)   The misclassification claim appears to be brought only by Cook (not GCC Moving, LLC).   (*Id.* at 1.)[4] Even though Estes was not a party to the ICOAs and had no involvement with how Cook ran his business, Cook alleges that Estes is liable for his misclassification as an "alter ego" of Big E and/or an employer of Cook.   (*See id.* at ¶¶ 18, 94-105.)

In contrast to Cook's position, Big E and Estes operated as separate and distinct business entities, and there is no evidence of record that would warrant ignoring the corporate formalities to hold Estes liable for Cook's purported misclassification.   Moreover, Estes was not an employer of Cook, as Cook was properly classified as an independent contractor.   Indeed, under the ICOAs, Cook acknowledged that he operated his business as an independent contractor of Big E.  Estes did not draft, negotiate, or oversee the ICOAs.   In addition, Estes was not involved in the formation or management of Cook's business enterprises, nor did Estes manage Cook or

---

[4] Confusingly, the Complaint alleges that the entire case is "governed by the Massachusetts Wage Act," even though Count I purports that Cook alone was misclassified under Section 148B.   (Dkt. # 1, ¶ 107.)   In any event, GCC Moving, LLC cannot recover under the Massachusetts Wage Act because GCC Moving, LLC contracted with Big E as a business and operated a separate business enterprise.  *See Weinberg v. Grand Circle Travel, LCC*, 891 F. Supp. 2d 228 (D. Mass. 2012) (holding that Section 148B does not apply to contracts between companies).

his employees.  As a result, in the event the Court should find Cook was ever misclassified as an independent contractor, Estes cannot be liable for such misclassification because it maintained no employment relationship with Cook.

The Complaint's second claim is pleaded in the alternative based on a theory of unjust enrichment.  (*Id.*, ¶¶ 106-110.)  In particular, the complaint alleges that, by virtue of Defendants misclassifying Cook as an independent contractor, Defendants improperly shifted the burden of certain employer related expenses and have thus "been conferred a substantial and unwarranted benefit at the sole expense of Plaintiffs for which it would be wholly inequitable and unjust for them to retain." (*Id.* ¶ 109.)  However, GCC Moving, LLC cannot rely upon a theory of unjust enrichment because an express contract (*i.e.*, the ICOAs) governed the terms of the relationship between GCC Moving, LLC and Big E.  In addition, given that Estes has already paid Big E for all independent contractor services that GCC Moving, LLC provided, Estes was not unjustly enriched by GCC Moving, LLC's purported misclassification as an independent contractor.

## ARGUMENT

### I.   SUMMARY JUDGMENT STANDARD.

Summary judgment is proper where the evidence shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).  The moving party may show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The burden then shifts to the opposing party to set out specific facts showing a genuine issue for trial.  See Fed. R. Civ. P. 56(e).  "[T]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to defeat a motion for summary judgment]; there must be evidence

9

on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## II. COOK'S WAGE ACT CLAIM FAILS AS A MATTER OF LAW BECAUSE ESTES MAINTAINED NO EMPLOYMENT RELATIONSHIP WITH COOK.

### A. BIG E WAS NOT AN ALTER EGO OF ESTES.

Under Plaintiffs' first theory of recovery from Estes, the Complaint alleges, "[u]pon information and belief, Big E is one of the alter egos of Estes." (Dkt. # 1, ¶ 18.) As mentioned, the primary reason Plaintiffs appear to pursue this theory is due to Cook's mistaken belief that Estes and Big E are "the same company." However, the evidence of record establishes that is not the case.

"Related corporate entities are generally regarded as separate and distinct from their stockholders and from each other, *My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 618, 233 N.E.2d 748 (1968), and Massachusetts law requires significant evidence to pierce the corporate veil." *Cox v. Truck Servs.*, 2002 Mass. Super. LEXIS 91, at \*11 (Apr. 26, 2002). Common corporate ownership, or the existence of a parent-subsidiary relationship, standing alone, is insufficient to disregard the corporate form and hold the parent liable for the obligations of the subsidiary. *See id.* at \*12; *Dorn v. Astra USA*, 1997 U.S. Dist. LEXIS 7009, \*9-10 (D. Mass. Apr. 2, 1997); *Bennett v. OmniSource Corp.*, 2015 U.S. Dist. LEXIS 149262, \*8 (W.D. Va. Nov. 4, 2015). Instead, "[s]uch cases usually involve fraud or deceit, a co-mingling of corporate and personal assets, thin capitalization or non-observance of corporate formalities,

none of which are alleged or argued in this case." *Cox*, 2002 Mass. Super. LEXIS 91, at *12-13.[5]

In *Sebago v. Boston Cab Dispatch, Inc.*, 471 Mass. 321, 28 N.E.3d 1139 (2015), the Supreme Judicial Court of Massachusetts had opportunity to address similar allegations to the ones Plaintiffs raise in this case. In particular, the *Sebago* Court considered whether taxicab drivers who were classified as independent contractors could sue several corporate entities on the ground that they were all their "employers" for purposes of the Massachusetts Wage Act. *Id.* The *Sebago* Court held that disregard of the corporate form required analysis of a number of factors, generally including pervasive control, absence of corporate records, nonobservance of corporate formalities, confused intermingling of business assets, thin capitalization, and use of the corporation in promoting fraud. *Id.* at 328. The *Sebago* Court further concluded that where the "allegations are limited to common ownership and control, there is no cause to analyze the defendants as a single employer." *Id.* at 329.

Here, the Complaint contains no allegations that Defendants disregarded their corporate relationship as parent-subsidiary by co-mingling assets, undercapitalizing Big E, or disregarding corporate formalities. (*See* Dkt. #1.) Plaintiff's mere allegation that "Estes considers Big E as one of the 'Estes Companies,' and . . . Big E is a wholly owned subsidiary of Estes" (*Id.*, ¶ 17), is therefore far from sufficient to disregard Big E's corporate form and impute any alleged misclassification to Estes. *See Cox*, 2002 Mass. Super. LEXIS 91, at *12 ("Common ownership and management of the stock of two or more corporations alone do not justify piercing the corporate veil to impose liability . . . .").

---

[5] Estes is incorporated in Virginia, where the same piercing the corporate veil analysis applies. *See Dorn v. Astra USA*, 1997 U.S. Dist. LEXIS 7009, *9-10 (D. Mass. Apr. 2, 1997); *Bennett v. OmniSource Corp.*, 2015 U.S. Dist. LEXIS 149262, *8 (W.D. Va. Nov. 4, 2015).

Moreover, Big E operated as a separate entity from Estes, and Estes was one of several customers of Big E.  (*See, e.g.*, SOF ¶¶ 5-6.)   Although Big E was Estes' wholly owned subsidiary, Big E had its own employees who worked exclusively for Big E.  (SOF ¶¶ 5, 42-43.) Indeed, Raill, the Northeast regional manager that assisted Cook with his ICOAs, was a Big E regional manager and was supervised by a Big E manager.  (SOF 43-44.)  There is no evidence that Estes ignored the corporate form of Big E.  As a result, not only does the Complaint wholly fail to allege any details to support an alter ego theory, the evidence of record establishes that Estes and Big E cannot be liable under any such theory.  Under these circumstances, even if the Court were to find Cook was misclassified under his ICOAs with Big E (which it should not), no good reason exists to pierce the corporate veil and hold Estes liable for such misclassification. *See, e.g.*, *Cox*, 2002 Mass. Super. LEXIS 91, at *13 (dismissing the plaintiff's alter-ego theory because "[t]here is nothing on the record to suggest sufficient commingling of the operations of [the two corporations] for the court to disregard the corporate forms of these two separate corporations and hold Trans-Spec liable as an employer of the plaintiffs for an alleged violation of the prevailing wage statute").

**B.    ESTES DID NOT MAINTAIN ANY DIRECT EMPLOYMENT RELATIONSHIP WITH COOK AND WAS THEREFORE NOT COOK'S (JOINT) EMPLOYER.**

Under Cook's second theory of recovery from Estes, Cook apparently attempts to hold Estes liable as his employer, even though Estes was not a party to the ICOAs, and the ICOAs clearly established that Cook was an independent contractor of Big E.  (*See* Dkt. # 1, ¶¶ 21-24.)[6]

---

[6] Although the Complaint acknowledges that the ICOAs were between Cook and Big E, and there are no specific allegations that Estes was Cook's "employer," given that the Complaint repeatedly uses "Defendants" in the plural without distinguishing which Defendant is to blame for the allegations that purportedly support Cook's misclassification claim, Estes will detail the reasons it cannot be held liable under any joint employer theory of

In that regard, the Complaint alleges that "Defendants took great effort to try and mask the Contract as one consisting of an independent contractor relationship between Cook and Big E (alone)," but "the Contract is and has always constituted an employment contract between Cook (who later formed GCC) and Defendants." (*Id.* ¶¶ 48-49).[7]   Although far from clear, it thus appears Cook is pursuing a "joint employer" theory of recovery to hold Estes liable for his purported misclassification.

Joint employers may exist where two parties share control over an individual's employment. *Wilfert Bros. Realty Co. v. Mass. Comm'n Against Discrimination*, 2006 Mass. Super. LEXIS 142, at *5 (Mar. 21, 2006).   Traditionally, the theory is "applicable where an individual is paid by one party to perform work under contract for another." *Id.* at *5-6.   A finding of joint employer liability rests upon a determination of the following four factors: "(1) the employer's control over the employee's work, (2) the extent to which each employer directs the employee in the details of his job, (3) which employer issues the employee's paycheck, and (4) whether the employer has the authority to discharge the employee." *Id.* at *6 (citing *Stanley v. Gillette Co.*, 2 Mass. Discrimin. L. Rep. 1203, 1205 (1980)).[8]

---

recovery.  Moreover, as discussed in footnote 2 *supra,* Estes adopts in full the arguments Big E asserts in its separate motion for summary judgment, which further establish that Plaintiffs were not misclassified as an independent contractor under Mass. Gen. Laws Ann. Ch. 149, § 148B.

[7] It is worth highlighting that the ICOAs Cook executed with Big E clearly and unambiguously established that Plaintiffs would be an independent contractor of Big E.  (SOF 48, 50.)  Big E even explained to Cook that he would be contracting as an independent contractor.  (SOF 47.)  Therefore, any argument that Defendants have somehow attempted to "mask" the nature of this relationship is unfounded.

[8] In *Gallagher v. Cerebral Palsy of Massachusetts, Inc.*, 92 Mass. App. Ct. 207 (2017), the Court recognized that Massachusetts courts have not addressed "whether the statutory 'provision of services' test in § 148B supplants the common-law 'right to control' test for purposes of a joint employment theory of liability under the Wage Act or the overtime statute." *Id.* at 214.  However, should the Court find that § 148B's provision of services test applies, Cook's misclassification claim still fails for the reasons set forth in Big E's separate motion for summary judgment (which Estes adopts in full, *see* Footnote 2 *supra*), establishing that Plaintiffs were not misclassified as an independent contractor under § 148B's provision of services test and that the Federal Aviation Administration Authorization Act of 1994 preempts Plaintiffs' re-classification claims.

1. **Estes neither maintained control over Cook's work nor directed Cook in the details of his job.**

With regard to the first two joint employer factors involving the amount of control a putative employer exerts over the individual's work and the details of his job, the record evidence establishes that Estes maintained essentially no control over Cook's work or job. First, Cook had absolutely no contact with Estes about how he ran his business or any of the terms and conditions of his ICOAs, as he concedes he never spoke with anyone other than Big E about such issues. (*See, e.g.*, SOF 94.) Second, Big E negotiated and explained the ICOAs to Cook and handled all of Cook's paperwork. (*See, e.g.*, SOF 47, 55.) Estes neither drafted the ICOAs nor participated in their negotiation, and Estes did not have any influence on the decision for Big E to classify Cook as an independent contractor, as the contracts were between Big E and its contractors. (*See, e..g.*, SOF 17, 48, 50, 53.) Third, Cook testified that Big E was Cook's point of contact for everything, and handled all of his issues, including those related to the ICOAs and Cook's compensation. (SOF 84, 94.) Fourth, Estes had no involvement in training or selecting Cook as an independent contractor, nor did Estes possess authority to hire or terminate Cook or his employees. (SOF 44-45, 96, 97.) Fifth, even according to Plaintiff's own testimony, Estes went to great lengths not to manage, or give any appearance that it managed, Cook's employees. (SOF 95.) Instead, when issues with Cook's employees arose, Estes contacted Big E, and Mike Raill of Big E contacted Cook to report the issue. (*Id.*) Under these circumstances, the record evidence demonstrates that Estes maintained no control over Cook's work and did not direct the details of his job.

Notwithstanding Estes' lack of control over Cook, the Complaint contains an assortment of allegations that involve purported requirements of "Defendants" involving Cook's employees

and the safe operation and maintenance of Cook's trucks. (*See, e.g.*, *id.* ¶¶ 30-46.) However, those alleged requirements were part of the ICOAs (to which Estes was not a party) and are essentially mere recitations of federal DOT requirements. *See, e.g.*, 49 C.F.R. Part 391 (in particular §§ 391.11 (general driver qualification standards), 391.43 (medical exams)); 49 C.F.R. Part 382 (drug and alcohol testing); 49 C.F.R. § 376.12(c)(2) (requiring carrier to have exclusive possession, control, and use of the equipment); 49 C.F.R. §§ 396.3, 396.17 (requiring carrier to ensure systematic inspections of all equipment operating under its authority and maintain records of such inspections); 49 C.F.R. § 390.21 (requiring certain markings of the name of the motor carrier on vehicles operated under carrier's DOT authority); (*see also* SOF 10). Moreover, when Cook operated under his own DOT authority he was responsible for meeting all of these requirements. (SOF 11.) This Court regularly recognizes that contractual requirements dictated by federal regulations are not evidence of control. *See, e.g., Ruggiero v. Am. United Life Ins. Co.*, 137 F. Supp. 3d 104, 114 (D. Mass. 2015) (branding and promotional requirements not evidence of control); *Santangelo v. N.Y. Life Ins. Co.*, Civ. Action No. 12–11295–NMG, 2014 WL 3896323, at *9 (D. Mass. Aug. 7, 2014) ("A company does not exercise the requisite control necessary to create an employer-employee relationship merely because it restricts the manner or means of their work in order to comply with statutory and regulatory requirements."), *aff'd*, 785 F.3d 65 (1st Cir. Apr. 6, 2015); *Sebago, v. Bos. Cab Dispatch, Inc.*, 28 N.E.3d 1139, 1150 (Mass. 2015) (restrictions on taxi drivers' "appearance, cellular phone usage, ability to smoke, procedures for obtaining or refusing passengers, standards for the treatment of passengers, meter rates, and geographical areas of operation" were imposed by municipal regulation governing

taxicabs, and not by defendant medallion owners or radio associations; plaintiffs were otherwise free from control and direction of defendants).

Cook's remaining allegations concerning Estes' purported control over Cook are similarly insufficient to tip the joint employer control factor in his favor.  In that regard, the Complaint alleges that "all driver assignments, deliveries and routes provided to Cook . . . were assigned by the Defendants' terminal(s) (typically the Estes Terminal Manager)" (*id.* ¶ 29), Defendants required Cook "to wear Estes branded uniforms" (*id.* ¶ 40), and Cook was assigned a driver number by Defendants' Corporate Human Resources Department (*id.* ¶ 47).

In contrast to Cook's allegations, the record evidence reveals that Estes did not track routes or instruct Cook or his employees to take any specific route in order to arrive at a destination, and Cook's drivers could select routes in order to complete deliveries more quickly and potentially earn more profit for Cook.  (SOF 26, 77.)  In addition, Cook's drivers independently inspected their freight to ensure it was in good condition, nobody from Estes ever directed or supervised how Cook or his drivers loaded their trucks, and Cook and his drivers could refuse deliveries they did not want to accept.  (SOF 75, 76.)  Furthermore, Cook has testified that he wore a Big E (not Estes) polo shirt, and that the driver numbers Cook and his employees were each assigned were of no consequence, as Cook and Estes were only concerned with ensuring Cook's business received credit for the services Cook's employees performed (not with confirming that the driver's name was correct on any manifest).  (SOF 24, 73, 74.) Therefore, Cook's remaining allegations wholly fail to establish that Estes maintained the requisite control over his work or the details of his job to establish the existence of a joint employer relationship.

For all these reasons, the first and second joint employer factors weigh strongly in favor of the conclusion that Estes was not Cook's employer as it did not operate control over Cook's work or direct the details of Cook's job.

**2.      Estes did not issue Cook his compensation or maintain authority to terminate Cook.**

With respect to the final two joint employer factors (*i.e.*, which entity issued the putative employee's paycheck and whether the alleged employer had the authority to discharge the putative employee), the record evidence establishes that Big E issued Cook's compensation (not Estes), and that Estes did not possess any authority to terminate Cook.  Regarding compensation, Cook could negotiate his company's rates under the ICOAs, and Cook has testified that Big E handled all of his Compensation issues, including paying Cook for the work that his business generated.  (SOF 17, 84-85.)  The compensation  factor thus tips wholly in favor of Estes.

In regard to the termination factor, Estes did not maintain any authority to discharge Cook or terminate his ICOAs that were between Cook and Big E.  (SOF 48, 50, 97.)  Instead, the ICOAs could only be terminated by Cook or Big E upon 20 days' notice.  (SOF 64.)  Estes was not even a party to the ICOAs.  (SOF 48, 50.)  Simply put, the record is devoid of any evidence to support a conclusion that Estes possessed authority to terminate Cook or his contract with Big E.  Accordingly, the fourth joint employer factor tips strongly in favor of the conclusion that Estes was not Cook's joint employer.

In summary, due to the overwhelming evidence establishing that Estes did not (1) control Cook's work, (2) direct the details of his job, (3) issue Cook's compensation, or (4) possess authority to terminate his employment, all four joint employer factors tip strongly in favor of the conclusion that Estes was not Cook's joint employer.  Accordingly, even if the Court were to

conclude that Cook was misclassified under his ICOAs with Big E, Estes is not liable as Cook's employer for such misclassification.[9]

### III.     GCC MOVING, LLC'S UNJUST ENRICHMENT CLAIM FAILS AS A MATTER OF LAW BECAUSE ITS RELATIONSHIP WAS GOVERNED BY CONTRACT.

In Plaintiffs' second claim for relief, GCC Moving seeks to recover under an alternative theory of unjust enrichment.  (Dkt. # 1, ¶¶ 106-110.)   However, it is undisputed that GCC Moving's relationship with Big E arises out of the ICOAs that Cook signed on behalf of GCC Moving.   (*See, e.g.*, SOF 48, 50.)   The ICOAs contain express provisions regarding the independent contractor relationship formed between the parties along with the costs GCC Moving and Cook agreed to bear—the same basis upon which GCC Moving's unjust enrichment claim seeks damages. (Compare ICOAs, ¶¶ 5(a), 6, 8(a), 15(a), 17, 18(a), Attachment B, with Dkt. # 1, ¶ 109.)   The ICOAs therefore preclude recovery on the unjust enrichment claim, and Estes is entitled to summary judgment on that claim.  *See In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 182 (D. Mass. 2003) ("Where a contract does govern the parties' relationship, the contract provides the measure of the plaintiff's right and no action for unjust enrichment lies.").

### CONCLUSION

For all the foregoing reasons, the Court should dismiss all of Plaintiffs' claims against Estes with prejudice.

Dated:  January 12, 2018.

Respectfully Submitted,

---

[9] Moreover, due to the overwhelming evidence that Cook was a business enterprise and managed an approximately million dollar business with more than 20 employees working for him in four states, for the reasons detailed in Big E's separate summary judgment brief, Cook was not a mere "employee" of Estes.  *See* footnote 2, *supra.*

/s/ David L. Woodard
David L. Woodard / (Admitted *Pro Hac Vice*)
POYNER SPRUILL LLP
301 Fayetteville Street, Suite 1900
Raleigh, NC 27602
Ph:      (919) 783-6400
E-mail: dwoodard@poynerspruill.com

David L. Terry / (Admitted *Pro Hac Vice*)
POYNER SPRUILL LLP
301 S. College St., Suite 2300
Charlotte, NC 28202
Ph:      (704) 342-5250
E-mail: dterry@poynerspruill.com

Geoffrey R. Bok
STONEMAN, CHANDLER & MILLER, LLP
99 High Street
Boston, MA  02110
Ph:    (617) 542-6789
E-mail: gbok@scmllp.com

***Attorneys for Defendant Estes Express Lines***

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 12, 2018, the foregoing document was filed electronically through the CM/ECF System and is available for viewing and downloading from the CM/ECF System, that it will be sent electronically to counsel of record identified as registered participants on the Notice of Electronic Filing, and that paper copies will be sent to those indicated as non-registered participants.


*/s/ David Woodard*